**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
Bryan L. Clobes (to be admitted *pro hac vice*)
1101 Market St., Suite 2650
Philadelphia, PA 19107
Telephone: (215) 864-2800
E-Mail: bclobes@caffertyclobes.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENYATA JOHNSON. BARRY BRUNETTI, and DALENTA JAMERAL "D.J." STEPHENS, | No. |
| *Plaintiffs*, | **CLASS ACTION COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE BIG TEN CONFERENCE, INC., PACIFIC 12 CONFERENCE, THE BIG TWELVE CONFERENCE, INC., SOUTHEASTERN CONFERENCE, ATLANTIC COAST CONFERENCE, THE AMERICAN ATHLETIC CONFERENCE, WESTERN ATHLETIC CONFERENCE, CONFERENCE USA, MID-AMERICAN CONFERENCE, MOUNTAIN WEST CONFERENCE, and SUN BELT CONFERENCE, | CLASS ACTION |
| *Defendants*. | |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...........................................................................................................1

II. THE PARTIES ...............................................................................................................9

    A. Plaintiffs ............................................................................................................9

    B. Defendants .......................................................................................................11

    C. Co-Conspirators ..............................................................................................22

III. JURISDICTION AND VENUE ...................................................................................23

IV. THE RELEVANT MARKETS IMPACTED BY DEFENDANTS'
    UNLAWFUL ACTS .....................................................................................................25

    A. The NCAA Division I Football Labor Market ................................................25

        1. The Football Bowl Subdivision Labor Market has Distinct
            Competition for Players' Athletic Services ........................................26

        2. Grants-in-Aid are Commercial Transactions .....................................28

        3. The Football Bowl Subdivision Labor Market Constitutes a
            Separate Market from NCAA Division II, NCAA Division III,
            NAIA, and Community /Junior Colleges ...........................................29

        4. There Is Robust Competition Among NCAA Members in the
            Football Bowl Subdivision Labor Market to Recruit and Retain
            College Football Players .....................................................................32

        5. NCAA Members' Competition for Class Members' Labor Services
            Is Constrained by the Unlawful Athletics Grant-in-Aid Cap .......................33

        6. The Relevant Geographic Market ......................................................35

    B. The NCAA Division I Men's Basketball Labor Market ...........................................37

        1. The Division I Men's Basketball Labor Market Is Distinct .........................37

        2. Grants-in-Aid are Commercial Transactions .....................................40

        3. The Division I Men's Basketball Labor Market Constitutes a
            Separate Market from NCAA Division II, NCAA Division III,
            NAIA, and Community/Junior Colleges ............................................40

        4. There Is Robust Competition Among NCAA Members in the Division I
            Labor Market to Recruit and Retain College Basketball Players .................42

        5. NCAA Members' Competition Is Constrained by the Unlawful
            Athletics Grant-in-Aid Cap ...............................................................43

| | | | |
|---|---|---|---|
| V. | | FACTUAL ALLEGATIONS | 43 |
| | A. | An Overview of the NCAA | 43 |
| | | 1. The NCAA's History. | 43 |
| | | 2. The NCAA's Basic Structure. | 44 |
| | | 3. The NCAA's Purpose. | 47 |
| | | 4. The NCAA's Detailed Governance Structure. | 47 |
| | | 5. The NCAA Manual. | 48 |
| | | 6. The NCAA's Enforcement Structure. | 49 |
| | B. | The NCAA Bylaw Challenged in this Litigation | 52 |
| | | 1. Numerous reasonable and less-restrictive alternatives exist. | 57 |
| | C. | The NCAA's Public Statements Regarding the Pro-competitive Nature of the Proposed Stipend and Absence of Pro-competitive Justifications for Capping Compensation at Current Levels | 66 |
| | | 1. 2014 Statements. | 66 |
| | | 2. 2013 Statements. | 68 |
| | | 3. 2012 Statements. | 70 |
| | | 4. 2011 Statements. | 71 |
| | | 5. 2003 Statements. | 73 |
| | | 6. The recent history of the latest stipend proposal. | 73 |
| | D. | NCAA Conferences' Statements Regarding the Stipend Proposal | 79 |
| | | 1. The Pac-12. | 79 |
| | | 2. The Southeastern Conference. | 84 |
| | | 3. The Big Ten. | 87 |
| | | 4. The Big 12. | 91 |
| | | 5. The Atlantic Coast Conference. | 92 |
| | | 6. Additional Admissions by Defendant Conferences and Their Members that the Challenged Restraint Injures Competition | 93 |
| | | a. American Athletic Conference. | 93 |
| | | b. Conference USA. | 93 |

c. Sun Belt Conference. ...................................................94

d. Mountain West Conference. ..........................................94

e. Mid-American Conference. ...........................................95

7. Additional Admissions from Other Division I Conferences and Their
Members that the Challenged Restraint Injures Competition ......................95

a. Atlantic 10 ...................................................................95

b. Big East Conference .....................................................96

c. Metro Atlantic Athletic Conference ..............................96

d. Horizon League ............................................................96

E. Football Bowl Subdivision Football Players Seek the Ability to Compete
without Anticompetitive Restraint in the Football Bowl Subdivision Labor
Market ..........................................................................................................97

F. Other Statements Supporting the Stipend Proposal .......................................98

G. NCAA Members' Statements against the Stipend Proposal Show that
Opposition is Not Based on Valid Antitrust Defenses, but Rather Serve
Primarily as Cost-Cutting Efforts or as a Means of Substituting the Judgment
of the Cartel for that of the Market ...............................................................99

H. Major College Football and Basketball Are Highly Commercialized
Businesses, not Charitable Endeavors ..........................................................103

I. Former NCAA Executive Director, Walter Byers, Makes Clear in his Book
that the Purpose of NCAA Rules is to Fix Prices .........................................114

J. Reality of College Athlete Life ....................................................................118

K. Defendants' Likely Affirmative Defenses Do Not Apply .............................121

1. Academic Consensus That Amateurism Is A Façade ...........................121

2. "Amateur College Athletics," "Amateur College Basketball,"
"Amateur College Football," "Division I Men's Basketball,"
and "Division I Football Bowl Subdivision Football" All Will
Continue to Exist ................................................................................124

3. Competitive Balance Will Not Be Impacted. ......................................128

4. Emmert Statements regarding inter-conference competition
(other than with respect to the alleged collusion) and the lack
of competitive balance within Division I .............................................132

5. Education Will Remain A Condition Of Athlete Eligibility. .................133

VI. INTERSTATE TRADE AND COMMERCE .................................................................133

VII.    CLASS ACTION ALLEGATIONS ..............................................................................135

VIII.   ANTITRUST ALLEGATIONS ...................................................................................137

FIRST CLAIM FOR RELIEF  *PER SE* VIOLATION OF § 1 OF THE
SHERMAN ACT, 15 U.S.C. § 1 (Against All Defendants) ................................138

SECOND CLAIM FOR RELIEF  VIOLATION OF § 1 OF THE SHERMAN
ACT, 15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE "*QUICK
LOOK*" RULE OF REASON ANALYSIS (Against All Defendants)...............................139

THIRD CLAIM FOR RELIEF  VIOLATION OF § 1 OF THE SHERMAN
ACT, 15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE FULL
RULE OF REASON ANALYSIS (Against All Defendants) .............................141

FOURTH CLAIM FOR RELIEF  VIOLATION OF SECTION 1 OF THE SHERMAN
ACT—15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE —GROUP
BOYCOTT/REFUSAL TO DEAL (Against All Defendants)............................................142

PRAYER FOR RELIEF ....................................................................................................144

DEMAND FOR JURY TRIAL ..........................................................................................144

1    Plaintiffs Kenyata Johnson, Barry Brunetti, and Dalenta Jameral "D.J." Stephens

2 (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, hereby bring

3 class action claims against Defendant National Collegiate Athletic Association ("NCAA"), five of

4 the most powerful members of the NCAA, the so-called "Power Conferences," *i.e.*, Defendants Pac-

5 12 Conference, The Big Ten Conference, Inc., The Big 12 Conference, Inc., Southeastern

6 Conference, and Atlantic Coast Conference (the Power Conferences are also collectively referred to

7 herein as the "Power Conference Defendants"), and six other powerful NCAA member conferences,

8 Defendants The American Athletic Conference, Conference USA, Mid-American Conference,

9 Mountain West Conference, Sun Belt Conference, and Western Athletic Conference.  Collectively,

10 the Conferences are referred to as the "Conference Defendants."

11    Plaintiffs, by and through their attorneys, allege as follows:

12

**I.  INTRODUCTION**

13   1.  This case is about Defendants' unlawful restraint of trade in three labor markets in

14 college sports.  The relevant labor markets are (1) the market for NCAA Division I football player

15 services; and (2) the market for NCAA Division I men's basketball player services.  In these labor

16 markets, college athletes work and perform for their schools.  In exchange, schools pay the athletes

17 with athletic scholarships (known as "grants-in-aid").  The NCAA and its members have unlawfully

18 agreed that no college will pay an athlete any amount for his or her work that exceeds the value of a

19 grant-in-aid, and have agreed that the allowed grant-in-aid does not compensate for the full cost of

20 attendance.

21   2.  The Defendants readily admit the existence of this restraint, as they must.  It is

22 expressly memorialized in the NCAA Bylaws.  The Defendants have ample power to enforce their

23 restraint.  They collectively share "monopsony" power over college athletes.  The NCAA and its

24 members are "the only game in town" when it comes to compensating college athletes for their

25 services.  In enacting the challenged restraint, the NCAA and its members have the ultimate power to

26 artificially depress compensation to college athletes.  If a top-tier athlete doesn't like it, he or she

27

28

---

essentially has no reasonably close alternative.  That is the nature of a monopsony.[1]  Instead of a free market, a market controlled by a monopsonist is a "take it or leave it" market.  The labor markets herein are prime examples of "take it or leave it" markets.

3.      College football and basketball is a big business for the universities and conferences that are members of Division I, the NCAA's top-tier.  In particular, Division I football and basketball generates billions of dollars a year in revenue.  Not a single dollar of that revenue, however, would exist if it were not for the efforts of the players themselves.

4.      Players are essentially working full-time football and basketball jobs while going to school.  The NCAA and the Conference Defendants have studied and acknowledged that a so-called "full ride" scholarship does not cover the full cost of attending school.  Athletes are often a few thousand dollars short for the typical expenses of a student.  These costs include money for gas, food, and other necessities.  While players scrimp, coaches and universities most certainly do not.  For example, the average salary for major college football coaches is over $2 million per year, with some coaches earning over $7 million.  The top football schools earn enormous amounts from football.  For example, team annual revenue for the top five programs in 2011-12 was as follows:

| | |
|---|---|
| Texas: | $109,000,000 |
| Michigan: | $ 85,229,247 |
| Alabama: | $ 81,993,762 |
| Auburn: | $ 77,170,242 |
| Georgia: | $ 74,989,418 |

5.      Revenue is not the only large number, profits are also high.  Alabama's football program made $47 million in 2012 and Texas made $81 million.  Profits at other schools are as follows:

---

[1] A monopoly is a similar concept in regards to dominant power, except that it refers to a seller having dominant power, instead of a buyer having dominant power.

| Top 10 schools for 2012 profit | |
|---|---|
| **School** | **Profit (in millions)** |
| Texas | $81.7 |
| Alabama | $47.1 |
| Michigan | $58.4 |
| Notre Dame | $46.0 |
| Georgia | $51.3 |
| Auburn | $38.8 |
| Florida | $49.1 |
| LSU | $48.5 |
| Oklahoma | $45.1 |
| Arkansas | $31.6[2] |

6.     Football is not the only top revenue maker.  Basketball is a major revenue producer:

| Basketball Program Rank | Basketball's Rank Among Football and Basketball Programs | | |
|---|---|---|---|
| 1 | 22 | Louisville | $42,434,684 |
| 2 | 43 | Syracuse | $25,888,761 |
| 3 | 45 | Duke | $25,665,732 |
| 4 | 51 | North Carolina | $24,881,106 |
| 5 | 60 | Kentucky | $21,598,681 |
| 6 | 63 | Arizona | $20,749,807 |
| 7 | 66 | Michigan State | $19,807,794 |
| 8 | 68 | Texas | $18,478,467 |
| 9 | 70 | Indiana | $18,289,795 |
| 10 | 71 | Ohio State | $18,121,349 |

7.     How is it that players cannot even make ends meet while the schools make tens of millions of dollars in profit?  The NCAA and the Conference Defendants have agreed that Division I

---

[2] Stefan Stevenson, *Expenses Rise in Business of College Football, but Business Is Good for Nation's Elite*, STAR-TELEGRAM, Dec. 18, 2013, *available at* http://www.star-telegram.com/2013/12/17/5427172/expenses-rise-in-business-of-college.html#storylink=cpy.

football and basketball players may only receive payments that the NCAA approves.  The primary form of payment is an athletic scholarship, formally known as a "grant-in-aid" (or "GIA").  The NCAA and Conference Defendants have agreed to unlawfully cap the value of a grant-in-aid at an amount substantially below what a football or basketball player would receive for his or her services in a competitive market, and at an amount below what it costs to attend school.  This agreement violates the Sherman Act.

8.      The value of a grant-in-aid is often several thousand dollars below the actual cost of attending a school (the "Cost of Attendance," an amount published by each school).  In the highly competitive marketplace of Division I FBS football and basketball, every player unquestionably would receive a grant-in-aid that actually covers the Cost of Attendance.  Indeed, as shown in great detail below, each of the Defendants stated that if they were not bound by the collusive agreement among themselves and their co-conspirators that comprise Division I, they would implement such an increase.  Moreover, if collusion among conferences were eliminated, every player likely would receive further *additional* compensation above the Cost of Attendance.

9.      Plaintiffs, on behalf of proposed classes of (1) Division I FBS football players and (2) men's Division I basketball players, who received grants-in-aid at any time between March 5, 2010 (four years prior to the date of the first-filed complaint in this case, the *Alston* case) and the present, seek a specific remedy via this Complaint—an award of damages for the difference between the grants-in-aid awarded and the Cost of Attendance.  Plaintiffs believe that their damages request is a reasonable, conservative estimate of the minimum harm to all Class Members.

10.      Numerous reasonable and less restrictive alternatives to Defendants' current anticompetitive practices are available.  For example, one less-restrictive alternative may be to allow the Conference Defendants to compete among themselves and against their co-conspirator conferences as to the financial aid terms that conference members will make available to college players.  Such incremental competition would allay the fears (even though unfounded) of those that decry the repercussions of an instantaneous transition to a wide-open free market, with every school making its own independent decisions.

11.     The NCAA, through its President, Mark Emmert, repeatedly acknowledged that the capped grant-in-aid is insufficient to meet even the basic economic needs of college athletes.  He stated in December 2013 that, "we've been working on that for 2½ years.  They were talking about that long before I showed up.  We don't need a lawsuit to do the right thing.  That's important for people to know."[3]  In fact, the NCAA created the issue in the first place, first by imposing a collusive cap on grants-in-aid in 1956, and then by removing a Cost of Attendance stipend in 1976.  Ever since, the NCAA has periodically been "working" on the issue, with no significant changes to the capped grant-in-aid limitations.  Despite the NCAA's public comments concerning the needs of college athletes, the collusive cap on grants-in-aid remains in place.

12.     At a typical NCAA member institution, however, the allowable costs covered by an athletics "grant-in-aid" are in fact several thousand dollars short, per year, per athlete, compared to what it actually costs a college athlete to attend school.  The NCAA quite accurately calls the larger cost number the "Cost of Attendance," which the NCAA defines in its rules as "an amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the institution."  Through collusive agreement among all Division I members of the NCAA, the artificial cap on athletics financial aid is set below the amount of the full Cost of Attendance that any student would incur to attend the relevant colleges and universities.  This agreement is enshrined in the Bylaws of the NCAA which serve, in essence, as the contract (as in the Sherman Act's prohibition on any contract, combination, or conspiracy in restraint of trade) among the conspirators, making the agreement explicit, and authorizing various cartel-policing measures against any school that violates the price-fixing agreement.  The NCAA thus arbitrarily restricts athletics financial aid to amounts that are less than the athletes would receive in a competitive market and then enforces that agreement through threat of sanctions ranging from loss of the ability to compete (through loss of scholarships) all the way to a full collective boycott of all other members

---

[3] Nicole Auerbach, *NCAA's Emmert Not Talking Settlement in O'Bannon Lawsuit*, USA TODAY, Dec. 11, 2013, *available at* http://www.usatoday.com/story/sports/college/2013/12/11/mark-emmert-ncaa-lawsuit-ed-obannon-ea-sports-collegiate-licensing-co/3987907/.

CLASS ACTION COMPLAINT

known colloquially as "the death penalty."  The NCAA thus arbitrarily restricts athletics financial aid to amounts that are less than the athletes would receive in a competitive market.

13.     A 2012 study concluded that "[i]n 2011-2012, the range of out-of-pocket expenses for a 'full' scholarship athlete in the Football Bowl Subdivision was $1000/year to $6904/year depending on the institution.  Meanwhile, the NCAA restricts the value of the full scholarship to a level of compensation that is at or below the poverty level for many athletes at a time when, according to President of IMG College, Ben Sutton, 'college sport is indisputably on fire' in terms of its capacity to generate revenue and television ratings."  The same can be said for "full" scholarship athletes in Division I college basketball.

14.     By denying players the benefits of economic competition, the grant-in-aid cap has imposed a lower standard of living and significant hardships on many of them.  Those athletes have much less time and ability to earn money through part-time jobs than do other students.  Those athletes are more likely to come from low-income households than other students.  Those athletes are more likely to incur substantial travel costs to attend school than other students.  Indeed, the NCAA has exacerbated the effects of the grant-in-aid cap by collusively restricting the ability of Class Members to earn extra money through part-time work.

15.     The NCAA's conduct violates the federal antitrust laws.  The NCAA, the Conference Defendants, and their member schools have illegally colluded to artificially depress the value of an athletics grant-in-aid, to the economic detriment of Plaintiffs and Class Members.  The NCAA and its members have further agreed not to compete with respect to grants-in-aid for athletes.  The artificial cap on grants-in-aid is set well below what schools would choose to offer to athletes in the absence of collusion.  And it is clear that among members of the Conference Defendants, non-collusive scholarship offers would rise to at least cover the full Cost of Attendance, and likely much more.  The NCAA thus arbitrarily restricts athletics financial aid to amounts that are less than the athletes would receive in a competitive market.

16.     There is no reasonable justification or legal defense for the athletics grant-in-aid cap. In particular, the athletics grant-in-aid cap is not necessary to promote any interest in preserving the

NCAA's dubious version of "amateurism." Rather, the NCAA's athletics grant-in-aid cap is simply a cost containment mechanism that enables the NCAA and its member institutions to preserve more of the benefits of their lucrative enterprise for themselves.

17. After the NCAA's own Board of Governors recently approved a proposal to allow so-called "stipends" to cover the gap between the capped grants-in-aid and the true Cost of Attendance as being fully compatible with the principles of "amateurism" as the NCAA defines them, the NCAA's members overrode that approval and rejected it. The NCAA stated that members rejected the proposal because of a desire to control costs, and not for a pro-competitive objective. However, under the antitrust laws, a defendant's desire to save costs—and thereby increase profits at the expense of other participants in the market—is not a legitimate justification for the grant-in-aid cap or any other horizontal agreement to restrict price or output.

18. Defendants have been very successful at suppressing the basic economic rights of players under their direct control. The NCAA does so, in part, by cloaking its actions in governmental terminology, such as "Constitution" and "legislation" and "infraction" to relentlessly reinforce the notion that its powers are coterminous with that of a governmental regulatory body. But the NCAA is not a governmental entity. It is simply a collection of independent businesses, no different than any other in this country, and should be treated as such.

19. Defendants historically created, structured, and maintained the athletics grant-in-aid *not* as a device to increase consumer welfare or to increase the volume or quality of their output. The athletics grant-in-aid limitations were not designed to boost demand for their product, meaning game attendance or television viewership. Instead, Defendants designed the athletics grant-in-aid, from its inception, as a means to evade the requirements of labor and workers' compensation laws, and as an aid to their risk management and cost containment.

20. Defendants' actions are at odds with basic economics. Normally, the quality and output of laborers in a market will rise when they are incented with the prospect of competitive compensation. By suppressing athletes' compensation far below competitive levels, the NCAA and the Conference Defendants have deprived consumers of the potential opportunity of seeing numerous

players remain in the college system for longer periods of time.  Increased continuity of players leads to increased skill levels of teams, and greater fan affinity with, and recognition of, players whom they see perform for longer periods of time.

21.     For example, it was reported in June of this year that "[f]ormer Connecticut basketball star Richard Hamilton said Thursday that he would have stayed in school for his senior year if college athletes were allowed to be paid by the NCAA.  'I would have stayed in school,' Hamilton said.  'I think so, I think so.  For me it was about timing but also about financial situation.  It was a chance to take care of the people that took care of you your entire life.  Sometimes when you're in college, you can't do the stuff you want to do for financial reasons.  If you have people helping you out of the NCAA helping you out, I think guys would think twice about going to the NBA.  (If you're getting paid) a lot of needs, not wants, but their needs are taken care of.'"  Hamilton continued that "[k]ids are struggling.  They've got families at home.  A lot of times it's our first situation to get out.  We understand what we have at home and the type of struggle your mom and dad are going through."

22.     The leadership of the NCAA has, for several years, made copious public statements *directly supporting*, in part, the structural relief that Plaintiffs seek here—the lifting of the artificial cap on the value of athletics grants-in-aid.  The NCAA Board of Directors, rather than arguing that a cap below the Cost of Attendance is necessary to produce college football and basketball, voted for the exact opposite—demonstrating that such an increase in the cap would have no adverse anticompetitive effects on the sport.  Moreover, the leadership of every major NCAA member conference (including all the Conference Defendants) has made similar public statements of support.  Additionally, numerous high-profile school administrators and coaches have also made similar public statements of support.  And yet, year after year, no actual change is made.

23.     Defendants insist on acting collectively and collusively with each other, or not acting at all.  But they also admit that it is their collusion with other NCAA members that prevents them from acting.  Why?  Because they all have agreed to be bound by outmoded and anticompetitive NCAA Bylaws.  Defendants thus repeatedly claim powerlessness, year after year, to change their

1   lucrative status quo, because smaller NCAA members will not agree to the change.  Were the

2   Conference Defendants to act independently (not just as a narrower cartel, but truly independently),

3   each would raise the grant-in-aid cap above the current levels.  Defendants have proven to be unable

4   to, in the words of NCAA President Emmert, "self-regulate."  Plaintiffs request this Court's

5   assistance to require Defendants to comply with the law.

**II.      THE PARTIES**

6

7   **A.      Plaintiffs**

8          **1.      Division I Football FBS Class Representatives**

9          24.      **Plaintiff Barry Brunetti** was a quarterback for the West Virginia University

10  Mountaineers and University of Mississippi Rebels.  Brunetti is a resident of Memphis, Tennessee.

11  In 2010, when Brunetti played at West Virginia, it was a member of the Defendant Big East

12  Conference.  In 2011, Brunetti transferred to the University of Mississippi, where he played

13  quarterback for the Rebels.  Brunetti played football at Mississippi for three years.  The University of

14  Mississippi is a member of Defendant Southeastern Conference.

15         25.      Brunetti was a 4-star recruit by Rivals.com.  Brunetti was a Parade High School All-

16  American team member and EA Sports second-team All-American, among other prestigious

17  distinctions.  Brunetti was recruited by numerous FBS schools including Duke University, University

18  of Louisville, Marshall University, University of Memphis, Mississippi State, Pennsylvania State

19  University, Purdue University and University of Tulsa.  Brunetti received multiple athletic

20  scholarship offers for his football ability.

21         26.      In 2010, Brunetti accepted a one-year athletic scholarship from West Virginia

22  University, limited to the amount of a full grant-in-aid scholarship as required under the NCAA rules

23  agreed upon by Defendants, their member institutions, and co-conspirators.

24         27.      In 2011, Brunetti accepted a one-year athletic scholarship from the University of

25  Mississippi, limited to the amount of a full grant-in-aid scholarship as required under the NCAA

26  rules agreed upon by Defendants, their member institutions, and co-conspirators.  Brunetti's athletic

27  scholarship was renewed in 2012 and 2013.

28

CLASS ACTION COMPLAINT

28.     Given his academic and athletic obligations, it was not feasible for Brunetti to work during the academic year.

29.     As a direct result of Defendants' violation of federal antitrust and other laws described herein, Plaintiff Brunetti has been injured in his business or property in an amount to be proven at trial.

30.     **Plaintiff Kenyata Johnson** was a starting linebacker for the University of Memphis Tigers from 2011-2012, during his Junior and Senior years. Johnson is a resident of Memphis, Tennessee.  During his two years at Memphis, the Tigers were a member of Defendant Conference USA.  Johnson attended Hinds Community College from 2009-2010, and played his first two years of eligibility there before transferring to Memphis.

31.     Johnson was rated as a 3-star recruit by Rivals.com.  Johnson was recruited by numerous FBS schools in addition to Memphis, including East Carolina University, University of Central Florida, New Mexico State, and Marshall University.  Johnson received multiple athletic scholarship offers for his football ability.

32.     In 2011, Johnson accepted a one-year athletic scholarship from the University of Memphis, limited to the amount of a full grant-in-aid scholarship as required under the NCAA rules agreed upon by Defendants, their member institutions, and co-conspirators.  Johnson's athletic scholarship was renewed for the 2012-13 season.

33.     Given his academic and athletic obligations, it was not feasible for Johnson to work during the academic year.

34.     As a direct result of Defendants' violation of federal antitrust and other laws described herein, Plaintiff Brunetti has been injured in his business or property in an amount to be proven at trial.

**2.     Men's Division I Basketball Class Representative**

35.     **Plaintiff Dalenta Jameral "D.J." Stephens** was a four-year Forward/Guard for the University of Memphis Tigers.  Stephens is a resident of Collierville, Tennessee.  The University of

Memphis was a member of Defendant Conference USA until it joined the American Athletic Conference beginning during the 2013-2014 seasons.

36.     Stephens was rated as a 3-star recruit by Rivals.com.  Stephens was recruited by numerous Division I schools, including Sam Houston State University, University of San Diego, University of San Francisco, and Western Kentucky University.  Stephens received multiple athletic scholarship offers for his basketball ability.

37.     In 2009, Stephens accepted a one-year athletic scholarship from Memphis, limited to the amount of a full grant-in-aid scholarship as required under the NCAA rules agreed upon by Defendants, their member institutions, and co-conspirators.  Stephen's athletic scholarship was renewed in 2010, 2011 and 2012.

38.     Given his academic and athletic obligations, it was not feasible for Stephens to work during the academic year.

39.     As a direct result of Defendants' violation of federal antitrust and other laws described herein, Plaintiff Stephens was injured in his business or property in an amount to be proven at trial.

**B.     Defendants**

40.     Defendant the National Collegiate Athletic Association (the "NCAA") describes itself as an "unincorporated not-for-profit educational organization founded in 1906," and maintains its principal place of business in Indianapolis, Indiana.  The NCAA further states that it "is the organization through which the colleges and universities of the nation speak and act on athletic matters at the national level."  It is composed of more than 1,200 colleges, universities, and athletic conferences, including the Conference Defendants, located throughout the United States.

41.     Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports.  The NCAA Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions.  Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its members and between members of the NCAA.  With respect

1    to the Division I "grant-in-aid" they constitute a series of annually renewed, horizontal price-fixing

2    agreements.

3          42.      The NCAA includes 1,102 active member schools, and these schools are organized

4    into three Divisions.  Division I includes 351 schools, including 242 with extensive football

5    programs.  Divisions II and III include schools with much less extensive or no football programs.  As

6    a practical matter, any academic institution that wishes to participate in any meaningful way in the

7    highest and most popular levels of college football must maintain membership in the NCAA and

8    abide by the Division I rules and regulations promulgated by the NCAA and its members.  There is

9    no practical alternative to Division I NCAA membership for any academic institution that wishes to

10    participate at the highest levels of college football and/or basketball.

11          43.      Because the NCAA and NCAA member institutions control the highest and most

12    popular levels of college football and basketball, any individual who wishes to provide athletic

13    services in exchange for the payment of full tuition for an undergraduate academic and athletic

14    education must, by necessity, attend an NCAA Division I member institution.  There are zero

15    practical alternatives that can provide the unique combination of attributes offered by Division I

16    NCAA football and basketball schools, including:  (i) the ability to exchange athletics services for

17    the payment of educational costs plus room and board; (ii) high quality academic educational

18    services; (iii) top-of-the-line training facilities; (iv) high quality coaches that will best be able to

19    launch players to professional careers; (v) national publicity through nationwide scheduling of games

20    and nationwide broadcasting contracts; and (vi) competition at the highest level of college football

21    by competing for the same institution where one is also a student.

22          44.      There is no major college football or basketball program in the United States that is

23    not an NCAA Division I member, abiding by the NCAA rules.  Division I NCAA member

24    institutions are by far the largest purchasers of student football and basketball labor in the United

25    States, and the NCAA and its Division I member institutions have monopsony power over the

26    markets for student football and basketball players.

27          45.      The NCAA maintains a staff of over 300 individuals at its headquarters, and has an

28

CLASS ACTION COMPLAINT

1    $800 million annual budget.[4]

2        46.    Defendant NCAA during the Class Period participated in the collusive restraint of

3    trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

4        47.    **Defendant Pac-12 Conference ("Pac-12")** is an unincorporated association, with its

5    principal place of business located in this District at 1350 Treat Boulevard, Suite 500, Walnut Creek,

6    CA 94597.  The Pac-12 is a multi-sport collegiate athletic conference, and a formal "conference

7    member" of Defendant NCAA's Division I.  In its 2011 IRS Form 990, the most recent one available

8    for public inspection, the Pac-12 identified itself as a tax-exempt organization pursuant to section

9    501(c)(3) of the U.S. Internal Revenue Code, and stated that, for its fiscal year ending June 30, 2012,

10   it obtained gross revenues of $175,898,248.  The Pac-12's "2013-14 Handbook" states that the Pac-

11   12 was organized for purposes including:  "[t]o provide its members with a jointly governed body for

12   sponsoring, supervising and regulating intercollegiate athletics as a conference member of the

13   National Collegiate Athletics Association ('NCAA') in accordance with the principles, policies,

14   constitution and bylaws of the NCAA" and "[t]o assist its members in funding and promoting their

15   intercollegiate athletics programs."

16       48.    For the purpose of collegiate football and basketball, the Pac-12's current members

17   are the following 12 institutions:  University of Arizona, Arizona State University, University of

18   California, Berkeley, University of Colorado, University of Oregon, Oregon State University,

19   Stanford University, University of California, Los Angeles, University of Southern California,

20   University of Utah, University of Washington, and Washington State University.  All of the Pac-12's

21   football members are also members of the NCAA's Division I, Football Bowl Subdivision.

22       49.    The Pac-12 is one of ten NCAA member conferences that managed, until this

23   January, the highly lucrative Bowl Championship Series, which identified itself as "a five-game

24   college football showcase."  The Bowl Championship Series, which has recently been retired in

25   favor of the "College Football Playoff" system, was "designed to ensure that the two top-rated teams

26

27   _____
         [4] Ben Steverman, *The Real Cost of March Madness*, BLOOMBERG, Mar. 21, 2012,
     http://www.bloomberg.com/consumer-spending/2012-03-21/the-real-cost-of-march-
28   madness.html#slide5.

CLASS ACTION COMPLAINT

in the country meet in the national championship game, and to create exciting and competitive matchups among eight other highly regarded teams in four other [postseason] bowl games." The Pac-12 was one of six "automatic qualifying" conferences for Bowl Championship Series purposes, and is an acknowledged Power Conference. This meant that the Pac-12 received an automatic berth into one of the five Bowl Championship Series postseason bowl games.

50.     The Pac-12 is now one of the managers and members of an entity called CFP Administration, LLC, an entity organized on June 10, 2013 under the laws of Delaware and headquartered in Irving, Texas. That entity will organize the "College Football Playoff" ("CFP") a football playoff system. The College Football Playoff describes itself as follows: "Beginning with the 2014-15 season, college football will enter a new four-team playoff era. The format is simple: the best four teams, two semifinals played in bowl games and a championship game played in a different city each year. It's the best of all worlds and the biggest innovation in the sport in decades." The CFP continues that "[e]very FBS team will have equal access to the playoff based on its performance" and the "[t]he popularity of the new format will increase revenue for all conferences and independent institutions." The CFP continues as follows:

> The FBS conferences will manage the College Football Playoff. All 10 conferences are members of the new entity—CFP Administration, LLC. University presidents and chancellors from all 10 conferences and Notre Dame form the Board of Managers and will govern the administrative operations, with commissioners (the Management Committee) and managing the event with guidance from an advisory group of athletics directors. A small staff in the playoff's office in Irving, Texas, will carry out the detailed responsibilities.

51.     *The New York Times* reported in August 2013 that the television network ESPN signed a 12-year, $7.3 billion deal to televise the College Football Playoff.

52.     Defendant Pac-12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

53.     **Defendant The Big Ten Conference, Inc. (the "Big Ten")** is a nonprofit corporation, organized under the laws of Delaware, with its principal place of business located at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport collegiate athletic

conference, and a formal "conference member" of Defendant NCAA's Division I.  In its 2011 IRS Form 990, the most recent one available for public inspection, the Big Ten identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for its fiscal year ending June 30, 2012, it obtained gross revenue of $315,479,314.  In its 2010 IRS Form 990, the Big Ten identified its mission as "to promote and regulate inter-collegiate athletic programs, encourage sound academic principles, and foster collegiality among our eleven member institutions, all of which are prestigious, non-profit educational institutions."

54.    For the purpose of collegiate football and basketball, the Big Ten's members are the following 12 institutions:  University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska-Lincoln, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, and University of Wisconsin-Madison.  On July 1, 2014, the University of Maryland and Rutgers University became members of the Big Ten Conference, bringing total membership to 14.  All of the Big Ten's football members are also members of the NCAA's Division I, Football Bowl Subdivision.  The Big Ten was an automatic qualifying conference for Bowl Championship Series purposes and is an acknowledged Power Conference.

55.    The Big Ten is now one of the managers and members of an entity called CFP Administration, LLC, an entity organized on June 10, 2013 under the laws of Delaware and headquartered in Irving, Texas.  That entity will manage the lucrative "College Football Playoff" ("CFP"), a football playoff system described herein.  Further details regarding the Big Ten are provided herein.

56.    Defendant Big Ten during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

57.    **Defendant The Big 12 Conference, Inc. ("Big 12")** is a nonprofit corporation organized under the laws of Delaware, with its principal place of business located at 400 East John Carpenter Freeway, Irving, Texas 75062.  The Big 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I.  In its 2011 IRS Form 990, the

most recent one available for public inspection, the Big 12 stated that it was formed in 1996, is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for its fiscal year ending June 30, 2012, it obtained gross revenue of $159,510,4398.  The Big 12 further stated in its IRS filing that its mission is to "organize, promote and administer intercollegiate athletics among its member institutions" and to "optimize revenues and provide supporting service sompatible [sic] with both academic and competitive excellence."

58.     For the purpose of collegiate football and basketball, the Big 12's current members are the following 10 institutions:  Baylor University, Iowa State University, University of Kansas, Kansas State University, University of Oklahoma, Oklahoma State University, University of Texas at Austin, Texas Christian University, Texas Tech University, and West Virginia University.  All of the Big 12's football members are also members of the NCAA's Division I, Football Bowl Subdivision.  The Big 12 was an automatic qualifying conference for Bowl Championship Series purposes and is an acknowledged Power Conference.

59.     The Big 12 is now one of the managers and members of an entity called CFP Administration, LLC, an entity organized on June 10, 2013 under the laws of Delaware and headquartered in Irving, Texas.  That entity will manage the lucrative "College Football Playoff" ("CFP"), a football playoff system described herein.  Further details regarding the Big 12 are provided herein.

60.     Defendant Big 12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

61.     **Defendant Southeastern Conference ("SEC")** is an unincorporated association, with its principal place of business located at 2201 Richard Arrington Boulevard North, Birmingham, AL 35203-1103.  The SEC is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I.  In its 2011 IRS Form 990, the most recent one available for public inspection, the SEC identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for its fiscal year ending August 31, 2012, it obtained revenues of $273,063,526.  It further identified its mission is to "promote and

administer intercollegiate athletic competition among its 14 member institutions located in the Southeastern United States."

62.     For the purpose of collegiate football and basketball, the SEC's current members are the following 14 institutions:  University of Florida, University of Georgia, University of Kentucky, University of Missouri, University of South Carolina, University of Tennessee, Vanderbilt University, University of Alabama, University of Arkansas, Auburn University, Louisiana State University, University of Mississippi, Mississippi State University, and Texas A&M University.  All of the SEC's football members are also members of the NCAA's Division I, Football Bowl Subdivision.  The SEC was an automatic qualifying conference for Bowl Championship Series purposes and is an acknowledged Power Conference.

63.     The SEC is now one of the managers and members of an entity called CFP Administration, LLC, an entity organized on June 10, 2013 under the laws of Delaware and headquartered in Irving, Texas.  That entity will manage the lucrative "College Football Playoff" ("CFP"), a football playoff system described herein.  Further details regarding the Southeastern Conference are provided herein.

64.     Defendant SEC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

65.     **Defendant Atlantic Coast Conference ("ACC")** is an unincorporated association with its principal place of business located at 4512 Weybridge Lane, Greensboro, North Carolina 27407.  The ACC is a multi-sport collegiate athletic conference and a formal "conference member" of Defendant NCAA's Division I.  In its 2011 U.S. Internal Revenue Service ("IRS") Form 990, the most recent one available for public inspection, the ACC stated that it was formed in 1953, is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for its fiscal year ending June 30, 2012, it obtained gross revenue of $224,076,000.  The ACC further stated in its IRS filing that it "exists to promote and regulate inter-collegiate athletic programs for and among twelve member institutions, all of which are non-profit educational institutions."  It also

1    identified itself as a corporation in that IRS filing, although elsewhere it has identified itself as an

2    unincorporated non-profit association.

3         66.    For the purpose of collegiate football and basketball, the ACC's current members are

4    the following 14 institutions:  Boston College, Clemson University, Duke University, Florida State

5    University, Georgia Institute of Technology ("Georgia Tech"), University of Maryland, College Park

6    ("Maryland"), University of Miami, University of North Carolina at Chapel Hill, North Carolina

7    State University, University of Pittsburgh, Syracuse University, University of Virginia, Virginia

8    Polytechnic Institute and State University ("Virginia Tech"), and Wake Forest University.  On July

9    1, 2014, the University of Louisville became an ACC member, and Maryland departed the ACC to

10   join the Big Ten Conference.  Also, as the ACC stated in its 2012-13 annual report, the University of

11   Notre Dame "officially joined the ACC on July 1, 2013 . . . Notre Dame will compete as a full

12   member in all conference sponsored sports with the exception of football, which will play five games

13   annually against league programs."  The ACC was an automatic qualifying conference for Bowl

14   Championship Series purposes and is an acknowledged Power Conference.

15        67.    Defendant ACC is now one of the managers and members of an entity called CFP

16   Administration, LLC, an entity organized on June 10, 2013 under the laws of Delaware and

17   headquartered in Irving, Texas.  That entity will manage the lucrative "College Football Playoff"

18   ("CFP"), a football playoff system described herein.  Further details regarding the ACC are provided

19   herein.

20        68.    Defendant ACC during the Class Period participated in the collusive restraint of trade

21   and other violations of law alleged in this Complaint, has thereby damaged Class Members.

22        69.    Defendants Pac-12, Big Ten, Big 12, SEC, and ACC are collectively referred to

23   herein as the "Power Conference Defendants."

24        70.    **Defendant American Athletic Conference**, f/k/a The Big East Conference

25   ("American") is an incorporated association, with its principal place of business located at 15 Park

26   Row West, 3rd Floor, Providence, RI 02903.  American is a multi-sport athletic conference, and a

27   formal "conference member" of Defendant NCAA's Division I.  Each of the Conference Defendants,

28

CLASS ACTION COMPLAINT

including American, profits significantly from their FBS and D-IA basketball programs. From 2014-15 through the 2019-20 school year, American is expected to receive $20 million annually for both football and basketball through its contract with ESPN. American was also rumored to be close to signing a deal with CBS for select basketball games that would pay American approximately $2 million per year. American includes the following member institutions: University of Central Florida, University of Cincinnati, University of Connecticut, University of Houston, University of Louisville, University of Memphis, Rutgers University, Southern Methodist University, University of South Florida, and Temple University. As of July 1, 2014, Tulane University, East Carolina University, and the University of Tulsa, all formerly members of Conference USA, joined American. In 2015-16, the U.S. Naval Academy will join for football only.

71.     Defendant American during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

72.     **Defendant Conference USA** is an incorporated association, with its principal place of business located at 5201 N. O'Connor Blvd., Irving, Texas. Conference USA is a multi-sport athletic conference, and a formal "conference member" of Defendant NCAA's D-IA. Each of the Conference Defendants, including Conference USA, profits significantly from their FBS and D-IA basketball programs. Conference USA signed a television deal in early 2011 with FOX and CBS, worth $14 million per year. Conference USA includes the following member institutions: University of North Carolina–Charlotte, Florida International University, Florida Atlantic University, Louisiana Tech University, Middle Tennessee State University, University of North Texas, Old Dominion University, University of Texas—San Antonio, Marshall University, Rice University, University of Southern Mississippi, UAB, and University of Texas–El Paso. Old Dominion University and the University of North Carolina–Charlotte are not members of the conference for football. On July 1, 2014, Western Kentucky University joined Conference USA from Defendant Sun Belt Conference.

73.     Defendant Conference USA during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

74.     **Defendant the Mid-American Conference** ("MAC") is an incorporated association, with its principal place of business located at 24 Public Square, 15th Floor, Cleveland, OH 44113-2214.  The MAC is a multi-sport athletic conference, and a formal "conference member" of Defendant NCAA's D-IA.  Each of the Conference Defendants, including the MAC, profits significantly from their FBS and D-IA basketball programs.  In 2009, ESPN signed a multi-year deal with the MAC that provided for a minimum of 25 events annually to be produced and aired on an ESPN platform.  In February of 2014, ESPN and MAC announced they had agreed to a deal to allow ESPN to launch a digital MAC Conference Channel.  The MAC includes the following member institutions:  University of Akron, Ball State University, Bowling Green State University, University of Buffalo, Central Michigan University, Eastern Michigan University, Kent State University, Miami (Ohio) University, Northern Illinois University, Ohio University, University of Toledo, University of Massachusetts, and Western Michigan University.

75.     Defendant MAC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

76.     **Defendant Mountain West Conference** ("MWC") is an incorporated association, with its principal place of business located at 10807 New Allegiance Dr., Suite 250, Colorado Springs, CO 80921.  MWC is a multi-sport athletic conference, and a formal conference member of Defendant NCAA's D-IA.  Each of the Conference Defendants, including MWC, profits significantly from their FBS and D-IA basketball programs.  In 2013, MWC announced an agreement in principle for ESPN to carry the rights for football and men's basketball starting in 2013 and ending after the 2019-20 season for $116 million.  MWC includes the following member institutions:  Boise State University, California State University-Fresno, U.S. Air Force Academy, Colorado State University, San Diego State University, San Jose State University, University of New Mexico, University of Nevada-Las Vegas, University of Nevada-Reno, Utah State University,

1    University of Wyoming, and University of Hawaii—Mānoa.  The University of Hawaii—Mānoa is a

2    member for football only.

3         77.    Defendant MWC during the Class Period participated in the collusive restraint of

4    trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

5         78.    **Defendant Sun Belt Conference** ("Sun Belt") is an incorporated association, with its

6    principal place of business located at 1500 Sugar Bowl Drive, New Orleans, LA 70112.  The Sun

7    Belt is a multi-sport athletic conference, and a formal conference member of Defendant NCAA's D-

8    IA.  Each of the Conference Defendants, including the Sun Belt, profits significantly from their FBS

9    and D-IA basketball programs.  The Sun Belt entered into a deal with ESPN in 2011 for broadcasting

10   rights through the 2019-20 season.  The Sun Belt includes the following member institutions:

11   Arkansas State University, Georgia State University, University of Louisiana-Lafayette, University

12   of Louisiana-Monroe, University of South Alabama, Texas State University, Troy University,

13   University of Arkansas-Little Rock, and University of Texas-Arlington.  The University of

14   Arkansas-Little Rock and University of Texas-Arlington are not members of the conference for

15   football.  On July 1, 2014, Western Kentucky University left the conference to join Conference USA.

16   In 2014, Appalachian State University and Georgia Southern University joined as all-sports members

17   and University of Idaho and New Mexico State University joined as football playing members.

18        79.    Defendant Sun Belt during the Class Period participated in the collusive restraint of

19   trade and other violations of law alleged in this Complaint, and has thereby damaged Class

20   Members.

21        80.    **Defendant Western Athletic Conference ("WAC")** is a nonprofit entity with its

22   principal place of business at 9250 E. Costilla Avenue, Suite 300, Englewood, CO 80112.  The WAC

23   is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant

24   NCAA's Division I.  In its 2012 IRS Form 990, the most recent one available for public inspection,

25   the WAC stated that it is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal

26   Revenue Code, and that, for its fiscal year ending June 30, 2013, it obtained gross revenue of

27   $17,414,222.  In a press release dated July 1, 2014, the WAC stated that "[a]fter completing its 52nd

28

CLASS ACTION COMPLAINT

year of intercollegiate competition, the Western Athletic Conference continues to evolve and feature some of the nation's best programs. One thing that remains unchanged is the persistent nature of the schools in the WAC to advance their programs to contend at the top levels of the NCAA." The WAC continues that it "has experienced tremendous success over the years. In men's basketball, the WAC has sent at least two teams to the NCAA Tournament in 28 of the past 40 seasons . . . . The WAC also sent teams to three BCS football bowl games since 2006." The WAC further states in its IRS filing that its it "incurs expenses . . . that ensure that each of the schools and its entire athletic programs, including coaches, student-athletes, administrators and staff remain in compliance with bylaws and rules established by the NCAA."

81.     During the Class Period, the WAC was an NCAA FBS conference for football purposes until after the 2012-13 season. As such, until that time it had a permanent seat on the NCAA Division I Board of Directors along with all other FBS conferences. Throughout the Class Period, the WAC has been a member of Division I for purposes of men's basketball.

82.     Defendant WAC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Class Members.

83.     Whenever in this Complaint Plaintiffs make reference to any act, deed, or transaction of a Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the Defendant's business or affairs.

**C.     Co-Conspirators**

84.     Various other persons, firms, corporations, and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein, including the NCAA's Division I member schools and non-Defendant Division I conferences. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and other violations alleged herein.

85.     At all relevant times, each co-conspirator was an agent of Defendants and each of the remaining co-conspirators, and in doing the acts alleged herein, was acting within the course and

1  scope of such agency.  Defendants and each co-conspirator ratified and/or authorized the wrongful

2  acts of Defendants and each of the other co-conspirators.  Defendants and the co-conspirators, and

3  each of them, are participants as aiders and abettors in the improper acts and transactions that are the

4  subject of this action.

### III.   JURISDICTION AND VENUE

6      86.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal

7  question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under

8  Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§

9  15(a) and 26.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d),

10  because this is a class action in which the matter in controversy exceeds the sum or value of

11  $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are

12  citizens of a state different from any Defendant.  This Court also has supplemental subject matter

13  jurisdiction with respect to the pendent state law claims pursuant to 28 U.S.C. § 1367.

14      87.   Venue is proper in this District because Defendants reside, are found, and have agents

15  in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Section 4 of the Clayton Act, 15

16  U.S.C. § 15.  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in

17  this District.  The athletics grant-in-aid cap applies to college athletes who have competed, or

18  presently do compete, for NCAA member institutions in this District, the NCAA sanctioned Division

19  I athletics events that regularly take place in this District, including regular-season football and

20  basketball games played by local schools and post-season events such as football bowl games and

21  NCAA postseason tournament basketball games, and numerous members of the proposed Class

22  reside in this District.

23      88.   This Court has personal jurisdiction over Defendants because, *inter alia*, they:  (a)

24  transact business throughout the United States, including in this District; (b) participate in organizing

25  intercollegiate athletic contests as well as licensing and selling merchandise and products, including

26  television events such as football bowl games and basketball pre- and post-season tournament games,

27  throughout the United States, including in this District; (c) have substantial contacts within the

28

CLASS ACTION COMPLAINT

United States, including in this District; and (d) are engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and/or doing business throughout the United States, including in this District.

89.    Additionally, NCAA Division I member schools are found within this District, such as the University of California, Berkeley and Stanford University, both members of Defendant Pac-12.  Additionally located in this District are several schools that are members of co-conspirator NCAA conferences, specifically USF, St. Mary's, Santa Clara, and San Jose State.  Moreover, NCAA Power Conference and Defendant Pac-12 is headquartered within this District in Walnut Creek, California.

90.    In July 2011, rivals.com evaluated "the top 10 states that produced Bowl Championship Series signees over the past 10 years."  It ranked California third in the nation, and stated that "California's large population is a key to its high number of Bowl Championship Series signees.  California, Stanford, UCLA and USC don't have to go very far to find high-quality players.  The other schools in what was the Pac-10 (now Pac-12) have also feasted on California talent, as have programs such as Colorado and Notre Dame.  This state has produced tons of top-level talent."  As alluded to, California's population is the largest in the nation by a very wide margin, and the recruiting patterns of the Power Conference Defendants' members reflect that, as they continuously and systematically travel and communicate into California to recruit California football and basketball players.

91.    Moreover, the NCAA conducted its Annual Convention in California this year.  The NCAA, the Power Conference Defendants, and other NCAA members expressly debated and discussed the subject matter detailed in this Complaint, and reinforced and ratified their agreements to not presently allow NCAA members to exceed the grant-in-aid cap up to the Cost of Attendance, and to not allow NCAA members to exceed the Cost of Attendance.

1    ## IV.    THE RELEVANT MARKETS IMPACTED BY DEFENDANTS' UNLAWFUL ACTS

2          92.    Plaintiffs herein set forth the following relevant markets: (1) the NCAA Division I

3    Football Labor Market; and (2) the NCAA Division I Men's Basketball Labor Market.  Each is

4    described in more detail below.

5    **A.    The NCAA Division I Football Labor Market**

6          93.              This relevant market is the nationwide market for the labor of NCAA Division

7    I college football players.  In this labor market, current and prospective college students compete for

8    roster spots on Division I football teams.  NCAA Division I member institutions compete to obtain

9    and retain the best Division I football players by paying in-kind benefits, namely, Division I football

10   scholarships, access to academic programs, access to training facilities, and instruction from premier

11   coaches.  In some cases, the capped compensation includes pay in cash, through the provision of a

12   housing and food allowance, but in all cases the amount of in-kind and cash compensation is strictly

13   capped by means of the conspiracy alleged herein.

14         94.    NCAA Division I football is further divided into two subdivisions, Football Bowl

15   Subdivision and Football Championship Subdivision.  The Football Bowl Subdivision constitutes a

16   distinct submarket within the broader labor market for Division I college football players.  Plaintiffs

17   only seek damages with respect to the Football Bowl Subdivision submarket, in which all of the

18   Conference Defendants' member teams compete.  The Football Bowl Subdivision Labor submarket

19   is referred to herein as the "Football Bowl Subdivision Labor Market."  The level of football played

20   by those schools that acquire their athletes through the Football Bowl Subdivision Labor Market is

21   referred to herein as "Major College Football."

22         95.    NCAA rules currently permit the award of 85 full scholarships for Football Bowl

23   Subdivision teams, and 63 full scholarships for Football Championship Subdivision teams (in the

24   latter case, those scholarships may be spread over 85 athletes).  Division I football programs compete

25   at the highest level of college football.  They generate millions of dollars in revenue from revenue

26   streams including game attendance ticket revenue, TV contracts, corporate sponsorships,

27   merchandise sales and licensing, and alumni contributions.

28

CLASS ACTION COMPLAINT

96.     The enormous revenues generated by Division I football programs is spent on multi-million dollar coaching contracts to provide superior coaching, new playing and training facilities, and travel to play games at opponents' increasingly distant locations (which take athletes away from school often for several days at a time.)

    1.     **The Football Bowl Subdivision Labor Market has Distinct Competition for Players' Athletic Services**

97.     The NCAA, the Conference Defendants, and the colleges and universities that compete in Football Bowl Subdivision conferences sanction and sponsor college football games. Those athletic contests involve teams comprised of players who are also receiving the higher-education services of the colleges and universities for which they provide their athletic services. The football players that compete in the Conference Defendants, and thus within the Football Bowl Subdivision Labor Market, are elite athletes, the very best football players in the world in their age group. Those elite players have no other options, other than in the Conferences Defendants, where they can compete against similarly elite competition. Most such players are not eligible to compete as professionals in the National Football League ("NFL"). The teams in that league are parties to a collective bargaining agreement with the union that represents professional football players (the "NFLPA"). That agreement prohibits a football player from joining the NFL until they have been out of high school for three years. Even as the number of athletes who have availed themselves of this option to enter the NFL after three years has grown, it has yet to reach 100 athletes per year, leaving most athletes unable to access any competitive labor offers until they complete at least four years of college under collusive compensation restrictions.

98.     This association of the products of Conference Defendant football with college students competing as elite athletes is a unique feature that makes those products successful and distinguishes those products from other sporting events and other entertainment alternatives. Because of the distinct commercial appeal of the football played in the Football Bowl Subdivision Labor Market, the NCAA and the colleges and universities in the relevant market generate substantial revenues by selling tickets to sporting events, selling broadcast rights to television and radio outlets, and related licensing and concession activities.

CLASS ACTION COMPLAINT

99.     The television broadcast revenues attributable to Football Bowl Subdivision teams dwarf those attributable to Football Championship Subdivision teams, demonstrating the marketplace's recognition of the Football Bowl Subdivision Labor Market as a distinct submarket where Football Bowl Subdivision schools participate in Major College Football.

100.     The Football Bowl Subdivision Labor Market includes all of the colleges and universities in the Football Bowl Subdivision, which the NCAA itself defines as the highest level of competition in college football.  This includes all colleges and universities that are members of the Conference Defendants, as well as those schools they collude with through NCAA agreements to fix the maximum price paid for the labor services of Football Bowl Subdivision athletes.  To compete in the Football Bowl Subdivision Labor Market, a college football program must be a member of the NCAA's Football Bowl Subdivision, and thus must meet game attendance levels specified by the NCAA and must play nearly all of its games against other teams that compete in that market.  It also must agree to abide by the Football Bowl Subdivision's specific and Division I's general rules mandating price fixing in the relevant market and its two submarkets.

101.     From the standpoint of a prospective college football player, there is no reasonably interchangeable substitute for the Football Bowl Subdivision Labor Market.  Participating in Major College Football provides prospective college-athletes the opportunity to compete at the highest level of college football while earning a college degree, and also offers prospective college football players a far greater prospect for advancement to a professional football career than is available anywhere else.  Because of the unique combination of athletic and academic benefits associated with competing in the Major College Football offerings of the schools and conferences competing in the Football Bowl Subdivision Labor Market, prospective college football players who have the opportunity to participate in Football Bowl Subdivision programs very rarely choose to pursue any alternatives to Football Bowl Subdivision.

102.     Consistent with the status of the Football Bowl Subdivision Labor Market as a distinct product market, each of the Conference Defendants markets its brand of football as a distinct product.  Thus, for example, Defendant SEC creates a product called Southeastern Conference

Football that includes a full season of SEC football competition (including a pre-season against other conferences) that culminates in the Southeastern Conference Championship Game in Atlanta, Georgia.  SEC members then also compete against other conferences' members in post-season bowl games, and starting in 2014-15, in a newly formed post-season playoff called the "College Football Playoff" as described herein.  Similarly, each of the other Conference Defendants produces a conference season of Major College Football.  Defendant NCAA's expert in other litigation has also testified to this effect:

> It would be more accurate to say the NCAA is sponsoring sports leagues.  It's not the league itself....  The NCAA is a collaboration of universities and conferences, and it sponsors and coordinates sports leagues, so the league itself would be, you know, say one of the collegiate leagues, like the Big Ten.

103.    While these 11 conferences serve as closer and more distance substitutes for each other, members of the live and television audiences for Major College Football do not view other football games, other sporting events, other entertainment options or any other product or category of products as reasonable substitutes for the Major College Football produced by participants in the Football Bowl Subdivision Labor Market.

### 2.    Grants-in-Aid are Commercial Transactions

104.    Despite the nonprofit status of NCAA member schools, the transactions those schools make with premier Division I football athletes—full "grants-in-aid" in exchange for athletic services—cannot be termed "noncommercial," since schools make millions of dollars annually as a result of these transactions.  In a recent oral argument in the Northern District of California, the NCAA cited case precedent it acknowledged defines its activities as commercial.[5]  Thus, the transactions between NCAA schools and college athletes are commercial in nature, and therefore take place in a relevant market for purposes of the Sherman Act.

105.    To field teams that can compete effectively on the field of play and generate increased revenues for their athletic programs, the colleges and universities that acquire talent in the Football

---

[5] *See* Hearing Tr. at 84, *In re NCAA Student Athlete Name & Likeness Licensing Litig.*, No. 09-1967-CW, ECF No. 1007 (N.D. Cal. Mar. 3, 2014).

CLASS ACTION COMPLAINT

Bowl Subdivision Labor Market compete in marketing their services to the talented college athletes whose participation is necessary for the products to exist.  As in all economic transactions, each party provides goods and services of benefit to the other party, on a number of dimensions.  The dimensions in which this competition to recruit and retain college athletes takes place includes the quality of the educational experiences provided to college athletes, the quality of coaching services, the quality of training amenities, the quality of athletic and non-athletic opportunities following graduation, and the quality of the athletic competition on the field of play.

106.    Of particular relevance to this case, the participants in the Football Bowl Subdivision Labor Market also compete in offering college athletes admission to their institutions and financial incentives to accept their offers of admission that take the form of grants-in-aid.  A grant-in-aid can be provided purely in-kind (through tuition grants, room and board, and books), or in many cases in a mix of in-kind compensation and direct cash payments.  These cash payments occur most commonly when students choose to live off campus and so, in place of room and board, schools simply give each player a monthly check.

107.    In exchange, athletes agree to compete for the school's football team, and their access to both in-kind and cash compensation is conditional on participation—an athlete who voluntarily leaves the team is not kicked out of school, but he is denied continued payment of a grant-in-aid for the remaining years of his college attendance.

3.    **The Football Bowl Subdivision Labor Market Constitutes a Separate Market from NCAA Division II, NCAA Division III, NAIA, and Community /Junior Colleges**

108.    NCAA Division II football programs are not in the same market as Division I football programs, especially those who compete for talent in the Football Bowl Subdivision Labor Market.  The total number of Division II scholarships is limited to 36.  A typical NCAA college football squad totals approximately 100 players.  So, almost no Division II football athletes are awarded a full scholarship.  Division II football programs have smaller budgets, play close to home, and do not generate excess revenue for the school as a whole.  They provide lower quality facilities and coaching, and limited (if any) opportunities to showcase an athlete's talent on national television.

CLASS ACTION COMPLAINT

There are few, if any, recorded instances of an athlete being offered the maximum allowed grant-in-aid to play at a Division I school (whether Football Championship Subdivision or Football Bowl Subdivision) choosing instead to accept a Division II scholarship.

109.    NCAA Division III football programs are prohibited from awarding athletic scholarships so they are not in the relevant market.

110.    The National Association of Intercollegiate Athletics ("NAIA") is the largest of only a few other associations sponsoring four-year college football. It is made up of smaller schools, and NAIA rules permit only 24 scholarships. So, almost no player receives a full scholarship to play football. NAIA football programs are also not in the relevant market. Nor are other college football sanctioning associations such as the National Christian Collegiate Athletic Association ("NCCAA") or the United States Collegiate Athletic Association ("USCAA").

111.    Two-year junior colleges by their very nature cannot award four-year college degrees. Superior high school football players do not choose to play at a junior college unless they are unable to meet NCAA academic eligibility standards.

112.    The differences between the NCAA divisions, and between the NCCAA and the NAIA (and other minor associations), are demonstrated by a variety of additional factors. Total football revenue is probably the most critical factor in differentiating the market. Total football revenue for the 242 Division I schools in 2011 was well over $3 billion, with the majority coming from the 120 Football Bowl Subdivision schools ($2,956,499,371). Total football revenue for the 122 Football Championship Subdivision schools was $375,774,921 in 2011.

113.    In contrast, total football revenue for the 157 Division II football schools was less than half of the Football Championship Subdivision revenue ($181,929,450). Football revenue for all NAIA schools was $83.6 million. For 2011, average football team revenue for Football Bowl Subdivision schools was $24.6 million. Average team revenue for Football Championship Subdivision schools was $3.1 million. Average football team revenue for Division II schools was $1.2 million. Average football revenue for NAIA schools was even less, approximately $1 million.

114.     The large differences in revenue between Division I schools and NAIA and Division II schools are driven in part by the differences in total attendance.  In 2012, Football Bowl Subdivision schools had a total attendance of 37,170,235 fans; Football Championship Subdivision schools had an attendance of 5,967,272 fans, and all 157 Division II football teams drew 3,006,297 fans.  Total 2011 attendance figures for the 81 NAIA football schools were not available but the number is insignificant when compared to NCAA Division I attendance figures, especially those for Football Bowl Subdivision.  As one such example, it has been reported that attendance at the NAIA championship game in 2012 was 5,263.  In contrast, the most recent Football Bowl Subdivision championship game drew over 94,000 attendees.[6]

115.     Average attendance figures also differentiate the relevant market.  In 2012, Football Bowl Subdivision schools averaged 45,440 per game.  Football Championship Subdivision schools averaged 9,041 per game.  Division II football averaged 3,520 per game.  NAIA schools play in much smaller stadiums.  Marion University, a NAIA school, has a stadium with a maximum capacity of 3,000.  Several Division I football schools compete in stadiums with a capacity in excess of 100,000.

116.     The differences between college football divisions in the quality of competition and the level of institutional support cause superior high school football players to choose Division I Football Bowl Subdivision schools and scholarships over other Division I, Division II, or NAIA scholarships.  For these players Division I-FCS, Division II and NAIA football is not a substitute for Division I Football Bowl schools.  As an example, although Towson University reached the finals of the 2013 FCS post-season championship tournament, the school cannot attract the same level of quality recruits as nearby FBS school University of Maryland, despite the fact that Maryland has had a long period without participating in a major post-season bowl game.

117.     The intense recruitment of talented high school football players has led to the growth of companies which scout and rate thousands of players.  The most prominent company, rivals.com

---

[6] *2012 NAIA Football National Championship*, Wikipedia, http://en.wikipedia.org/wiki/2012_NAIA_Football_National_Championship.

("Rivals"), rates high school players on a 0- to 5-star scale. Of the 21,198 athletes tracked by rivals.com between 2007-11 who received a Division I scholarship offer, 90% accepted. The vast majority of the other 10% opted out of college football rather than accept a scholarship at a Division II or NAIA school. Again, this indicates that Division II and/or NAIA football is not an adequate substitute. The very fact that most NAIA and Division II athletes do not even rate a zero-star rating from Rivals is evidence that they are of a far different caliber of quality than those in the Rivals database.

      4.    **There Is Robust Competition Among NCAA Members in the Football Bowl Subdivision Labor Market to Recruit and Retain College Football Players**

118.    There is acutely intense competition among Division I schools to recruit and retain the athletic services of college football players. This competition is most intense among the Power Conference Defendants that compete in the Football Bowl Subdivision Labor Market. The colleges and universities in the relevant market compete against one another to recruit and retain college athletes to participate in their athletic programs through agreements under which the athletes commit to attend a particular college or university in exchange for a GIA. NCAA Division I schools do not engage in price competition to recruit and retain those athletes due to the fact the NCAA Bylaws at issue restrain them from doing so.

119.    NCAA members compete on different dimensions for Class Members to provide their labor services than what would occur but for the illegal restraints. NCAA members compete by marketing in-kind benefits. For instance, colleges may compete to hire the coach that will be perceived as best able to potentially launch players from the NCAA to the National Football League, an attractive component for a prospective college football player. Instead of investing directly in prospective and current college athletes, colleges divert the acquired surplus by spending it on a veritable arms race to provide top-of-the-line training facilities which, in turn, are explicitly designed to attract and retain collegiate football players. Many colleges also market to collegiate football players the strength of a college's academic programs in attracting the collegiate athletes' services.

120.    The NCAA prohibits its member institutions from directly paying college athletes salaries or even offering deferred trust funds or other forms of payment for their labor services.

CLASS ACTION COMPLAINT

Instead, schools have restrained the direct benefits to only allow students with the desired athletic ability to receive the maximum allowed (per the restraint in suit) Division I football grants-in-aid—which is demonstrably below the cost of attendance.  In effect, the college athlete offers his or her athletic abilities on behalf of the NCAA member institution in exchange for what the NCAA has restrained to allow the market to pay—a reduction in the cost of attending the college.  NCAA member institutions compensate the athletes with these goods and educational services because college athletes bring substantial direct and indirect benefits to the school in the form of:  (a) enhanced publicity and recruiting, which increases overall tuition revenue; (b) increased alumni donations; and (c) millions of dollars in gate receipts and licensing revenue.  If a school were to offer more or less to an athlete than the maximum allowed per the restraint, rival schools free of the restraint would respond by choosing from a collection of benefits (direct payments, indirect payments, educational superiority, etc.) to offer to make a more attractive offer for that athlete's services instead.  Under the current system although there is no required minimum scholarship level, the existing competition pushes virtually all FBS scholarships up to the maximum allowed under the current collusive restraints.  Currently competition exists but is restrained by collusion:  if a school offers less than the maximum allowed per the restraint, rival schools compete by making the maximum offer allowed under the restraint.  But-for the restraint, competition would be even more vigorous: if a school were to offer less to an athlete than the market rate (*e.g.*, only the current collusive maximum), rival schools free of the restraint would respond by choosing from a collection of benefits (direct payments, indirect payments, educational superiority, etc.) to make an even more attractive offer for that athlete's services.

     5. **NCAA Members' Competition for Class Members' Labor Services Is Constrained by the Unlawful Athletics Grant-in-Aid Cap**

     121.    Because all of the NCAA members competing in the Football Bowl Subdivision Labor Market have agreed to abide by the NCAA's athletics grant-in-aid cap, the schools do not compete against one another with respect to the amount of athletics financial aid and other forms of direct compensation they provide to college athletes.  The NCAA and the colleges and universities in the relevant markets are able to enforce that agreement because, from the standpoint of prospective

college athletes, there are no acceptable substitutes for the Major College Football offered by the Conference Defendants. Absent the agreement not to compete on this dimension, the Conference Defendants' member schools and those of their co-conspirator conferences would compete vigorously to attract talent using increased financial aid and other direct forms of compensation. But having secured an agreement of 100% of the schools and conferences in the Football Bowl Subdivision Labor Market, the NCAA and the conferences in the relevant market thus collectively wield market and monopoly power in the relevant market and are able to dictate the terms upon which the college athletes who participate in Major College Football receive grants-in-aid.

122.    The demand for college athletes is such that, absent the unlawful athletics grant-in-aid cap, the colleges and universities in the Football Bowl Subdivision Labor Market would have competed against one another by offering higher amounts of athletics-based financial aid to college athletes, up to and likely past the true Cost of Attendance. Grants-in-aid are therefore artificially "capped" by the common scheme imposed by the NCAA at amounts lower than the amounts that would prevail in a truly competitive market. All or nearly all of the college athletes in the proposed Class receive the maximum athletics grant-in-aid amount that the colleges and universities are permitted to give under the NCAA's rules and regulations. As detailed herein, the Commissioners of the Conference Defendants have all publicly stated that, absent the NCAA restraint which they and their co-conspirators have collectively imposed upon the market, each Conference Defendant would allow and provide compensation in excess of the current cap.

123.    As one such example, Defendant Big Ten Commissioner Jim Delany has argued in favor of providing Big Ten athletes with "a yearly stipend that would provide a set amount of extra money to cover the difference between the actual cost of attending a school versus what a full ride scholarship provides. He identified a fixed cost of anywhere from $2000 to $5000 per athlete."[7] Similarly, SEC Commissioner Mike Slive recently explained that, but for the NCAA-wide collusion, the each of the five Power Conferences would immediately begin providing scholarships that cover

---

[7] Jon Johnston, *Jim Delany and the NCAA: The Times They Are A Changin'*, SB NATION, July 25, 2013, http://www.cornnation.com/2013/7/25/4556982/jim-delany-and-the-ncaa-the-times-they-are-a-changin.

the full cost-of-attendance: "If autonomy is granted to the five conferences, then full cost of attendance will be one of the priorities for us to discuss once we have the autonomy that we seek. At that point in time, there has to be a process amongst the 65 institutions that comprise the five conferences for developing legislation that we are . . . [to] implement the full cost of attendance."[8]

124. Additional paragraphs herein identify many more such statements from the Conference Defendants indicating their desire to use payments above the current grant-in-aid cap as a part of the competition for recruits. Defendants' own public statements make clear that for the members of the Classes, increased competition on the terms of athletics-based financial aid upon the elimination of the grant-in-aid cap would result in additional compensation, primarily in the form of increased athletics-based financial aid for all members of the proposed Classes.

### 6. The Relevant Geographic Market

125. The relevant geographic market is the United States. All Division I football teams are located in the U.S. As a uniquely American sport, 99.9% of all Division I football players are from the United States. Schools that participate in the Football Bowl Subdivision Labor Market recruit athletes throughout the nation, as is demonstrated in the recruiting maps published by the sports website "The Bleacher Report." These maps, *available at* http://bleacherreport.com/articles/1659569-top-200-college-football-recruits-for-2014-interactive-map, show that schools from states as distant as Alabama and Oregon clearly compete for talent on a nationwide basis, with both programs focusing on the talent-rich state of California as well as throughout the Southeast.

---

[8] James Crepea, *Slive: Leagues, Union Advocates Have Common Ground*, USA TODAY, Apr. 21, 2014, *available at* http://www.usatoday.com/story/sports/ncaaf/2014/04/21/slive-leagues-union-advocates-have-common-ground/7974363/.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Oregon:**



**Alabama:**



**B.     The NCAA Division I Men's Basketball Labor Market**

126.    This relevant market is the nationwide market for the labor of NCAA Division I college men's basketball players.  In this labor market, current and prospective college students compete for roster spots on Division I men's basketball teams.  NCAA Division I member institutions compete to obtain and retain the best Division I basketball players by paying in-kind benefits, namely, Division I basketball scholarships, access to academic programs, access to training facilities, and instruction from premier coaches.  In some cases, the capped compensation includes payments in cash, through the provision of a housing and food allowance, but in all cases the amount of in-kind and cash compensation is artificially restrained by means of the conspiracy alleged herein.

127.    NCAA rules currently permit the award of thirteen full scholarships for men's Division I basketball teams.  Division I basketball programs compete at the highest level of college basketball.  They generate millions of dollars in revenue from revenue streams including game attendance ticket revenue, TV contracts, corporate sponsorships, merchandise sales and licensing, and alumni contributions.

128.    The enormous revenues generated by Division I basketball programs is spent on multi-million dollar coaching contracts, new playing and training facilities, and travel to play games at opponents' increasingly distant locations (which take athletes away from school often for several days at a time).

1.     **The Division I Men's Basketball Labor Market Is Distinct**

129.    The NCAA, the Power Conferences, their co-conspirator conferences, and the colleges and universities that compete in men's Division I basketball conferences sanction and sponsor college basketball games.  Those athletic contests involve teams comprised of players who are also receiving the higher education services of the colleges and universities for which they provide their athletic services.  The basketball players that compete in Division I are elite athletes, among the very best basketball players in the world, and certainly in the United States, in their age group.  Approximately 85% of all athletes in the NBA first played in Division I men's basketball. Fewer than ten American-born athletes have ever chosen to play in a European league if given the

opportunity to play basketball in Division I.  Those elite players have no other reasonably close alternatives, other than in men's Division I basketball, where they can provide their services and receive an education while competing against similarly elite competition.  Most such players are not eligible to compete as professionals in the National Basketball Association ("NBA").  The teams in that league are parties to a collective bargaining agreement with the union that represents professional basketball players (the "NBPA").  That agreement prohibits a non "international" basketball player from joining the NBA until they are 19 years of age *and* have been out of high school for at least one year.  Since 2005, only 60 athletes have been taken in the NBA draft after a single year of college.  Most athletes are thus unable to access any competitive labor offers until they complete at least two years of college under collusive compensation restrictions.  Even those athletes who join the NBA Development League ("NBDL"), or D-League, where the minimum age is 18, often remain in college under collusive compensation restrictions until they have a chance to enter the NBA draft.  Most only join the NBDL once it becomes clear that they will not be drafted into the NBA, where the minimum salary for a rookie will be $507,336, guaranteed, in the 2014-15 season, compared to the NBDL's average salary of $15,500 to $26,000, pre-tax, without guarantees.

130.    The television broadcast revenues attributable to men's Division I basketball teams dwarf those attributable to men's Division II or III basketball, or NAIA basketball, demonstrating the marketplace's recognition of men's Division I basketball as a distinct market.

131.    The Division I Men's Basketball Labor Market includes all of the colleges and universities in the NCAA's Division I that field men's Division I basketball teams, which the NCAA itself defines as the highest level of competition in college basketball.  This includes all colleges and universities that are members of the Conference Defendants, as well as those schools they collude with through NCAA agreements to fix the maximum price paid for the labor services of Division I men's basketball athletes.  To compete in the Division I Men's Basketball Labor Market, a college basketball program must be a member of the NCAA's Division I, and thus must play nearly all of its games against other teams that compete in the market. It also must agree to abide by Division I's general rules mandating price fixing in the relevant market.

132.     From the standpoint of a prospective college basketball player, there is no reasonably interchangeable substitute for the Division I Men's Basketball Labor Market.  Participating in Major College Basketball provides prospective college athletes the opportunity to compete at the highest level of college basketball while earning a college degree, and also offers prospective college basketball players a far greater prospect for advancement to a professional basketball career than is available anywhere else.  Because of the unique combination of athletic and academic benefits associated with competing in the Major College Basketball offerings of the schools and conferences competing in the Division I Men's Basketball Labor Market , prospective college basketball players who have the opportunity to participate in Division I Men's Basketball Labor Market programs very rarely choose to pursue any alternatives to Division I Men's Basketball.  Only a small percentage of the athletes playing Division I Men's Basketball even leave school early to become eligible for the draft.  In 2014, for example, only 43 underclassmen declared for the NBA draft.  With 351 NCAA Division I teams, and a maximum of 13 scholarship athletes per team, that represents less than 1% of all players who enter the draft before finishing school.  Similarly, over the period 2007-11, only three athletes with a 3-star or higher ranker (per Rivals) have elected to forgo the opportunity to play Division I Men's Basketball to play professionally in Europe: Jeremy Tyler, Yvan Nigarabakunzi, and Brandon Jennings.[9]

133.     Consistent with the status of the Division I Men's Basketball as a distinct product market, each of the Conference Defendants markets its brand of basketball as a distinct product.  Thus, for example, Defendant SEC creates a product called Southeastern Conference Basketball that includes a full season of SEC basketball competition (including a pre-season against other conferences) that culminates in the Southeastern Conference Men's Basketball Tournament.  SEC members then also compete against other conferences' members in post-season tournament games, such as in the NCAA "March Madness" tournament, the National Invitational Tournament ("NIT"), and others.  Similarly, each of the other Conference Defendants produces a conference season of

---

[9] Selected Proceedings of the Santa Clara Sports Law Symposium, Andrew Schwarz & Jason Belzer, *National Letter of Indenture: How College Athletes Are Similar to, and in Many Ways Worse off Than, the Indentured Servants of Colonial Times*, at fn.52 (Sept. 2012).

CLASS ACTION COMPLAINT

1    Major College Basketball.  Defendant NCAA's expert in other litigation has also testified to this

2    effect:

> It would be more accurate to say the NCAA is sponsoring sports
> leagues.  It's not the league itself . . . .  The NCAA is a collaboration of
> universities and conferences, and it sponsors and coordinates sports
> leagues, so the league itself would be, you know, say one of the
> collegiate leagues, like the Big Ten.

6    134.    While these 11 conferences serve as closer substitutes for each other (with the Power

7    Conferences having substantially more overlap among each other and also higher market share

8    among broadcasters and consumers), members of the live and television audiences for Major College

9    Basketball do not view other non-professional basketball games, other sporting events, other

10   entertainment options or any other product or category of products as an acceptable substitute for the

11   Major College Basketball produced by participants in the Division I Men's Basketball Labor Market.

### 2.    Grants-in-Aid are Commercial Transactions

13   135.    For the reasons detailed above in the section regarding the Football Bowl Subdivision

14   Labor Market, the transactions that NCAA Division I members schools enter into with premier

15   Division I men's basketball athletes are commercial transactions.

### 3.    The Division I Men's Basketball Labor Market Constitutes a Separate Market from NCAA Division II, NCAA Division III, NAIA, and Community/Junior Colleges

18   136.    NCAA Division II basketball programs are not in the same market as Division I

19   basketball programs.  The total number of Division II scholarships is limited to ten.  A typical

20   NCAA college basketball squad totals approximately fifteen players.  So, very few Division II

21   basketball athletes are awarded a full scholarship.  Division II basketball programs have smaller

22   budgets, play close to home, and do not generate excess revenue for the school as a whole.  They

23   provide lower quality facilities and coaching, and limited (if any) opportunities to showcase an

24   athlete's talent on national television.  There are few, if any, recorded instances of an athlete being

25   offered the maximum allowed grant-in-aid to play at a Division I school choosing instead to accept a

26   Division II scholarship.

27

28

137.    NCAA Division III basketball programs are prohibited from awarding athletic scholarships so they are not in the relevant market.

138.    The NAIA is the largest of only a few other associations sponsoring four-year college basketball.  It is made up of smaller schools, and NAIA rules permit only 11 scholarships.  So, almost no player receives a full scholarship to play men's basketball.  NAIA basketball programs are also not in the relevant market.  Nor are other college basketball sanctioning associations such as the National Christian Collegiate Athletic Association ("NCCAA") or the United States Collegiate Athletic Association ("USCAA").

139.    Two-year junior colleges by their very nature cannot award four-year college degrees.  Superior high school basketball players do not choose to play at a junior college unless they are unable to meet NCAA academic eligibility standards.

140.    The differences between the NCAA divisions, and between the NCCAA and the NAIA (and other minor associations), are demonstrated by a variety of additional factors.  Total basketball revenue is probably the most critical factor in differentiating the market.  Total basketball revenue for the 14 largest conferences in Division I basketball in 2011 was \$984,040,600, with the majority coming from the six Power Conferences (\$736,128,987 from the then Pac-10, Big 12, SEC, ACC, Big East, and Big Tens).  With significant reorganization amongst the power conferences, increased attendance, and new TV deals, that number has likely grown significantly in the past three years.

141.    In contrast, median basketball revenue for Division II basketball schools in 2011 was \$345,000, with a maximum of \$1,497,000.  With 22 conferences consisting of an average of 14 schools each, revenues are likely less than \$100,000,000 in total.  For 2011, average basketball team revenue was \$338,186 for the 97 NAIA Division I schools and \$207,236 for the 134 NAIA Division II schools.

142.    The large differences in revenue between Division I schools and NAIA and Division II schools are driven in part by the differences in (1) total attendance and (2) TV revenues.  In 2013, the 345 NCAA Division I Men's Basketball programs had a total attendance of 27,876,649 fans; and

all 284 Division II basketball teams drew only 2,781,472 fans, roughly one-tenth of Division I.  The average per team is about one-eighth the size as compared to Division I.  Total 2013 attendance figures for the NAIA basketball schools were not available but the number is insignificant when compared to NCAA Division I attendance figures.  As one such example, it has been reported that attendance at the entire 2014 NAIA Division II tournament was 26,400, for 31 games involving 32 teams.  In contrast, the most recent NCAA Division I men's basketball championship game alone drew an estimated 79,238 attendees.

143.     The differences between college basketball divisions in the quality of competition and the level of institutional support cause superior high school football players to choose Division I basketball schools and scholarships over other Division II, or NAIA scholarships.  For these players Division II and NAIA basketball is not a substitute for Division I basketball schools.

144.     The intense recruitment of talented high school basketball players has led to the growth of companies which scout and rate thousands of players.  The most prominent company, rivals.com, rates high school players on a 0- to 5-star scale.  Of the top 150 athletes rated by rivals.com in 2013 who received a Division I scholarship offer, 100% accepted.  The same is likely true for the next 500 best high school basketball players in the country.  The vast majority of the rest of the nation's best high school players likely opted out of college basketball altogether rather than accept a scholarship at a Division II or NAIA school.  This indicates that Division II and/or NAIA basketball is not an adequate substitute.  The very fact that most NAIA and Division II athletes do not even rate a zero-star rating from Rivals is evidence that they are of a far different caliber of quality than those in the Rivals database.

    4.     **There Is Robust Competition Among NCAA Members in the Division I Labor Market to Recruit and Retain College Basketball Players**

145.     For the same reasons detailed above in the section regarding the Football Bowl Subdivision Labor Market, there is acutely intense competition among Division I schools to recruit and retain the athletic services of college basketball players.  Again, as described above, absent the restraint in suit, the robust competition among Division I schools would occur in regards to the terms of grants-in-aid, pushing the value of those grants-in-aid higher due to competition.

### 5.    NCAA Members' Competition Is Constrained by the Unlawful Athletics Grant-in-Aid Cap

146.    For the same reasons detailed above in the section regarding the Football Bowl Subdivision Labor Market, NCAA members' competition is constrained by the unlawful athletics grant-in-aid cap.

## V.    FACTUAL ALLEGATIONS

### A.    An Overview of the NCAA

#### 1.    The NCAA's History.

147.    Former NCAA Executive Director Walter Byers, in his 1995 book, *Unsportsmanlike Conduct:  Exploiting College Athletes*, wrote:  "[t]he first intercollegiate competition in the United States was conceived and organized by students in the mid-1840s.  By the turn of the century, eastern colleges were competing in some 19 sports.  This all came about through student initiative and effort.  The students set in place the underlying structure for college sports.  Today, professional coaches, professional managers and money-minded presidents have total control.  It is time to give back to the students who play sports the freedoms they deserve.  At a minimum, they are entitled to freedoms enjoyed by their fellow students."

148.    The NCAA details its view of history on its website.  It states that it "was founded in 1906 to protect young people from the dangerous and exploitive athletics practices of the time."[10] The NCAA continues that "[t]he rugged nature of early-day football, typified by mass formations and gang tackling, resulted in numerous injuries and deaths and prompted many college [sic] and universities to discontinue the sport.  In many places, college football was run by student groups that often hired players and allowed them to compete as non-students.  Common sentiment among the public was that college football should be reformed or abolished."  The NCAA continues that "President Theodore Roosevelt summoned college athletics leaders to two White House conferences to encourage reforms.  In early December 1905, Chancellor Henry M. MacCracken of New York

---

[10] Notably, *The Washington Times* reported on December 24, 2013, that the NCAA stated in a court filing early that month, in response to a wrongful death lawsuit filed by a college football player's family, that "[t]he NCAA denies that it has a legal duty to protect student-athletes."

CLASS ACTION COMPLAINT

University convened a meeting of 13 colleges and universities to initiate changes in football playing rules.  At a subsequent meeting Dec. 28 in New York City, 62 higher-education institutions became charter members of the Intercollegiate Athletic Association of the United States (IAAUS).  The IAAUS officially was constituted March 31, 1906, and took its present name, the NCAA, in 1910."[11]

149.    The NCAA states on its website that "[f]or several years, the NCAA was a discussion group and rules-making body, but in 1921 the first NCAA national championship was conducted: the National Collegiate Track and Field Championships.  Gradually, more rules committees were formed and more championships were created, including a basketball championship in 1939."

150.    The NCAA continues that "[a]s college athletics grew, the scope of the nation's athletics programs diverged, forcing the NCAA to create a structure that recognized varying levels of emphasis.  In 1973, the Association's membership was divided into three legislative and competitive divisions − I, II and III.  Five years later, Division I members voted to create subdivisions I-A and I-AA (renamed the Football Bowl Subdivision and the Football Championship Subdivision in 2007) in football."

2.    **The NCAA's Basic Structure.**

151.    The NCAA's publicly available documents confirm that it operates by way of horizontal agreements among its members.  The NCAA, in its "Consolidated Financial Statements as of and for the Years Ended August 31, 2012 and 2011" (the "Financial Statements"), describes itself as an "unincorporated not-for-profit educational organization."  It further states that it "is the

---

[11] The NCAA annually awards a Theodore Roosevelt Award to an individual "for whom competitive athletics in college and attention to physical well-being thereafter have been important factors in a distinguished career of national significance and achievement."  There is considerable irony in the NCAA's references to former President Theodore Roosevelt being instrumental in the formation of the NCAA, given his own abhorrence of trusts that violate the Sherman Act and the NCAA's evolution into its present-day form including its status as an adjudged antitrust law violator and recidivist.  *See, e.g.*, http://www.whitehouse.gov/about/presidents/theodoreroosevelt ("Roosevelt emerged spectacularly as a 'trust buster' by forcing the dissolution of a great railroad combination in the Northwest.  Other antitrust suits under the Sherman Act followed.").  *See also* http://www.theodorerooseveltcenter.org/Learn-About-TR/Themes/Capitalism-and-Labor/The-Northern-Securities-Case.aspx ("The Northern Securities Case (1904), which established President Theodore Roosevelt's reputation as a 'trust buster,' reached the Supreme Court in 1904.  It was the first example of Roosevelt's use of anti-trust legislation to dismantle a monopoly, in this case a holding company controlling the principal railroad lines from Chicago to the Pacific Northwest.").

organization through which the colleges and universities of the nation speak and act on athletic matters at the national level." The NCAA additionally states that it "is a voluntary association of more than 1,200 institutions, conferences, and organizations devoted to the sound administration of intercollegiate athletics in all its phases." The NCAA further states that "[t]hrough the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character." The NCAA additionally states that it "serves as the colleges' national athletics governing agency."

152.     The NCAA further states in its 2011 Internal Revenue Service Form 990 ("IRS Tax Return") that its "active member institutions and voting conferences are the ultimate voice in all Association decisions."

153.     The NCAA states on its website that it "oversees 89 championships in 23 sports. There are more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities within the NCAA." The NCAA further states:

> Each member school is able to choose a level of competition that best fits its mission. Competition is offered in Division I (the largest programs that provide the most athletically related financial aid for student-athletes), Division II (limited financial aid) and Division III (no athletically related financial aid).
>
> There are 1,066 active member schools in the NCAA membership—340 in Division I, 290 in Division II and 436 in Division III. The NCAA also contains 95 member conferences in all three divisions. Overall membership—counting schools, conferences and related associations—is 1,273.
>
> Division I is subdivided based on football affiliation. A total of 120 schools are members of the Football Bowl Subdivision (FBS). That subdivision is characterized by postseason play outside the NCAA structure and also by higher financial aid allocations. The second Division I subdivision is the Football Championship Subdivision, which contains 122 schools that participate in the NCAA's Division I Football Championship. The remaining 98 Division I schools do not sponsor football.

154.     The NCAA, in Article 3.01 of its Constitution, states that "Division I offers three classes of membership:  active, conference and affiliated."

155.     NCAA Constitution Article 3.02.3, titled "Membership Categories," states:

> **3.02.3.1 Active Member.**  An active member is a four-year college or university that is accredited by the appropriate regional accrediting

CLASS ACTION COMPLAINT

agency and duly elected to active membership under the provisions of this article (see Constitution 3.2.3). Active members have the right to compete in NCAA championships, to vote on legislation and other issues before the Association, and to enjoy other privileges of membership designated in the constitution and bylaws of the Association.

**3.02.3.2 Member Conference.** A member conference is a group of colleges and/or universities that conducts competition among its members and determines a conference champion in one or more sports (in which the NCAA conducts championships or for which it is responsible for providing playing rules for intercollegiate competition), duly elected to conference membership under the provisions of this article (see Constitution 3.3.3). A member conference is entitled to all of the privileges of active members except the right to compete in NCAA championships (see Constitution 3.3.2). Only those conferences that meet specific criteria as competitive and legislative bodies (see Constitution 3.02.1 and 3.02.2) and minimum standards related to size and division status are permitted to vote on legislation or other issues before the Association.

156. The NCAA states on its website that "[e]ach division creates its own rules governing personnel, amateurism, recruiting, eligibility, benefits, financial aid, and playing and practice seasons—consistent with the overall governing principles of the Association. Every program must affiliate its core program with one of the three divisions."

157. The NCAA further states this on its website:

Division I is subdivided based on a school's football sponsorship. Schools that have football teams that participate in bowl games belong to the Football Bowl Subdivision. Those that participate in the NCAA-run football championship belong to the Football Championship Subdivision. Other schools don't sponsor football at all.

Schools that belong to the Football Bowl Subdivision have different requirements from other schools. For example, they must sponsor a minimum of 16 varsity sports, including football. Other Division I schools must sponsor 14 sports. Additionally, Football Bowl Subdivision schools must meet stricter requirements for financial aid distribution and home football attendance than schools who classify in the FCS or Division I without football.

The subdivisions are based on football sponsorship only. All other sports are considered simply Division I.

CLASS ACTION COMPLAINT

1         3.      **The NCAA's Purpose.**

2         158.    The NCAA in its Financial Statement states that, "[a] basic purpose of the NCAA is

3   to maintain intercollegiate athletics as an integral part of the educational program and the athlete as

4   an integral part of the student body."

5         159.    In its 2011 IRS Tax Return, the NCAA states that "[t]he mission of the NCAA

6   national offices is to conduct efficiently the business of the association as directed by the

7   membership . . . ."  The NCAA therein further states that, "[t]he NCAA's purpose is to govern

8   competition in a fair, safe, equitable and sportsmanlike manner and to integrate intercollegiate

9   athletics into higher education so that the educational experience of the student-athlete is

10  paramount."

11        160.    Article 1 of the NCAA's Constitution states that the NCAA's purposes include "(c)

12  To encourage its members to adopt eligibility rules to comply with satisfactory standards of

13  scholarship, sportsmanship and amateurism;" "(f) To supervise the conduct of, and to establish

14  eligibility standards for, regional and national athletics events under the auspices of this

15  Association;" "(h) To legislate, through bylaws or by resolutions of a Convention, upon any subject

16  of general concern to the members related to the administration of intercollegiate athletics;" and (i)

17  To study in general all phases of competitive intercollegiate athletics and establish standards

18  whereby the colleges and universities of the United States can maintain their athletics programs on a

19  high level."

20        4.      **The NCAA's Detailed Governance Structure.**

21        161.    The NCAA states in its Financial Statement that it "operates through a governance

22  structure, which empowers each division to guide and enhance their ongoing division-specific

23  activities."  It continues that, "[i]n Division I, the legislative system is based on conference

24  representation and an eighteen member Board of Directors that approves legislation."  The NCAA

25  continues that, "[t]he governance structure also includes an Executive Committee composed of

26  sixteen chief executive officers (member institution chief executive officers) that oversee

27

28

CLASS ACTION COMPLAINT

association-wide issues, which is charged with ensuring that each division operates consistently with the basic purposes, fundamental policies, and general principles of the NCAA."

162.    The NCAA further states that its "Executive Committee serves as the senior governing body of the NCAA."

163.    The NCAA further states this on its website:  "**Division I Board of Directors** Eighteen members comprised of chief executive officers (CEOs).  All 11 Football Bowl Subdivision conferences have a permanent seat.  Seven Football Championship Subdivision and Division I conferences rotate seats."[12]

### 5.    The NCAA Manual.

164.    The NCAA and its members govern themselves through the NCAA's "Manuals," promulgated yearly, with additional quarterly updates.  The Manuals include, among other things, the NCAA's "Constitution" and "Operating Bylaws."  Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports.  The NCAA Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions.  Thus, the rules set forth in the NCAA Constitution and Bylaws constitute express, horizontal agreements among the NCAA and its members.

165.    NCAA Constitution Article 5.2.2 ("Bylaws") states that "[e]ach division may adopt legislation to be included in the operating bylaws of the Association, which provide rules and regulations not inconsistent with the provisions of the constitution and which shall include, but not be limited to, the following particulars:  (a) The administration of intercollegiate athletics by members of the Association; (b) The establishment and control of NCAA championships (games, matches, meets and tournaments) and other athletics events sponsored or sanctioned by the Association; (c) The procedures for administering and enforcing the provisions of the constitution and bylaws; and (d) The adoption of rules of play and competition in the various sports, and the delegation of authority in connection with such subjects to individuals, officers or committees."

---

[12] Football Bowl Subdivision has since consolidated its 11 conferences into 10, with schools that played football in the WAC conference moving to other conferences or becoming independents.

1          6.        **The NCAA's Enforcement Structure.**

2          166.      Typically, antitrust cases involving allegations of a price-fixing cartel require

3    extensive discovery to demonstrate the presence of each element of an effective cartel.  In the case of

4    the NCAA, the agreement, the punishment mechanisms, and the policing mechanisms are each laid

5    out in clear, publicly available language.

6          167.      The NCAA's Constitution and Bylaws contain extensive provisions, constituting

7    express horizontal agreements among competitors, requiring NCAA members to abide by all

8    provisions of the Constitution and Bylaws, including the athletics grant-in-aid limitation at issue in

9    this Complaint.  The Constitution and Bylaws further contain extensive provisions providing for

10   discipline of members that do not abide by the rules.  The Constitution and Bylaws further provide

11   detailed monitoring provisions.

12         168.      For example, NCAA Constitution Article 1.3.2, titled "Obligations of Member

13   Institutions," states that "[l]egislation governing the conduct of intercollegiate athletics programs of

14   member institutions shall apply to basic athletics issues such as admissions, financial aid, eligibility

15   and recruiting.  Member institutions shall be obligated to apply and enforce this legislation . . ."

16   Article 2.8.1, titled "Responsibility of Institution," found within Article 2.8, titled "The Principle of

17   Rules Compliance," reiterates that "[e]ach institution shall comply with all applicable rules and

18   regulations of the Association in the conduct of its intercollegiate athletics programs," and that

19   "[m]embers of an institution's staff, student-athletes, and other individuals and groups representing

20   the institution's athletics interests shall comply with the applicable Association rules, and the

21   member institution shall be responsible for such compliance."  Article 3.1, titled "Eligibility for

22   Membership," reinforces that "institutions or organizations must accept and observe the principles

23   set forth in the constitution and bylaws of the Association."  Constitution Article 3.2.1.2, titled

24   "Compliance with Association Rules," states that "[t]he institution shall administer its athletics

25   programs in accordance with the constitution, bylaws and other legislation of the Association."

26         169.      Article 3.2.4, titled "Conditions and Obligations of Membership," states that "[t]he

27   active members of this Association agree to administer their athletics programs in accordance with

28

---

CLASS ACTION COMPLAINT

the constitution, bylaws and other legislation of the Association." Pursuant to Bylaw 18.4.2.1, each year, by September 15th, each NCAA member must "[c]ertify, though its president or chancellor on a form approved by the Legislative Council, the institution's compliance with NCAA legislation."

170.    The NCAA's Constitution and Bylaws contain numerous disciplinary provisions detailing the dire consequences for any member that breaks the rules. The penalties can include expulsion from the NCAA. NCAA Constitution Article 1.3.2 states that "the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation" to apply and enforce NCAA legislation. Article 2.8.3, titled "Penalty for Noncompliance," states that "[a]n institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association." Article 3.2.5.1, titled "Termination of Suspension," states that "[t]he membership of any active member . . . failing to meet the conditions and obligations of membership may be suspended, terminated or otherwise disciplined . . . ." Article 3.01.4 states that "[a]ll rights and privileges of a member shall cease immediately upon termination or suspension of its membership." Article 3.2.5.1.1, titled "Cessation of Rights and Privileges," states that "[a]ll rights and privileges of the member shall cease upon any termination or suspension of active membership."

171.    The NCAA, in addition to regulating its members, directly regulates college athletes themselves. For example, the NCAA Bylaw 14.1.3, for example, states that each year, a college athlete "shall sign a statement in a form prescribed by the Legislative Council . . . related to . . . eligibility . . . financial aid, amateur status . . . [f]ailure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition." Bylaw 14.01.3 states that, to be eligible, "a student-athlete shall be in compliance with all applicable provisions of the constitution and bylaws of the Association . . . ." Bylaw 14.1.1 states that, "[t]o be eligible for regular-season competition, NCAA championships, and for postseason football games, the student-athlete shall meet all general eligibility requirements." Constitution Article 3.2.4.3 states that, "[t]he institution shall be obligated immediately to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition." In other words, the NCAA mandates

1   a collective boycott by all members of any athlete found to have deviated from the price-fixing

2   activity alleged in this Complaint.

3         172.     To reinforce its rules, the NCAA goes even further.  For example, Constitution Article

4   3.2.4.11, titled "Discipline of Members," states that, "active members shall refrain from athletics

5   competition with designated institutions as required under the provisions of the Association's

6   enforcement procedures."  In other words, the NCAA mandates a collective boycott by all members

7   of any school found to have deviated from the price-fixing activity alleged in this Complaint.

8         173.     NCAA member conferences further enforce NCAA rules.  For example, NCAA

9   member the Pac-12 Conference, headquartered in this District, in Walnut Creek, CA, in its "2013-14

10  Handbook," states in its "Statement of Purpose" that "[t]he Conference is formed for the following

11  purposes:  a. To provide its members with a jointly governed body for sponsoring, supervising, and

12  regulating inter-collegiate athletics as a conference member of the National Collegiate Athletics

13  Association ("NCAA") in accordance with the principles, policies, constitution and bylaws of the

14  NCAA . . . ."  The Pac-12 continues that "[t]he members of the Conference value:  . . . Compliance

15  with Conference and NCAA rules."  The Pac-12 continues that "[t]he Conference may place a

16  member on probation or suspension, or terminate its membership, by vote of at least three-fourths of

17  all the members of the CEO Group eligible to vote on the matter, for one or more of the following

18  reasons:  . . . Violating rules and regulations of the NCAA, or becoming ineligible for active

19  membership in Division I of the NCAA, by a written determination of the NCAA; . . . Such

20  disciplinary action may also include the assessment of financial penalties."  The Pac-12 continues

21  that "[t]he Conference is a member of the NCAA, therefore, all member institutions are bound by

22  NCAA rules and regulations unless the Conference rules are more demanding."  The Pac-12

23  continues that "[t]he rules of the National Collegiate Athletic Association shall govern all matters

24  concerning financial aid to student-athletes except to the extent that such rules are modified by the

25  CEO Group."  The Pac-12 continues that "The rules of the National Collegiate Athletic Association

26  shall govern all matters of student-athlete eligibility except to the extent that such rules are modified

27

28

CLASS ACTION COMPLAINT

for practice and competition in Conference sports by regulations adopted by the CEO Group."  All of the other Conference Defendants make similar statements in their governing documents.

174.    As a practical matter, any academic institution that sponsors a Division I FBS football program or Division I men's basketball program must maintain membership in the NCAA and abide by the rules and regulations promulgated by the NCAA and its members, including the NCAA Constitution, Bylaws, Executive Regulations and Official Interpretations.  All colleges and universities that participate in the relevant market are NCAA members; have conferred upon the NCAA the right to sanction and approve games including football bowl games and postseason tournament basketball games; have agreed to restrictions under which they are forbidden from competing on the field against non-NCAA teams; and have agreed to abide by all of the NCAA's rules and regulations.  There is no practical alternative to NCAA membership for any academic institution that wishes to sponsor a Major College Football or Major College Basketball program. There is no Major College Football or Major College Basketball program in the United States that is not an NCAA member, abiding by the NCAA rules.

175.    As a result of the NCAA rules embodied in the grant-in-aid cap, no NCAA member school has provided any college athlete with athletics-based financial aid in excess of the grant-in-aid cap, other than a few noted "scandals" in which the NCAA imposed punishments on schools for exceeding the cap through the provision of "under-the-table" benefits.

176.    The academic institutions in the relevant markets aggressively compete against one another on the field of play, in recruiting college athletes, in seeking to recruit and retain talented coaching staffs, in building athletic facilities that will attract athletes and coaches, and in soliciting revenues from television, radio and corporate sponsors.  Absent the unlawful grant-in-aid cap, the same competitive forces would result in more valuable grants-in-aid and other forms of direct compensation.

**B.    The NCAA Bylaw Challenged in this Litigation**

177.    The Plaintiffs in this litigation specifically challenge NCAA Bylaw 15.1, titled "Maximum Limit on Financial Aid—Individual," which states in pertinent part the following:  "A

student-athlete may receive institutional financial aid based on athletics ability (per Bylaw 15.02.4.1) and educational expenses awarded per Bylaw 15.2.6.4 up to the value of a full grant-in-aid . . ." Bylaw 15.02.5, titled "Full Grant-in-Aid," states that "[a] full grant-in-aid is financial aid that consists of tuition and fees, room and board, and required course-related books."

178. Other NCAA Bylaws reinforce the prohibition. Bylaw 12.01.1 states that "[o]nly an amateur student-athlete is eligible for intercollegiate athletics participation in a particular sport." Bylaw 12.1.2 states that "[a]n individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual: Uses his or her athletics skill (directly or indirectly) for pay in any form in that sport . . . ." Bylaw 12.02.7 states that "[p]ay is the receipt of funds, awards or benefits not permitted by the governing legislation of the Association for participation in athletics." Bylaw 12.01.4, titled "Permissible Grant-in-Aid," states that "[a] grant-in-aid administered by an educational institution is not considered to be pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations set by the Association's membership." Bylaw 12.1.2.1, tilted "Prohibited Forms of Pay," states that "'[p]ay,' as used in Bylaw 12.1.2 above, includes, but is not limited to the following: . . . Educational expenses not permitted by the governing legislation of this Association (see Bylaw 15 regarding permissible financial aid to enrolled student-athletes)." Bylaw 15.01.2 states that "[a]ny student-athlete who receives financial aid other than that permitted by the Association shall not be eligible for intercollegiate athletics."

179. Under the grant-in-aid cap, which is set forth in Division I Bylaw 15.02.5, a "Full Grant-In Aid" to a college athlete is defined as "financial aid that consists of tuition and fees, room and board, and required course-related books." The grant-in-aid for each member institution is thus expressly restricted to cover an amount less than the full Cost of Attendance at any member institution, because the Cost of Attendance is separately and more broadly defined by NCAA Division I Bylaw 15.02.2 to be "an amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the institution." It is also

expressly restricted below the level that would prevail in a market free of anticompetitive collusion, as is made clear by the statements of the Power Conference Defendants, their member schools, and their co-conspirator conferences and co-conspirator conferences' member schools. As described below, absent collusion regarding athletics grants-in-aid, the Power Conference Defendants would raise the amount they offer to athletes in the relevant markets above the current maximum allowed GIA.

180. NCAA Bylaw 15.02.2.1, titled "Calculation of Cost of Attendance," further states that "[a]n institution must calculate the Cost of Attendance for student-athletes in accordance with the cost-of-attendance policies and procedures that are used for students in general. Accordingly, if an institution's policy allows for students' direct and indirect costs (*e.g.*, tuition, fees, room and board, books, supplies, transportation, child care, cost related to a disability and miscellaneous personal expenses) to be adjusted on an individual basis from the institution's standard cost figure, it is permissible to make the same adjustment for student-athletes, provided the adjustment is documented and is available on an equitable basis to all students with similar circumstances who request an adjustment." Therefore, for every member of the proposed Class, each university has already calculated his Cost of Attendance figure, per NCAA requirements.

181. The NCAA enforces the agreed upon grant-in-aid cap through a further agreement under which any college athlete who receives athletics-based financial aid in excess of the grant-in-aid cap is ineligible to compete in NCAA sports. NCAA members have set up elaborate and sophisticated mechanisms to monitor compliance and penalize violations of the horizontal restraints on trade. Among other things, the NCAA requires members to report each college athlete's financial aid information to the NCAA on or before the first day of outside competition for the sport in which the college athlete participates. This information is compiled onto a form known as a "Squad List" and each Conference Defendants' member school maintains control of this document. The NCAA makes available to its members, at no charge, "compliance" software that ensures that schools comply, not with the antitrust laws, but with the cartel's agreements, including price fixing. The software applies NCAA regulations to college athletes' information, generates reports to the NCAA

1   and warns the member when the jointly imposed limit on a college athlete's financial aid has been

2   exceeded.  Violations are adjudicated and penalties imposed by competing member institutions.

3         182.   Any Division I member that deviates from the NCAA rules limiting the amount, terms

4   and conditions of financial aid to college athletes is subject to severe sanctions, including expulsion,

5   under NCAA rules.  These punishments have included a complete ban on football/basketball

6   participation (the "death penalty") as well as a reduction in the number of grants-in-aid a school can

7   offer.  The very fact that a reduction in the number of grants-in-aid is seen as a severe punishment is

8   a clear sign as to how valuable even the last scholarship athlete on a team is.

9         183.   Moreover, because NCAA rules prohibit members from playing games with non-

10   NCAA members, an expelled member would be unable to continue participating in major college

11   sports.  Because sports businesses, such as college football and basketball teams, require opponents

12   to provide a game for its consumers, and require multiple opponents to form a league season of

13   football that culminates in a league championship, an organized, collective boycott by all other

14   participants in Major College Football/Basketball constitutes a tremendous barrier to any one team

15   (or even a small handful of teams) succeeding in forming a rival league if boycotted by all NCAA

16   members.  Thus, the NCAA's price-fixing regime is designed with strict enforcement built in that

17   prevents a fracturing of the cartel.

18         184.   As a result, in practice, Division I schools do not deviate from the rules limiting the

19   amount, terms and conditions of financial aid to college athletes other than the exceptional case of

20   what the NCAA refers to as "cheating" such as providing excessively luxurious accommodations

21   (former University of Southern California running back Reggie Bush) or too many textbooks

22   (University of Nebraska).

23         185.   For many years, the grant-in-aid cap has restricted the amount of athletics-based

24   financial aid available to college athletes in NCAA Division I, and it continues to do so to this day.

25   As the NCAA itself writes "[a]n "incidental allowance" of $15 per month was once justified as an

26   educational expense that was tied to Cost of Attendance, but was eliminated from the NCAA grant-

27   in-aid definition in the 1970s."  This statement refers to the anticompetitive decision in 1976 to take

28

---

CLASS ACTION COMPLAINT

an already collusive limitation on compensation to athletes and further reduce it through a collusive decision to remove certain elements of the then-permitted GIA.  While in 1975-76, the NCAA allowed its members to provide direct compensation up to the value of ". . . commonly accepted educational expenses (i.e., tuition and fees; room and board; required course-related supplies and books, and incidental expenses not in excess of fifteen dollars per month) . . .," as of 1976-77, that limit was lowered to include only ". . . commonly accepted educational expenses (i.e., tuition and fees, room and board and required course-related books) . . ."

186.   The "laundry" stipend was first allowed per NCAA rules in 1956, and was set at $15. According to the U.S. Department of Labor's Bureau of Labor Statistics' "CPI Inflation Calculator," $15 in 1956 had the same buying power as $130.74 in 2014.  Presuming that $130.74 per month was paid for nine months each year during an average academic year that would equal $1,176.66 per year per player in 2014 dollars.

187.   In addition to collectively prohibiting this "laundry money" payment, since 1976-77, through the artificial limitations on financial aid embodied in the grant-in-aid cap, the NCAA and its members have agreed among themselves not to include in financial aid such costs as school supplies, recommended text books, travel costs, and incidental expenses.  (In addition, a cap prohibiting the provision of health and disability insurance existed until eliminated via a legal settlement in 2008.)

188.   Without the grant-in-aid cap, the colleges and universities that sponsor college football and basketball and compete in the relevant markets would provide athletic scholarships in an amount in line with the college athlete's value in a competitive market.  The same competitive forces that drive schools to provide coaches with million-dollar salaries and build lavish athletic facilities would also compel those schools to provide athletics-based grants-in-aid at a truly competitive level (with some of the excessive spending on the former categories curtailed to fund spending on the latter).  Indeed, the athletic directors of the University of Texas acknowledged this in a 2013 Declaration in other litigation in this District, when they declared that "[i]ntroduction of that kind of commercial recruiting competition for and between student-athletes would heavily impact recruiting throughout NCAA institutions, including Division I. At least some student-athletes would likely

gravitate toward schools that would 'pay' them the most amount of money. . . ." The grant-in-aid cap thus enables the NCAA, its member colleges and universities, and the coaches to reap all of the financial benefits of big-time college sports, while depriving Class Members of millions of dollars in athletics-based financial aid.

189.    Through the grant-in-aid cap, the NCAA and its members have thus contracted, combined and conspired to fix, depress or stabilize the amount, terms and conditions of athletics-based financial assistance to Class Members in the relevant market.

190.    The grant-in-aid cap has been successful and effective. As a result of the grant-in-aid cap, Class Members receive lower amounts of financial assistance and other direct compensation than they would receive if Class Members were permitted to receive athletics-based financial aid covering their costs of attendance.

191.    Absent the horizontal restraint on competition imposed through the grant-in-aid cap, competitive grant-in-aid offers would be an important means by which NCAA Division I members would compete for and recruit Class Members. Class Members would receive more generous scholarships as a result of competition among those schools. Defendants' collusive restraint on grants-in-aid violates the United States' antitrust laws. The restraint's anticompetitive effects substantially outweigh any alleged pro-competitive effects that Defendants may offer.

       1.    **Numerous reasonable and less-restrictive alternatives exist.**

192.    Numerous reasonable and less-restrictive alternatives are available to Defendants' current anticompetitive practices. For example, one less-restrictive alternative may be to allow the Conference Defendants to compete amongst each other as to the financial aid terms that conference members will make available to college football and basketball players. *See, e.g.*, Jonathan Mahler, *College Athletes Should be Paid Exactly This Much*, BUS. WEEK, Jan. 2, 2014 ("Once the NCAA monopoly has been broken, the various conferences would be free to write rules for their respective members. Some conferences might even experiment with salary caps and see how the market reacts. As long as they weren't colluding to fix prices—as they are doing now—the market would find an equilibrium."). This differs in an important respect from the currently proposed "autonomy" rules

for Power Conference Defendants, being debated by these Defendants including by the use of the media.  The proposed "autonomy" rules do not provide individual conference autonomy at all, but rather simply allow a vote by a smaller set of cartel members to set rules for that subset of the cartel. The incremental competition offered by true individual conference autonomy would allay the fears (even though unfounded) of those that decry the repercussions of an instantaneous transition to a wide-open free market, with every school making its own independent decisions.

193.    The Conference Defendants already compete with each other in a myriad of ways. Among the most obvious is their competition in the Coaching Labor Market to attract the best coaches to help recruit athletes and to win games.  In litigation captioned *Law v. NCAA*, the plaintiffs challenged efforts similar to the grant-in-aid cap in suit that were undertaken to fix the price of (basketball) coaching talent.  In that case, after applying the "quick look rule of reason" antitrust analysis, the Court, and the Circuit Court of Appeals, both held that the NCAA's nationwide collusion in this labor market violated the antitrust laws.  Despite the NCAA's claim that such rules were necessary to the survival of college sports, no such collapse has occurred.  Instead, as Gary Barta, the Athletic Director of the University of Iowa (a member of Defendant Big Ten Conference) recently explained on Iowa Public television:

> "[W]e have to compete with the marketplace, and the marketplace says 'this is what a football coach makes, this is what a basketball coach makes, this is what a tennis coach makes, and I'm expected to win, I'm expected to graduate, and so I have to participate in that marketplace. you see, and I'm happy to do so."[13]

His counterpart at Iowa State, Jamie Pollard, explained how the need to attract students creates demand for quality coaches:

> "Well, I'll break it down to a simple question.  A student-athlete, when they're choosing which school to go to, chooses based on the facilities, based on coaches, based on the academic institution.  If Gary [Barta, Iowa A.D.] or I took the opinion that we're not going to pay the market rate for [Iowa State football coach] Paul Rhoads or [Iowa football coach] Kirk [Ferentz] that would impact some of those decisions those student-athletes would make.  So you know we could all sit and say

---

[13] Iowa Public Television, *Barta and Pollard Say High Salaries for Coaches Are Market Driven and Justified*, YouTube (Feb. 14, 2014), https://www.youtube.com/watch?feature=player_detailpage&v=EewKGGIOxRE#t=68.

CLASS ACTION COMPLAINT

well, they're overpaid or that's a lot of money to be paid but it is the marketplace. It is what it is."[14]

194.    In the absence of the anticompetitive, collusive restraint detailed herein, the Conference Defendants could be expected to compete along these same lines regarding the terms of the financial aid that their member institutions offer to current and prospective college football and basketball players. The Conference Defendants appear to be thriving. Each is run by smart business executives capable of negotiating billion-dollar television deals. Surely each of them can independently (without the need for collusion across the Conference Defendants) determine a method to compete regarding grants-in-aid, while still preserving consumer interest in its own brand of Major College Football and Basketball. Indeed, if each conference were to determine (in its own independent determination) that by offering its athletes more than the Cost of Attendance, it would lose fan interest and thus suffer a decline in revenue, nothing in an open market would compel them to make such a business-losing payment offer. However, were the individual conferences to collude before making that determination (as has been proposed in recent NCAA proposals), this would constitute a continued violation of the antitrust laws. Thus, such competition should not occur without judicial oversight. Plaintiffs therefore request the appointment of an Antitrust Compliance Monitor, as detailed elsewhere herein, to ensure that Defendants do not unlawfully impede competition among themselves even after the NCAA is enjoined from enforcing the current price-fixing agreement.

195.    The need for such a Monitor is abundantly clear from current conduct of the Power Conferences. Even as the Power Conferences acknowledge the anticompetitive effect of their current membership in the NCAA by explaining NCAA rules prevent them from offering the higher compensation they think the market demands, they simultaneously seek to form a cartel among themselves. In a system where each school currently has a "Compliance Officer" who enforces, not the Antitrust Laws, but the price-fixing rules of an illegal cartel, an appointed monitor will be needed to change a deep culturally rooted belief in collusion among competitors. Such a Monitor would be

---

[14] *Id.*

helpful to prevent conduct like what occurred on May 20, 2104, when the Pac-12 engaged in blatant cartel conduct: price-fix signaling, by stating its desire to fix prices with all members of the other four Power Conference Defendants.[15]

196.     Each Conference Defendant has indicated that if left to design its own compensation plan, each would increase current compensation levels by at least the difference between the current collusively set grant-in-aid maximum and the true Cost of Attendance. Ending this collusion would widen consumer choice as each Conference Defendant (as well as their co-conspirators) could choose the level of payment that best balances its desire to attract the best talent with the perceived reaction of its consumers (broadcasters, alumni, other students, fans). If a given conference felt that payment in excess of this new Cost of Attendance level were in its best financial interest, it could make such an offer. On the other hand, if a conference felt that such payments would be detrimental to overall demand, then even absent a national collusive cap, that conference need not offer more, and would live with the quality of team it could attract with a Cost of Attendance offer.

197.     Defendants' conduct, therefore, artificially limits and narrows consumer choice, and prevents new products from coming on to the market and existing.

198.     Defendant NCAA's expert economist, in other litigation, has also testified that lifting the current cap would be pro-competitive as well: "For example, I have asked myself, suppose that the NCAA were to define differently what is an appropriate payment that would cover student expenses and tuition and to change that amount. It's a subject that has been under some debate, and I think there are changes in the rules that could be made that would still achieve the pro-competitive purposes that the NCAA has set out, but I have not seen my charge by the NCAA as advising them as to how to change their regulations."

199.     The American Bar Association's "Antitrust" publication in 2000 focused on antitrust issues in sports, including college sports. In that journal they published an analysis of the NCAA's

---

[15] Antonio Gonzalez, *APNewsbreak: PAC-12 Presidents Back New NCAA Model*, AP.Org, May 20, 2014, http://collegefootball.ap.org/article/apnewsbreak-pac-12-presidents-back-new-ncaa-model.

price-fixing rules and concluded that less restrictive alternatives, such as conference-based

competition, exist:

> [A] more viable alternative, that recognizes the necessity of coordination among teams to create league sports, is to devolve power from the NCAA to the various collegiate conferences. Conferences can play the procompetitive joint venture role accepted by the courts in their treatment of sports leagues, creating the necessary competitive framework for the existence of the product. Each conference, then, could choose a common wage regime, and within that conference, the necessary balance for the creation of a team sport would be maintained, without the need for an overarching super-cartel to control the entire market for college-age athletes.... [16]

200.    Existent dimensions of competition among NCAA member conferences include

competing:  (1) on non-monetary terms to attract the best football players to their conferences; (2) to

attract member institutions (a phenomenon known, as of late, by the term "conference realignment");

(3) to retain member institutions; (4) to provide desirable revenue sharing among member

institutions (whether equal sharing, or unequal sharing); (5) to provide conference "stability"; (6) to

attract favorable television broadcast revenues; (7) to provide conference-owned television networks;

(8) to attract sponsorship monies; and (9) to retain the most qualified referees and officials.

201.    More specifically, one aspect of competition among conferences involves competing

on whether revenue will be shared equally among member schools, or according to other formulas

featuring a component of non-equal sharing.  For example, on September 21, 2011, ESPN.com

reported that "[t]he Pac-12 decided it won't expand further late Tuesday because commissioner

Larry Scott failed to get assurance that Texas [a member of the Big 12 conference] would back an

equal revenue sharing plan if the league added the Longhorns, [Big 12 conference members]

Oklahoma, Texas Tech and Oklahoma State, a source with direct knowledge told ESPN.com."

202.    In 2013, a member of the ACC, the University of Maryland, College Park

("Maryland"), initiated litigation against the ACC, triggered by issues relating to when, on

"November 19, 2012, Maryland publicly announced its intention to [leave the Atlantic Coast

---

[16] Daniel A. Rascher & Andrew D. Schwarz, *Neither Reasonable nor Necessary: 'Amateurism' in Big-Time College Sports*, ANTITRUST MAG., 51 (Spring 2000), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=926339.

CLASS ACTION COMPLAINT

Conference and] join the Big Ten Conference beginning on July 1, 2014." Maryland's complaint is notable for, among other things, detailing the competition among conferences as follows:

> Competition is not limited to members of the same conference, who compete both on and off the field. Each conference, as a joint venture of the university members, competes in many ways with other conferences (typically joint ventures among a separate and distinct set of other universities). Conferences (or associations of member schools) compete for member schools, sales of tickets, sale of broadcasting rights, advertising and sponsorships, and opportunities for their members to compete in lucrative athletic contests, such as the Bowl Championship Series in football and the NCAA men's and women's basketball tournaments.
>
> There exists a market in which intercollegiate athletic conferences compete for member institutions. Conferences often leverage broadcasting revenues to enhance the attractiveness of their athletic associations to prospective members. Various conferences have recruited and added member institutions to create or maintain appealing rivalries and enhanced competition, in order to increase fan interest, broadcasting ratings, and sponsorship appeal, with the goals of improving the product offerings of the conference, increasing revenues to the conference and its members, and enhancing its members' reputations and brands.

203. Competition among NCAA member conferences to attract new member institutions has been very well-documented. *The New York Times*, in an article dated November 30, 2013, titled "Tracing the History of N.C.A.A. Conferences," reported that "[a] frenzy of realignment has transformed college athletics: about one in four major football programs has switched conferences since 2010. The effects are only starting to play out as programs build new infrastructure to televise and market their programs, especially in up-and-coming conferences. As conferences have become essential to stay competitive, the number of unaffiliated major schools has declined sharply." *The New York Times* provides a detailed, interactive chart, documenting conference switching among "[m]ajor college football programs since 1965" at this Internet website: http://www.nytimes.com/newsgraphics/2013/11/30/football-conferences/ (last visited February 5, 2014).

204. Maryland's complaint against Defendant ACC provides additional information on conference realignment and competition:

> Changes in the alignment of colleges and universities within athletic conferences have occurred with increased frequency in recent years. Within 2012 alone, major revisions in membership occurred or were

CLASS ACTION COMPLAINT

-62-

announced not only with respect to the ACC, but also in other collegiate athletic conferences.

The rapid conference realignment that has occurred in recent years (and that is likely to continue, absent unreasonable restraints on competition) has enabled institutions of higher learning to enhance the academic, athletic, and research opportunities available to their students, student-athletes, and faculty through both increased revenues and enhanced visibility and reputational benefits.

Conference realignment is a method by which an academic institution can enhance its reputation and brand and its ability to attract student-athletes, students, faculty, and coaches.  Realignment also presents an opportunity for universities to join conferences with universities with common attributes and missions.

Conference realignment creates conferences that are more appealing to intercollegiate athletics fans, which results in greater competition and greater benefits to consumers from the products offered by those conferences.  Realignment of conferences creates the opportunity to attract to conference athletic events fans and consumers who are otherwise not following intercollegiate athletics.

Both historically and recently, the ACC has been an active participant in the market to recruit universities to become athletic conference members by aggressively pursuing and adding members.  The ACC was founded in 1953 by seven universities that all left the Southern Conference.  Shortly thereafter, the University of Virginia also withdrew from the Southern Conference to join the ACC.  In 1971, the University of South Carolina withdrew from the ACC and later joined the Southeastern Conference.  Thereafter, Georgia Tech, once part of the Southeastern Conference and a charter member of the Southern Intercollegiate Athletic Association, joined the ACC.  In 1991, the ACC extended membership to Florida State, a charter member of the Dixie Conference and former member of the Metropolitan Collegiate Athletic Conference.

The ACC's membership remained the same until approximately 2004, when the ACC initiated the most recent trend of conference realignment.  That year, the University of Miami and Virginia Tech left the Big East Conference to join the ACC.  One year later, Boston College followed.

Recently, the ACC has been extremely active in the market for new conference members.  In 2012, Syracuse University and the University of Pittsburgh announced that they will withdraw from the Big East Conference and join the ACC in 2013.  On September 12, 2012, the ACC announced that the University of Notre Dame will join the conference by 2015 for all conference-sponsored sports except football (although Notre Dame has agreed to play five ACC football teams each season).  Most recently, on November 28, 2012, ACC presidents and chancellors voted to admit the University of Louisville (in a meeting from which Maryland was improperly and illegally excluded).  Louisville is scheduled to leave the Big East and become an ACC member in 2014.

CLASS ACTION COMPLAINT

205.    Conferences and their members compete on the strength of the conference's brand, including to recruit college football and basketball players.  For example, on February 6, 2013, *Yahoo! Sports* reported:

> "Kids want to play in the SEC," [new Kentucky football coach Mark] Stoops told *Yahoo! Sports* Wednesday morning.  "It's important, we have a great program, a great school in a great location and we play the best conference in America." . . .

> "SEC membership isn't the ultimate trump card, but it's a pretty good one," said Rivals.com national recruiting expert Mike Farrell.  "The SEC is a great selling point.  A lot of kids choose the SEC not just because they have the best chance to win a national title, but to play against a better caliber of competition." . . .

> While it is nothing new for SEC programs landing coveted recruits—predictably, Alabama, Florida and LSU were all ranked in the top five—the depth of the dominance is something new. . ..  That's the power of the league brand.  Fans of rival conferences can be excused for getting sick of the "SEC, SEC" chant and the fawning media coverage that follows.  But just imagine how their coaches feel hearing it on the recruiting trail. . . .  "These schools have even proven they can go out of the region and bring kids to the SEC," Farrell said.  "That's new." . . .

> Again, it's one thing for Alabama or Florida to recruit nationally.  But everyone?  Ole Miss landed wide receiver (Laquon Treadwell) from Illinois.  Auburn got defensive end (Tashawn Bower) out of New Jersey and defensive end (Elijah Daniel) from suburban Indianapolis.  South Carolina went to Philadelphia for running back David Williams.  And Kentucky picked up defensive back Marcus McWilson out of Youngstown, Ohio.

> Rival fans can complain about SEC bias, SEC hype, even SEC over-signing.  No one is arguing against that.  This is what National Signing Day is, however, and this is what the system has delivered.

> A world where one conference's high tide has lifted all boats, even in, of all places, the long-lowly, just-waiting-for-basketball-season Big Blue of Kentucky.

206.    On July 27, 2010, *Sports Illustrated* reported, regarding the Pac-12, the following:

> "I don't think it's far-fetched to think that five years from now, you'll see Pac-10 teams competing in Asia, hosting teams over here, and the brand of the Pac-10 starting to built over there and exposed on TV," [Pac-12 Commissioner Larry] Scott said.  "That's going to provide some great opportunity for student-athletes."  He also hopes it might pave the way for more academic collaboration between Pac-10 schools and Asian universities.

> A "logical byproduct," Scott said, is the potential to eventually recruit athletes from Asia.

CLASS ACTION COMPLAINT

207.    Conferences compete to attract other personnel, not merely college football and basketball players.  For example, *USA Today*, on March 12, 2009, reported that John W. Adams, the NCAA's coordinator of men's basketball officiating, stated that "[t]here's competition (among conferences) for the best officials on certain days.  They're independent contractors, and many of them do it for a living."

208.    In July 2010, *Sports Illustrated* reported the following comments from the now-NCAA President Mark Emmert, who was then the President of Pac-12 member the University of Washington:

> "The Pac-10 has always had a very good reputation," said Washington president Mark Emmert, who will take over as NCAA president on Nov. 1.  "The brand has always stood for academic quality and integrity.  We certainly wanted to keep all that in place because it's essential and central to who we are.  But it also had a bit of a stodgy, a little bit self satisfied image that we wanted to change.
>
> We wanted to demonstrate that out west, people are engaged in innovation and creativity.  We are the home of Microsoft and Google, and we do build airplanes.  We do all sorts of exciting and dynamic things out west. . . . Yet the conference wasn't really a reflection of that energy."

209.    President Emmert's remarks surely could find application in regards to determining a viable, less restrictive alternative to the restraint challenged herein.  Of interest, given President Emmert's reference to Google, are the following September 2012 remarks of Google's Chief Legal Officer, David C. Drummond, himself a former college football player:

> The problem with college sports is not too much money; it's the lack of basic self-awareness.  Even if you believe that amateurism was at one time a reasonable and attainable ideal.  That time has obviously passed.  Compensating athletes is clearly part of the answer, but it's not the whole answer; what college sports need now is a redesign.  And that redesign will have many important details.  But what's clear is that Version 2.0 of the college sports business will need to recognize that it's an American business and behave accordingly.  Some would say that this is an incredibly tall order, perhaps too tall.  Fair enough.  But to the reformers in the room, I would urge you to consider a saying we really like at Google:  sometimes really good things come from having a healthy disregard for the impossible.

210.    Drummond offered his own solution, one that could thrive in the less restrictive alternative of conference competition outlined above.  Drummond explained:

1

> The first norm that technology transfer managers knew they should respect was the one that says that people who contribute to a commercial endeavor should be compensated in a way that is at least rationally related to their contribution. At Stanford, the policy for licensed inventions calls for one-third of the royalties to go to the inventor, one-third to the inventors' department, and one-third to the inventors' school. Where the school accepts start-up equity in lieu of cash royalties, it is typically a very small percentage, in the case of Google, about 2%. This means that the founders of Google were able to reap the benefits of their hard work and ingenuity, even though they were still students at Stanford.

Under this less restrictive alternative, not every school or conference would be required to adopt the Stanford system, or any specific model. But it would be open to them as a choice, with respect to how best to compete for talent in the relevant markets how best to offer its downstream consumers a choice when it sells its products of conference football and basketball in competition with other conferences' offerings. Under the current system of collusion and mandate, no school is able to widen choice by offering alternative models to the NCAA's collusive, we-know-better-than-the-market restriction on competition and choice.

**C. The NCAA's Public Statements Regarding the Pro-competitive Nature of the Proposed Stipend and Absence of Pro-competitive Justifications for Capping Compensation at Current Levels**

211. The NCAA has made a litany of public comments seemingly supporting the concept of a stipend. Each one seems potentially promising in a vacuum, until one realizes they go back to at least as early as 2003 (leaving aside that these stipends were provided prior to 1976-77 and only stopped by action of the NCAA), with little change ever following the statements.

**1. 2014 Statements.**

212. On or about April 10, 2014, the NCAA distributed to its members a memorandum with the following introduction: "The NCAA communications staff prepared the following material to assist members in conducting public outreach or responding to media requests." Under the section "We Can Do Better," the memorandum stated that "[o]ur members believe in addressing some of the legitimate concerns that critics have raised, like providing the full cost of attendance—to help pay for that trip home or to grab a movie and dinner—particularly for those students with limited economic means." The memorandum further included a quote from Dabo Swinney, head football coach at

1    NCAA and SEC member Clemson University, in which he stated:  "I am 1,000 percent in favor of a

2    stipend or modernizing the scholarships, because they haven't changed.  Costs more to go to a

3    movie, costs more to buy gas, costs more to wash your clothes than it did when I was in school.

4    There needs to be an adjustment there."

5         213.   On March 31, 2014, CBSSports.com reported that Wake Forest University president

6    Nathan Hatch, chairperson of the NCAA's Steering Committee for Governance, distributed a

7    document to NCAA members detailing the NCAA rules that the Power Conferences would seek to

8    amend or change in upcoming NCAA governance discussions.  The article continued that "Among

9    the topics addressed in what is labeled an 'Attachment to Memorandum': . . . Provide full cost of

10   attendance to players."  The article continued:  "'I think what was reflected in that memo is a

11   growing consensus,' Pac-12 commissioner Larry Scott said."  The actual memorandum is titled

12   "Enhanced List of Policies Subject to Group of Five Autonomous Decision-Making," and states in

13   pertinent part:  "The Group of Five Conferences' 'Vision for College Athletics in the 21st Century,'

14   previously identified the following items for Legislative Autonomy to be allocated to the Five

15   Conferences:  a.  Define the full grant-in-aid as meeting a student-athlete's cost of attendance

16   (Bylaws 15.1 and 15.2.4) . . . . c. Enhance benefits provided to student-athletes for the purpose of

17   supporting their needs based on available resources rather than competitive equity (Bylaw

18   20.9.1.3)."[17]

19        214.   In January 2014, NCAA Division I Board of Directors Chairman Nathan Hatch, also

20   the President of NCAA Division I member Wake Forest University, circulated a letter to NCAA

21   members regarding a "template prepared by the Division I Board of Directors' Steering Committee

22   on Governance that is intended to aid participants during the January 16 and 17 Division I Dialogue

23   in San Diego."  The "template" includes a "Proposed Legislative Structure" regarding "Legislative

24   Autonomy" that is "[d]efined as the ability, within the current NCAA structure, for the SEC, B1G

25   [sic, i.e. the Big Ten], PAC-12, ACC and Big 12 conferences and their institutions to adopt reforms

26

27        ───────────────
         [17] Document available at http://www.cbssports.com/images/collegefootball/NCAA-Group-Of-
28   Five-Policies-Decision-Making.pdf (last visited July 9, 2014).

CLASS ACTION COMPLAINT

in a regulatory structure that respects the demands on student-athletes in the 21st century and acknowledges the need for these conferences / institutions to define rules that address their unique challenges."

215.    The document continues that one of the "Proposed Areas of Autonomy" is to "[d]efine a full grant-in-aid as meeting a student-athlete's cost of attendance in a manner consistent with the core values of the collegiate model and not to exceed total cost of attendance."

216.    On January 13, 2014, the *Associated Press* reported that "NCAA President Mark Emmert said Monday that providing a stipend to student-athletes seems less threatening to the schools that earlier knocked down a proposal to increase the value of a scholarship to cover the full cost of attendance.  'It seems to be a much less controversial notion today than it was 18 months ago,' Emmert said of the stipend proposal.  'As we've talked about it more and the membership has had a chance to digest it, it's being seen as less threatening.'"

217.    On July 9, 2014, NCAA President Mark Emmert testified before the United States Senate's Commerce Committee that it is imperative that college athletes receive full cost of attendance scholarships.

       2.    **2013 Statements.**

218.    On January 20, 2013, the *Associated Press* referenced President Emmert and reported that "[w]hen talking about a needs-based proposal, Emmert used as an example his cousin who was a volleyball MVP at [the University of] Washington.  'I know my cousin's circumstances and she didn't need it,' he said.  "But there were other players on that team for whom that would probably have been very important.'"

219.    On April 10, 2013, *The Chronicle of Higher Education* reported that "[w]hen [NCAA President] Mark Emmert gathered together more than 50 college presidents nearly two years ago to discuss ideas for reforming big-time sports, the group came to a pretty clear consensus on the need to increase aid to athletes."  The article continued that "[w]ith big money flowing in from TV contracts, and increasing amounts going toward coaches' salaries and facilities, the idea of allowing Division I colleges to direct up to $2,000 more a year to certain players seemed to make sense."  The

CLASS ACTION COMPLAINT

1    unfortunate postscript: "after a series of failed attempts to carry out the proposal, the NCAA is

2    essentially back to the drawing board."

3         220.    The article quoted Sidney A. McPhee, the President of NCAA member Middle

4    Tennessee State, and a proponent of the stipend, as being the "head of the NCAA Student-Athlete

5    Well-Being Working Group" and the "chief arbiter of the stipend debate."  It further states that "[t]he

6    climate has frustrated Mr. McPhee, who believes that even the less-wealthy programs have an

7    obligation to make a priority of players and their unmet financial needs.  'If you want to compete [in

8    Division I,]' he says, 'you've got to step up.'" (bracketed text in original).  The article continues that

9    "[i]t's also a matter of fairness, he says.  Institutions increase aid packages for other students all the

10   time, so why shouldn't they do it for athletes too?"  The article continues that "[o]ver the past few

11   months, Mr. McPhee has expanded his group to include more athletic directors, presidents, financial-

12   aid directors, and others.  In recent weeks the group has spent much more time looking at the concept

13   of aid and different ways to enhance it."  The article explained that rather than base any cap on

14   athlete compensation on an assessment of the least restrictive alternative available, it was a simple

15   question of what best suited the self-interest of the members of the cartel:  "[i]n a recent straw poll,

16   the group agreed almost unanimously with the idea of allowing increased aid for athletes.  Still, Mr.

17   McPhee is not optimistic that Division I members will ultimately support such a change.  'There is

18   still continuing opposition to doing anything,' he says.  'I'm afraid that whatever we do will have a

19   high likelihood of an override.'"

20        221.    An article in *U.S. News & World Report*, dated September 16, 2013 regarding stipend

21   and other proposed reforms, stated that the NCAA Division I Board of Directors "hope to adopt

22   proposals at its meeting next April [2014], and then have a special meeting for the membership next

23   summer.  'That could involve bringing all 350 members of Division I together and having every

24   school vote on it,' [NCAA President] Emmert said.  'It'll be a bit like a constitutional convention.'"

25   Except of course, in this case, the "convention" is in fact an open meeting of an anticompetitive

26   cartel, explicitly meeting to discuss whether the current fixed-price offering should be adjusted to

27   another fixed-price offering.

28

222.    On November 24, 2013, *The New York Times* reported that "Elizabeth Altmaier, a professor of Iowa who served on a number of N.C.A.A. panels on commercialism as a faculty athletics representative, said she believed there needed to be a way for college athletes to get more than scholarships.  'People who say, in a very superior manner, that these kids had a college education and that's sufficient remuneration are naïve at best, and blind at worst, to the realities of being a student athlete in a Division I institution.'"

223.    On December 11, 2013, *The New York Times* reported President Emmert as stating: "There is an interest in making sure that full cost of attendance is covered.  . . . That number varies from school to school.  It can vary from $0 to $6,000.  A debate the members will have to have is, are we going to allow the closing of that gap?  And if so, how high can we go?  No one right now wants to go above full cost of attendance, that a student-athlete could get what it costs to be a student, but they're students, not unionized employees, not somebody that's on the payroll."  It is clear that the NCAA believes that it, its co-Defendants and other co-conspirators, can act with impunity with respect to price competition in the Football Bowl Subdivision Labor Market, and the Major College Basketball Labor Markets, and that rather than facing a market price, they may impose whatever price-fixed amount of pay they "allow" cartel members to offer.

      3.    **2012 Statements.**

224.    An *Associated Press* article dated December 5, 2012 stated that "Emmert chided athletic programs that make major decisions guided by efforts to generate more revenue, then complain they can't afford a stipend.  At the forum, which is sponsored by IMG and hosted by SportsBusiness Daily/Global/Journal, Emmert said of conference realignment:  'When people say it's all about the money, that's not inaccurate.'  He later took that argument to the stipends cause:  'When the world believes it's all a money grab, how can you say we can stick with the same scholarship model as 40 years ago?'"

225.    An article dated December 6, 2012, and presently posted by the NCAA on its website, is titled "NCAA President Emmert fights for student-athletes' right to more funds."  It states that "NCAA President Mark Emmert is still determined to provide college athletes with 2,000 dollars for

expenses not covered by scholarships."  It continues that "[t]he stipends would help cover the full cost of attending college, which scholarships don't meet, providing money for expenses beyond tuition, room and board, books and fees."  The article continued that "[t]he biggest key to implementing the stipends may be changing schools' mindsets.  'This is a branding issue,' Emmert said."  The article continued that "Emmert chided programs that make major decisions guided by efforts to generate more revenue, then complain they can't afford a stipend."  The article continued that "Emmert argues that money is not the issue.  Money is pouring in from TV deals.  The new college football playoff contract will be worth about 470 million dollars a year."

### 4.   2011 Statements.

226.   On May 24, 2011, the NCAA posted on its website an article by an NCAA member school's assistant director of compliance, who stated that "[a] few hundred bucks a month is not going to make a great deal of difference for student-athletes who are offered lavish gifts like cars, personal training, jewelry, trips to South Beach, etc.  But according to former NFL agent Josh Luchs, many times the benefits used to recruit a student-athlete are fairly modest. If a student-athlete can no longer be swayed by pocket money, agents will be forced to provide bigger benefits to student-athletes.  And bigger benefits are easier to catch . . . .  With the full cost of attendance covered for revenue sports and star athletes, plus all the existing and legal ways to get cash to a student-athlete, it will no longer be a case of *needing* to take money from agents or boosters."

227.   NCAA President Mark Emmert also has repeatedly explained that there is little chance that such payments will generate concerns regarding competitive balance because the power of competition along many indirect fronts has already distributed talent in proportion to a school's/conference's ability to compete for talent directly through the relief requested here:

> a.   "When you look at a student who's being recruited by heavily funded institutions, those kids are rarely asking, "Do I go here, or do I go to an institution that has less money?  If students have the opportunity to go to that dominant athletic program, they're going to go."[18]

---

[18] Seth Wickersham, *Emmert: "Don't Lie. Don't Steal."*, ESPN COLLEGE SPORTS, Dec. 2, 2011, http://espn.go.com/college-sports/story/_/id/7303903/ncaa-president-mark-emmert-makes-rulebook-

b.    "I don't think any of the Butler kids were recruited by, you know, by Kansas."[19]

c.    "So if you've got a gap between $40,000 and $150,000, (then) $2,000 isn't going to make much of a difference."[20]

228.    Emmert explained: "As for the continued separation of the haves and the have nots, that's economics, Emmert said. 'We've always had that. The financial differences have always been there. Some universities have huge competitive advantages [because] of history and culture and decisions that the university made over decades that are in some ways insurmountable and you wouldn't want to take them away.. . . I'm sure Alabama under Bear Bryant had these stunning competitive advantages . . . Now to say that the University of Louisiana-Lafayette and Alabama have huge competitive disadvantages it didn't look much different 40 years ago. It reinforces some of those inherent advantages some of those universities have had for a century.'"[21]

229.    In a memo he wrote to then-recently chosen President Mark Emmert, Wally Renfro, the long-time Vice President of the NCAA, characterized Division I as being divided into the top 25 percent (the "haves"), the middle 50 percent (the "have-nots"), and the bottom 25 percent (the "forget-about-its"), and stated that the last group "has largely stopped trying to compete."[22]

---

changes-offers-stipends-athletes: [Emmert] When you look at a student who's being recruited by heavily funded institutions, those kids are rarely asking, "Do I go here, or do I go to an institution that has less money?" If students have the opportunity to go to that dominant athletic program, they're going to go.

[19] *Id.*

[20] Joseph Duarte, *NCAA's Emmert Says Legislation Won't Impact Gap Between Haves, Have-Nots*, HOUSTON CHRON., Nov. 3, 2011, *available at* http://www.chron.com/sports/college/article/NCAA-s-Emmert-says-legislation-won-t-impact-gap-2251444.php (Emmert: "Well, the gap right now is pretty enormous. If you look at the lowest-resourced conference, they spend about $40,000 per year per student-athlete, for all costs in. The Southeastern Conference at the top spends roughly four times that, so (about $150,000) per student. So if you've got a gap between $40,000 and $150,000, (then) $2,000 isn't going to make much of a difference.").

[21] Dennis Dodd, *NCAA President: Conference Realignment "A Market Shakedown,"* CBSSPORTS.COM, May 31, 2012, http://www.cbssports.com/collegefootball/blog/dennis-dodd/19217878/ncaa-president-conference-realignment-a-market-shakedown.

[22] Memorandum of Points and Authorities in Support of Motion by Antitrust Plaintiffs for Summary Judgment, Exhibit 12 at 137, *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. 09-cv-01967-CW, ECF No. 999-2 (N.D. Cal. Feb. 26, 2014).

CLASS ACTION COMPLAINT

230.     On December 15, 2011, the NCAA posted on its website another article by an NCAA

member school's assistant director of compliance, who stated that "Proposal 2011-96, which allows

schools to provide up to $2,000 beyond the current grant-in-aid limits, is not an unfunded mandate.

They key word is allows.  The proposal requires schools to do nothing, just permits them to."

### 5.     2003 Statements.

231.     Myles Brand, the former President of the NCAA, has admitted that the unlawful

agreement is not necessary to preserve amateurism, and that athletic scholarships covering the Cost

of Attendance would be fully compatible with the legitimate purposes and objectives of the NCAA.

In a letter to the editors of the *Denver Post*, then-President Brand wrote the following in 2003:

> Ideally, the value of an athletically related scholarship would be
> increased to cover the full-cost of attendance, calculated at between
> $2000 and $3000 more per year than is currently provided.  I favor this
> approach of providing the full cost of attendance.  The Division I
> membership, which is where the final decision will be made, will
> continue to address the issue over the next several months.[23]

232.     Indeed, Brand reconfirmed his support for eliminating the grant-in-aid cap even after

a predecessor lawsuit was filed.[24]  Most recently, Brand stated that eliminating the grant-in-aid cap to

allow scholarships covering the full Cost of Attendance "strikes me as a reasonable approach."[25]

### 6.     The recent history of the latest stipend proposal.

233.     On October 27, 2011, the NCAA issued a press release stating the following:

> The Division I Board of Directors continued the quick-action
> precedent set earlier this summer, adopting a package of proposals
> Thursday that toughen academic standards and provide increased
> academic and economic support to student-athletes.
>
> "These changes demonstrate a remarkable resolve by presidents," said
> NCAA President Mark Emmert.  "They represent a return to and a
> focus on values that are at the core of what intercollegiate athletics are

---

[23] Myles Brand, Letter to the Editor, *Welfare of Student-Athletes NCAA's Top Priority*, DENVER POST, Aug. 17, 2003.

[24] *See* Mark Alesia, *Lawsuit:  NCAA Should Pay 'Full Cost,'* INDIANAPOLIS STAR, Feb. 22, 2006, *available at* http://www.indystar.com/apps/pbcs.dll/article?AID=/ 20060222/SPORTS/602220460.

[25] Mark Alesia, *Tourney Money Fuels Pay to Play Debate:  Fewer than 1% of Athletes Help Make More than 90% of the NCAA's Money*, INDIANAPOLIS STAR, Apr. 1, 2006, *available at* http://pqasb.pqarchiver.com/indystar/doc/240809664.html?FMT=ABS&FMTS=ABS:FT&date=Apr +1%2C+2006&author=ALESIA%2C+MARK&pub=Indianapolis+Star&edition=&startpage=&desc =Tourney+money+fuels+pay-to-play+debate.

CLASS ACTION COMPLAINT

all about.  They also represent a clear signal to the world about what we care about and what we stand for."

The Board approved an implementation plan—which includes all football bowl games—that mandates a certain level of academic performance in order to participate in postseason competition.  The eligibility requirement will begin phasing in with the 2012-13 academic year.

The Board also adopted legislation giving student-athletes who receive full athletics scholarships the opportunity to receive additional athletics aid up to the full cost of attendance or $2,000, whichever is less.

The working group that made the recommendation told the board the $2,000 figure is meaningful in addressing the miscellaneous expenses student-athletes now have.  Institutions will not be required to offer the benefit, but conferences are encouraged to consider common application within their membership.

. . .

Student-athlete well-being improvements

The Board also adopted legislation that addresses the miscellaneous costs of attending college.  Student-athletes who receive full athletics scholarships or get other school financial aid combined with athletics aid to equal a full scholarship will have the opportunity to receive additional athletics aid (or other institutional aid, including use of the Student-Athlete Opportunity Fund) up to the institution's calculation of full cost of attendance or $2,000, whichever is less.

The figure will be adjusted according to the consumer price index, so the presidents will not need to approve new figures when the cost of living changes.  The Board resolved to not revisit the $2,000 amount for three years.

. . .

Penn State President Graham Spanier chaired the working group established to examine student-athlete well-being issues.

"We understand the situation of our student-athletes.  This isn't about paying student-athletes, but it is about being fair and recognizing that in Division I it ought to be important to meet this need," Spanier said.  "We all have lots of different choices to make, but we felt that these proposals are right for our student-athletes."

234.    The NCAA further stated, in regards to an effective date, that the new rule would apply to "[a]id agreements that take effect August 1, 2012 [awards can be executed before that date]."

235.    The NCAA's own statement that these Cost of Attendance stipends do not constitute "pay" is telling ("This isn't about paying student-athletes").  This is because the NCAA knows its definition of pay is entirely based on the arbitrary decisions of the cartel.  If the NCAA allows any compensation, by Rule (*e.g.*, Bylaw 12.02.7) it is instantly transformed from pay into allowable financial aid.  Bylaw 12.02.7 states that "[p]ay is the receipt of funds, awards or benefits not permitted by the governing legislation of the Association for participation in athletics."  By this the NCAA makes clear that the price is fixed, the rules are arbitrary and that there is nothing other than the will of a collusive body, and certainly no neutral weighing of the pro-competitive benefits versus the perils of collusion, that makes the decision.

236.    On December 8, 2011, the NCAA posted on its website "Frequently Asked Questions," and stated this:  "Does the same amount have to be offered every year of a multi-year award?  Multi-year awards are not required to award the same amount each year.  For example, a multi-year agreement can stipulate that a student-athlete will receive a certain amount in the freshman year and a different amount in the sophomore year."

237.    On December 8, 2011, the NCAA also stated in this question and answer that the proposed change was subject to a cartel vote:  "What if the legislation is overridden?  Institutions were permitted to offer both the miscellaneous expense allowance and multi-year awards to recruits beginning with the early NLI signing period in November.  Both rules are subject to override, but agreements signed prior to the last day for override requests (December 26) will be honored."

238.     The cartel did in fact choose to disallow even this small amount of market-based competition.  On December 15, 2011, the NCAA's news service reported that "[t]he new rule allowing Division I institutions to give some student-athletes an additional $2,000 miscellaneous expense allowance has been suspended until the Board of Directors convenes in January.  As of Dec. 15, enough schools—125—have called for an override of the legislation to prompt the automatic suspension under NCAA bylaws."  The NCAA's release quoted NCAA President Mark Emmert as stating that "[b]ased on conversations I have had, I am confident that there remains a very high level of support for this permissive legislation to provide better support for our student athletes."

239.    The NCAA, however, made clear that the rule itself offered no chance of harm to the NCAA itself, or to the continued success of "amateur college football" or "amateur college basketball" and explicitly announced that "[a]ny allowances offered in writing during the November [2011] early signing period will be honored, according to Division I Vice President David Berst. Nearly 10,000 prospective Division I student-athletes signed National Letters of Intent for next year during the early signing period in November." The NCAA continued that "[u]nless the Board takes some action to alter the proposal, prospective student-athletes who sign with schools during the upcoming signing periods in February and April will not have the option to receive the additional $2,000 allowance."

240.    On January 14, 2012, the NCAA issued another press release, stating that "[t]he Division I Board of Directors reaffirmed Saturday its support for a $2,000 miscellaneous expense allowance, but direct the Student-Athlete Well-Being working group to come back to the presidents [of NCAA member institutions] in April with recommendations for implementation."

241.    On November 3, 2012, the *Associated Press* reported that rather than being based on an assessment of the least restrictive alternative available, the decision was made to appease the cost-containment concerns of cartel members: "[t]he $2,000 was a 'compromise' among [NCAA Division I Board of Directors] members, Emmert said. Some thought that the total amount should have been higher, but Emmert said the board wanted to settle on a reasonable amount it felt all schools would be able to afford. 'It could've been higher, it could've been lower,' he said. 'But that was the number that everyone agreed was a good place to be.' Emmert says the stipend bears no comparison to offering a salary to a student-athlete, essentially making him or her a paid employee of the university. 'We're still supporting them as students, not as somebody we're paying to play a game,' said Emmert, a former president at the University of Washington."

242.    In October 2013, the NCAA issued a press release referring to its Division I Leadership Council having convened a meeting on October 24, 2013, in Indianapolis. The NCAA stated that competitive balance was not impacted by a less restrictive version of its current price-fixing, stating: "Council members agree that the true 'level playing field' between schools cannot be

achieved by making rules that limit the ability of schools with more resources to use them.  Members stress that in some areas rules could become more permissive to allow schools who can afford to take advantage of the flexibility to do so."  The press release continued that "[m]any [Council members] believe that student-athlete benefits, including a change in the definition of a full athletics scholarship to include the full cost of attendance, could be an area of compromise."

243.    On October 29, 2013, the NCAA's Division IA Athletics Directors Association made a presentation to the NCAA's Board of Directors.  *Yahoo! Sports* reported that "Morgan Burke and Mike Alden, athletic directors at Purdue and Missouri, respectively, made the presentation on behalf of the Division IA Athletic Directors Association and the National Association of College Directors of Athletics."  The article continued that "[t]he athletic directors' proposal is considered particularly influential because of their roles of running the on-campus operations of some 350 schools of all shapes and sizes."  The article continued that "[o]ne source believes the proposal made by the athletic directors is, in general, similar to one made by the conference commissioners, easily the other most influential group in college athletics."

244.    *Yahoo! Sports* posted a copy of the proposal, which includes this statement: "Intercollegiate Athletics must ensure and improve student-athlete well-being which include the ability to increase opportunities for student-athletes to receive athletics' [sic] assistance beyond what is currently available."

245.    On October 29, 2013, *USA Today* quoted Purdue athletics director Morgan Burke, who represented the IA Athletics Directors Association at the meeting, as stating that, with respect to the numerous proposed changes presented, "[t]here will have to be some give and take as we do down the road, but the fact that all 351 (Division I) athletics directors are speaking out of the same hymnal, it's the first time in my 20 years."  This representation that a clear meeting of the minds among employees of all 351 competitors in the Football Bowl Subdivision Labor Market had been reached is a clear statement of the renewal of the collusive agreement.

246.    NACDA's website states, in an entry dated September 25, 2013, under the slogan, "351 Division I Programs—ONE VOICE"  the following:  "NACDA President Mike Alden, athletics

director at the University of Missouri and D1A Athletic Directors' Association President Morgan

Burke, athletics director at Purdue University, are serving as national spokesmen for all 351 Division

I programs." It continues that "[t]he National Association of Collegiate Directors of Athletics

(NACDA) and the 1A Athletic Directors' Association, in addition to NACDA's Affiliate

Associations, the Football Championship Subdivision Athletics Association and the Division I-AAA

Athletics Directors Association (DI-AA ADA), are working as a cohesive unit in developing

recommendations that will help improve the governance and operation of intercollegiate athletics."

247.    The website links to the transcript of a teleconference dated September 27, 2013,

which contains the following exchanges (again, under the prominent slogan "351 Division I

Programs—ONE VOICE") explaining that the competitors discussed prices and came to an explicit

agreement that the current price fix was not necessary, but that actual competition would not be

permitted by cartel rule:

> Q. Morgan, obviously the statement the other day kind of speaks for itself, but where does your group come down on potential cost-of-attendance stipends for student-athletes?
>
> MORGAN BURKE: Well, I think that's a subject that's going to get a lot of debate, has gotten a lot of debate, as people have looked at miscellaneous expense allowance. We're committed to trying to make sure the resources that are needed for a quality student-athlete experience are there.
>
> Certainly if you go back into the 1960s, there was such a thing called laundry money, incidental money given to the student-athletes. That went away in the mid '70s. I think you're going to see a question occur on that topic.
>
> . . .
>
> **Q. In the statement the other day, you addressed the integrity issue that needs to be handled effectively, enforcement. What are some of the recommendations that you're making beyond what is already being done at the NCAA level?**
>
> MORGAN BURKE: I'm a big supporter for what the NCAA stands for. Again, we are the NCAA.
>
> . . .
>
> **Q. Mike, in the statement you put out the other day, you said, Pay-for-play is not part of the amateur setting, there's no place for that. You and the SEC have said before that you'd be for**

**exploring stipends and things like that. How do the two opinions vibe and how do they play into each other?**

MIKE ALDEN: I appreciate that. You know, what I had said earlier on this call, but also is we don't talk about pay-for-play. Wherever that's come from, whoever has created that terminology, that hasn't been necessarily anything that we've either talked about at Mizzou or talked about as athletics directors or certainly from an SEC standpoint.

What we've talked about is exploring the opportunity for a full cost of attendance. I used the example a little bit earlier, I'm going to reiterate it. I'm using my son as an example. Jake is a freshman here at Purdue. When we came here as his parents this summer, they showed us what our tuition, fees, books, room and board would be. They said, That's not what it's going to cost for him to go to school at Purdue, it's going to be a little bit more. His full cost of attendance, as parents, you need to budget a little bit more because he's probably going to come home twice, he needs incidental expense money, laundry money, whatever it may be.

That's the area all of us are looking at to explore. How do we have an opportunity to really look at what term, and most schools term, not athletics, most schools of higher education term 'a full cost of attendance.'

**D.     NCAA Conferences' Statements Regarding the Stipend Proposal**

      **1.     The Pac-12.**

248.    It is clear that absent the current restraint, the Pac-12's members would make competitive offers in the relevant markets for at least the full Cost of Attendance and that the conference did not see any harm to the Pac-12's views of amateurism or competitive balance from making such offers in that market. For example, on June 15, 2011, *The Denver Post* reported the following:

[T]he issue of athletes getting shortchanged by major-college football's billion-dollar business has pushed Scott to seek an increase in scholarship money for every varsity athlete on a Pac-12 campus.

"It's a question of priorities, and sometimes you have to prioritize what's right," Scott said. "I think this is an issue of principle. And we're going to advocate for it."

Scott broached the topic with Pac-12 athletic directors at their recent conference meetings. His pitch received mixed reviews. The athletic directors are ecstatic about getting about $20 million a year in television revenue per school once the new TV contracts kick in, but many will need that money to soak up red ink.

Increasing scholarships for tuition that is rising rapidly on many campuses would put it right back.

CLASS ACTION COMPLAINT

"Morally, I think it's the right thing to do," Oregon State athletic director Bob De Carolis said.  "But there are a lot of other issues and a lot of ways to get to it."

Scott presented hard data in Seattle.  He said the shortfall between the amount of an athletic scholarship and actual living expenses—termed "cost of attendance"—is $2,000 to $4,000 per student per school year.

"Our concern is kids from underprivileged backgrounds who literally have trouble covering costs, have a meal, have a little spending money," Scott said.  "That's a concern."

. . .

The move could provide an uneven playing field.

"I don't think there is an even playing field," Scott said.  "There's not an even playing field in TV exposure.  There's not an even playing field in coaches and coaches salaries.  There's not an even playing field in stadiums."

. . .

"I think the kids need more money, period," said Washington State football coach Paul Wulff.  "They say they can work a job, but it's unrealistic for what we ask these guys to do."

Wulff said he advocates providing a stipend of about $200 a month.

"The only reason I say that is to make sure they can eat," he said.  "In my opinion, I'd rather not give them any more money but have the ability to feed them two meals a day minimum every day.  I don't want to hear a kid say, 'Coach, I don't have enough money to eat.'  It harms their performance."

It's a long way from fruition, but the debate won't go away.  Scott will make sure it won't.

"No one relishes the idea of increased funding," Scott said.  "By the same token, we are as a conference at a level in terms of resources coming and a conference that likes to stand for doing things the right way, that it's the right thing."

249.   On March 8, 2012, *Sports Illustrated* reported:  "[Pac-12 member] Arizona State president Michael Crow [stated]:  "I had one of those scholarships as an undergraduate, but it was an ROTC scholarship.  Thirty-nine years ago, that scholarship paid me $100 month of spending money because that was the estimate then of what I needed to take care of my incidental expenses.  And that was 39 years ago.  This proposal [athletic grant-in-aid cost of attendance / stipend proposal] is not dramatically different than that."

CLASS ACTION COMPLAINT

250.     On March 8, 2012, *Sports Illustrated* further reported:  "[Pac-12 member University of] Washington president Michael Young said that when his school prepares academic scholarship packages, it bases the amount awarded on the cost-of-attendance figure it reports to the federal government. So a student on a full academic scholarship to Washington, he said, would receive more money than a student on a full athletic scholarship. Young also noted that the student on an academic scholarship can get a job, while employment opportunities for athletes are limited by available time and by NCAA restrictions. 'The kids who are on solely need-based aid can basically work 20 hours a week or whatever and earn a little pizza money or earn a little money for tattoos or whatever they want,' Young said, tongue planted firmly in cheek. 'Our athletes, on the other hand, work 40-50 hours a week for the school, and they don't get anything except what these other kids get without having to work for it. It seems when one thinks about simple equity, from that perspective, it's hard to argue that these kids shouldn't get something.'"

251.     On January 6, 2013, the *Associated Press* reported:  "The problem is scholarship rules have lagged behind the times, said Pac-12 Conference Commissioner Larry Scott, now in his fourth year in the job.  His conference, like most of the major ones, supports a stipend.  'The scholarship rules don't allow you to cover the full cost of attendance,' he said.  'Doesn't cover things like miscellaneous meals, trips home, clothes and other things.  For me there has been a gap.  This does not cross the philosophical Rubicon of paying players."

252.     On June 2, 2013, the *Los Angeles Times* reported that "Scott address a number of topics Monday during a conference call with reporters following last weekend's summer meetings in Park City, Utah."  The article continued that "[t]he full cost of attendance issue is not going away.  Several major conferences, including the Southeastern [SEC] and Pac-12, favor a plan that will use increased television money to compensate their athletes with an additional scholarship stipend . . . 'I'd like to think it could happen under the current structure,' Scott said of the stipend.  'This is clearly the right thing.'"

253.     On July 25, 2013, *Sports Illustrated's* SI.com reported that "[t]he big five conferences [Pac-12, SEC, Atlantic Coast Conference, Big 12, and Big Ten] want to be able to give the stipend to

CLASS ACTION COMPLAINT

all scholarship athletes."  The article quotes Pac-12 Commissioner Larry Scott as stating that, "[s]chools that have resources and want to be able to do more for student-athletes are frustrated, concerned that we're being held back from doing more for the student-athletes in terms of the stipend."  With respect to the smaller NCAA member schools that had blocked implementation of the stipend, he stated that "[t]he idea that there is an even playing field in terms for resources is a fanciful and quaint notion."  The article continued that "Scott compared the stipend being stymied to the delays in bringing instant replay to college football in the 2000s."  The article quoted Commissioner Scott as stating that "[i]nstant replay took longer than it needed to get into college football because not everyone could do it.  There are still some schools out there whose conferences can't afford instant replay.  It doesn't strike me that the world's fallen in or that it's created some crisis just because everyone can't have instant reply."

254.    On July 27, 2013, the *Denver Post* reported the following regarding Pac-12 Conference Commissioner Larry Scott's statements at the Pac-12's preview held at Sony Studios, in Culver City, California:  "Scott is fully behind the cost-of-attendance stipend most of the smaller schools can't afford.  A figure of $2,000 per scholarship athlete for a school year has been mentioned.  It remains in the discussion stages.  'This must be addressed,' Scott said."  The article continued that "[t]he major conferences' bigger beef is smaller schools blocking legislation favored by the minority that makes most of the money.  'It's time to acknowledge that one size does not fit all and that we need more flexibility in the system,' Scott said.  'We must design a structure that allows for appropriate differences based on priorities and resources throughout the NCAA.'"

255.    On November 24, 2013, *The New York* Times quoted Mr. Scott as stating that "[t]here's a strong feeling we need to loosen up the reins of what the high-resource conferences can do for student athletes."

256.    On May 7, 2014, *USA Today* reported that "[t]his October will mark the third anniversary of NCAA president Mark Emmert unveiling a proposal that would have allowed schools to give college athletes a stipend of up to $2,000 per year."  The article continued that "Pac-12 commissioner Larry Scott confirmed that the current focus of those five leagues [the Power

Conferences] is a scholarship that covers the full cost of attendance rather than a stipend." The article continued that Commissioner Scott stated the following: "I think at some stage we'll plan to have financial aid officers and athletics administrators representing the 65 schools together discussing a common approach of how to go about it."

257. On May 20, 2014, the *Associated Press* reported that "Pac-12 university presidents have sent a letter to their colleagues at the other four major football conferences calling for sweeping changes to the NCAA model and autonomy for those leagues. A copy of the letter was obtained by The Associated Press on Tuesday night. It was sent last week to the other 53 university presidents from the Southeastern Conference, Big Ten, Big 12 and Atlantic Coast Conference . . . 'We acknowledge the core objectives could prove to be expensive and controversial, but the risks of inaction or moving too slowly are fare greater,' the letter reads. 'The time for tinkering with the rules and making small adjustments is over.' Arizona State President Michael Crow told the AP that his counterparts in the Pac-12 are not 'happy with where things are going. We're not happy with the nature of the debate out there. And we felt like our voice is not well understood.' . . . The full list of proposals included in the letter are: — Permit institutions to make scholarship awards up to the full cost of attendance . . . Crow said the decision by Pac-12 presidents to send the letter was unanimous and the initial feedback from university presidents has been positive."

258. Although as discussed *supra*, this conduct represents continued efforts by the five largest FBS sports leagues (*i.e.*, the Power Conference Defendants) to continue their common price-fixing even as they move away from a larger NCAA-wide price fix, nevertheless this clearly demonstrates that the current price-fixed level is far below the market level that would prevail, absent collusion.

259. On May 21, 2014, the *Associated Press* further reported that "[Pac-12 Commissioner] Scott said he doesn't expect much pushback on the issue from schools in small and mid-major conferences. Asked if the autonomy initiative could create a bigger divide between conferences, Scott said most collegiate leaders — even those from non-major conferences — believe that idea is outdated. 'One size fits all doesn't work anymore,' Scott said. 'The conferences that can afford to

and want to do more for student-athletes ought to be able to do it. I'd be a little surprised if that view were still out there.'"

## 2.   The Southeastern Conference.

260.    It is clear that absent the current restraint, the SEC's members would make competitive offers in the relevant markets for at least the full Cost of Attendance and that the conference did not see any harm to the SEC's views of amateurism or competitive balance from making such offers in that market.

261.    On March 8, 2012, *Sports Illustrated* reported:  "The debate [among NCAA Division I members regarding the stipends] began in earnest last summer after a group of presidents at an NCAA retreat proposed a rule that would allow conferences to choose whether their schools could offer athletes up to a $2,000 annual stipend to help defray the difference between their athletic scholarships and the actual cost of attendance.  The proposal came after a presentation that showed the exponential revenue growth in college athletics in the past generate.  'They showed where it has been spent,' [SEC member University of] Florida president Bernie Machen said.  'It has been spent entirely on facilities and coaches' salaries.  The amount spent on student has not increased at all after all this additional money has gone into college sports.  That's just embarrassing."

262.    The *Associated Press*, in an article dated January 6, 2013, reported Commissioner Slive as stating with respect to the proposed $2,000 stipend, "[i]t doesn't strike me as drastic by definition.  There is a fixed definition for a scholarship.  There's no reason why it shouldn't be reviewed."  Commissioner Slive continued that "I do understand the economics, that it might be more difficult for some than others, but for those that can do it, it's the right thing to do and that ought to be the guiding factor."

263.    Commissioner Slive stated the following in an interview on April 29, 2013, with respect to the NCAA's failure to allow a $2,000 stipend:  "It's a disappointment that it's not taken care of yet.  We truly believe that we ought to do more for our student-athletes than just the room, board, books and tuition.  We're hopeful that we can continue to make that work . . . I think it's fair to say it's an idea that's not going to go away."

CLASS ACTION COMPLAINT

264.     As quoted above, on April 21, 2014, *USA Today* reported that Slive further stated that if given "autonomy," each Power Conference will in fact "implement the full cost of attendance."

265.     An *Associated Press* article dated January 6, 2013 quoted Alabama football coach Nick Saban (now making in excess of $7 million per year) as follows:

> A lot of the young people that we have, that play college football, the demographics that they come from, they don't have a lot and I think we should try to create a situation where their quality of life, while they're getting an education, might be a little better.
>
> I feel that the athletes should share in some of this to some degree.  I don't really have an opinion on how that should be done.  There's a lot of other people who probably have a lot more experience in figuring that one out, but I do think we should try to enhance the quality of life for all student-athletes.
>
> I believe the leadership in the NCAA finally sort of acknowledges that so that's probably a big step in that direction.

266.     A *USA Today* article, from that same day, further quoted Mr. Saban as stating that "I don't think there's any question about the fact that something . . . I do think that something should be done to enhance the quality of life of student-athletes that are on scholarship because in our sport especially, there is socioeconomic groups that struggle a little bit, even with a scholarship, because there is a cost associate with going to college that is beyond room, board, tuition in books."  The article further stated that "Saban pointed to the windfalls provided by conference TV networks and the coming college football playoff as a compelling reason for the discussion.  'I think especially where we've sort of gotten to from a business perspective relative to the financial end of things that there isn't really any good reason that the student-athletes who create that should not share in that to some degree.'"

267.     Sportingsnews.com reported on March 5, 2012, in regards to University of Kentucky men's basketball coach John Calipari, that when asked what he would change with the NCAA if he had the power to do so, Mr. Calipari stated that "[t]here would be a stipend, probably in the area of $4,000 to $5,000, and I'm talking men and women, all the athletes."

268.     On July 16, 2013, ESPN.com, in an article titled "Steve Spurrier stumps for stipends," reported that "[University of] South Carolina [football] coach Steve Spurrier gave a peek behind the

curtain of the annual Southeastern Conference coaches meetings Tuesday, revealing that the league's coaches voted unanimously that every student-athlete in basketball and football should be given a stipend affording their parents travel expenses to and from games."  The article continued that "[t]he league's elder statesman among football coaches said it is only right that those players who generate the school so much money should be given what would amount to a minor benefit."  The article quoted Mr. Spurrier as stating:

> We believe those two sports, the income producers, those players—most of them come from lower-income families— that we should provide some expense money so their parents can go to the games—lodging, travel, meals, what have you," Spurrier said.  "We're only talking about in football like $300 a game, basketball would be a little less, where the players in the course of the year have $3,600-$3,900, depending on how many games you play, just to have a little bit of pocket money and their parents can have money to come to games.

269.     The article continued that "Spurrier has pushed for stipends for the past two years, and reiterated Tuesday that all the SEC football and basketball coaches agreed their players deserved what would amount to pocket change compared to the money generated from ticket sales and television revenue."  The article continued that "Spurrier said it wasn't 'pay-for-play,' but rather expense money.  In fact, Spurrier said the coaches would pay for the expenses out of pocket, if need be."

270.     The connection between coach earnings and the compensation of revenue-producing athletes was not lost on coach Spurrier, who developed a proposal to provide a stipend to players on a per-game basis that garnered support from Alabama's Nick Saban, Florida's Will Muschamp, LSU's Les Miles, Mississippi's Houston Nutt, Mississippi State's Dan Mullen, and Tennessee's Derek Dooley.  In explaining the rationale for the proposal, Spurrier said, "A bunch of us coaches felt so strongly about it that we would be willing to pay it—70 guys, 300 bucks a game," Spurrier said.  "That's only $21,000 a game.  I doubt it will get passed, but as coaches in the SEC, we make all the money—as do universities, television—and we need to get more to our players."  Spurrier went on to say that "People don't realize that most football players come from underprivileged homes.  My plan was meant to show that I believe our players deserve more expense money to be more like the average college student."

3.    **The Big Ten.**

271.    It is clear that absent the current restraint, the Big Ten's members would make competitive offers in the relevant markets for at least the full Cost of Attendance, and that the conference did not see any harm to the Big Ten's views of amateurism or competitive balance from making such offers in that market.  The Big Ten, however, has also indicated at times it intends to do so only subject to an anticompetitive agreement with its competitors.  For example, on May 19, 2011, ESPN.com reported:

> Big Ten officials discussed a proposal that would pay athletes to help cover living expenses on top of their scholarships during the league's spring meetings this week.
>
> The idea, which is backed by current NCAA president Mark Emmert and was favored by late NCAA president Myles Brand, is to bridge the gap between what athletic scholarships pay and other expenses like transportation and clothing.  That difference has been estimated at between $2,000 to $5,000 per player.
>
> Big Ten commissioner Jim Delany said league athletic directors and officials have seriously discussed whether they should use some of their growing TV revenue to pay athletes more.
>
> "Forty years ago, you had a scholarship plus $15 a month laundry money," Delany said.  "Today, you have the same scholarship, but not with the $15 laundry money.
>
> "How do we get back more toward the collegiate model and a regulatory system that is based more on student-athlete welfare than it is on a level playing field, where everything is about a cost issue and whether or not everybody can afford to do everything everybody else can do?" Delany asked.
>
> Delany stressed that the Big Ten was merely at the discussion stage, but he added the league is interested in talking to other conferences to see if they also favor such a plan.  He acknowledged many schools and conferences across the country couldn't afford to cover those additional expenses, which could run about $300,000 a year just for football and men's basketball players alone.
>
> But some Big Ten officials say if they can help out their athletes, then the concept of using the same rules for all teams should be abandoned.  Ohio State athletic director Gene Smith said the stakes are simply higher for schools like his than for those in the MAC or Sun Belt.
>
> "The reality is, if there's cost of attendance and you can't afford it, don't do it," Smith said.  "The teams you're trying to beat can't do it either.  Don't do it because Ohio State's doing it.  That's one of the things schools at that level get trapped into thinking."

CLASS ACTION COMPLAINT

272.    On March 8, 2012, *Sports Illustrated* reported:  "'I think we should go farther than $2,000,'" [Big Ten Conference member, University of Nebraska-Lincoln Chancellor Harvey] Perlman said.  'I think the NCAA ought to allow us to give up to the cost attendance, whatever it is."  The article continued:  "Nebraska's Perlman, who fancies himself a deregulator, has a solution.  If schools don't want to pay the extra scholarship money, they shouldn't.  But he would ask that they not bother trying to stop other schools from paying it.  Because no matter how much the NCAA regulates spending, the wealthy schools will find ways to use their wealth to their advantage.  'You can tell me that I can't give them bagels with cream cheese and I can't give them more scholarships and I can't do this and I can't do that, and I follow those rules,' Perlman said.  'But then what I do to recruit competitively is I spend the money on other stuff.  So I build facilities where there is no limit on what I can do, and I make those facilities far beyond what normal students live in because there's no limit on that.  There's a standard understanding about regulatory environments that if you regulate something, people will move to the part of their activity that isn't regulated.'"

273.    On July 24, 2013, the *Chicago Sun-Times* reported Commissioner Delany as stating that "a miscellaneous expense needs to be implemented, and it needs to be implemented in a way that allows the student to engage in athletics and also to receive support from the institution above the scholarship, up to the cost of education."

274.    On August 7, 2013, *USA Today* reported Commissioner Delany as stating "[m]y line is cost of attendance, and that's as far as I'm willing to do.  After cost of attendance, then I think you're into another game, pay for play, and I'm personally not in favor of it."

275.    On September 26, 2013, *USA Today* reported that Commissioner Delany stressed the need to "do everything we should do to define a fair package that fits for the 21st Century."  The article continued that Delany's "preferred model would include the ability for those conferences to have the autonomy to legislate their own rules without—or with much less regard for—the concept of an artificially 'level playing field' for schools with fewer resources.  The wealthier schools would be able to provide more benefits to athletes, such as stipends to help cover full cost of attendance and miscellaneous expenses.  Delany also suggested as examples expanded educational opportunities and

allowing schools to pay expenses of players' parents on road trips.  'There are things we can do to prioritize their experience,' he said.  'But I feel as strongly as I did 20 years ago it's not pay-for-play.'"

276.    Tom Osbourne, the then Athletic Director at the University of Nebraska in 2012, and formerly a football coach there for 25 years, stated this in an interview with the *Associated Press* published on December 25, 2012, and presently posted by the NCAA on its website:

> I would hope student-athletes can be put somewhere at the forefront of the agenda.  I find it odd that you see the escalation of dollars yet there seems to be a lot of controversy over providing student-athletes with a $2,000 stipend.  It doesn't quite compute.  It seems to me that the athletic scholarship should be cost of attendance, not just room, board, books, tuition and fees . . . .

277.    SI.com, in an article dated November 11, 2013, discussed Nebraska's Chancellor Harvey Perlman, "who is the Big Ten's [Conference] representative on NCAA reform," and quoted Perlman as stating that "[t]he fact is that with all this revenue that we have, we can spend it on anything we want under current  NCAA regulations, except to benefit student-athletes."  He continued that "[t]hat's where we're regulated and prevented from doing things.  I'm not saying we're going to pay them.  None of us would agree to that.  But there are a variety of areas to have opportunities among the five to consider the rules we want to live with."

278.    On May 7, 2014, *USA Today* published an interview with the Big Ten's Commissioner Delany.  Therein he stated that "I think the next frontier really, is the restructuring of the NCAA and getting our house in order.  There are some things we haven't been able to do that we need to do . . . .  In my view, that means getting costs of education legislation through, getting some improvements in time demands . . . ."  He continued that "I think there's a general recognition that there are some areas—student-athletes welfare, in particular—where there needs to be some flexibility in rule-making.  I think there's a general recognition that that's the case.  What I don't feel particularly enthusiastic about, but we're still working on, is the definition of majoritarian/super-majoritarian bar for passage."  Commissioner Delany continued that "[n]ow people are suggesting, if you want to undo [NCAA rules] through autonomy [of the Power 5 Conferences], you need 2/3 of all votes from the autonomous group and four or five conferences . . . .  You don't do basic business

1   with those kinds of majorities . . . . We don't want to create the bar so high that (there's) quasi

2   phantom reform.  We want real reform."

3       279.    Commissioner Delany continued in his May 7, 2014 interview that "in implementing

4   these rules, if we get the autonomy, if we get them passed, we want to have the authority to interpret

5   them and to waive them and enforce.  We don't want to turn it over to NCAA staff.  We all have

6   professional people in our offices who are more than prepared, more sufficiently experienced to

7   interpret these rules, and to waive them if necessary.  We don't want to turn that over to someone

8   else.  Though interpretation, you can gut the intent of a rule.  Sometimes, common sense requires

9   that the rule not be applied.  We want to be able to control that."  When then asked "On a conference

10  level?  School level?" Commissioner Delany responded "Group of five level."  Commissioner

11  Delany continued that "we've got to have the autonomy to make the rules for the 21st century

12  Division I athlete."  When asked "There are lot[s] of areas of autonomy that have been discussed

13  over the last few months.  What are the ones you feel are imperative to change?" Commissioner

14  Delany responded:  "There are five or six of them.  I'd say cost of education.  I think a lifetime trust

15  that allows students to come back, get their degree.  I think real change in time demands . . . ."

16  Delany continued that "[i]n the 21st century, it's painfully obvious we need to change.  It's painfully

17  obvious it's not all a level playing field, and that a lot of the level-playing field philosophy is under

18  attack.  I would rather have us change it than have it not change or change for us."

19      280.    On May 9, 2014, Iowa's *Quad-City Times* reported the following quote from

20  University of Iowa President Sally Mason, the chairperson of the Big Ten's Council of Presidents

21  and Chancellors:  "It's certainly something that we want to keep an eye on, and we want to be certain

22  that we have the latitude . . . to make it so that the kinds of things that the athletes at Northwestern

23  were asking for, whether it is better health care for them, whether it is full cost of education, the

24  kinds of benefits, these are the kinds of things we have been wanting to do.  Programs like Iowa and

25  all of those in the Big Ten, we're resourced well enough that we can do these things and we should

26  be allowed to do these things."

27

28

CLASS ACTION COMPLAINT

281.    On May 15, 2014, mLive.com reported that "[a]ccording to [Big Ten member] Purdue athletic director Morgan Burke, though, providing players with this extra spending money isn't an issue about budgets—it's an issue of right and wrong.  'It's fundamentally the right thing to do,' Burke said Wednesday during the Big Ten's spring meetings outside Chicago.  'It's got to be done for men and women, it's got to be done for Olympic sports and non-revenue sports.  It's the right thing to do.  The reality is, this is fundamentally fair.  And so we'd better find the money.  We find the money for lots of other things, we'd better find money for this.'"  Burke continued that "But how about if mom and dad are both working, they don't qualify for Pell [grants] and they haven't got two nickels to rub together (while in college).  And, yet, we're setting here with phenomenal growth in our media revenues and rights agreements—(paying them that money) isn't doing anything more than you should be doing.  It's fair." (parentheses in original article).

282.    On June 24, 2014, the Big Ten issued a statement reading in pertinent part: "Today, the presidents and chancellors of the Big Ten schools issues the following statement signed by the leaders of each institution: . . . We must do whatever it takes to ensure that student-athlete scholarships cover the full cost of a college education, as defined by the federal government.  That definition is intended to cover what it actually costs to attend college."

### 4.    The Big 12.

283.    It is clear that absent the current restraint, the Big 12's members would make competitive offers in the relevant markets for at least the full Cost of Attendance and that the conference did not see any harm to the Big 12's views of amateurism or competitive balance from making such offers in that market.  For example, on April 17, 2013, Big 12 Commissioner Bob Bowlsby stated the following in a television interview on the Longhorn Network:

> "I served on the NCAA's Financial Aid and Amateurism Committee 30 years ago, and we came up with the revolutionary idea that it should be room, board, book, tuition and fees and $2,000 a year, so not much has changed over the last decades.  But, I really think we all understand that it costs more than room, board, books and tuition and fees to go to college, so I could certainly advocate for some measure of incremental payment to student-athletes . . . if were to come up with a plan, that especially on a need basis, would put some additional money in the hands of student-athletes, and when I say student-athletes, I don't  just mean football player or basketball players.  I think if you apply any form of the labor theory of value, swimmers work just as

hard as the basketball players, the track athletes work just as hard as the football players do, I think we have to do it for all student athletes, men and women, on a need basis, and if it goes above $2,000 per year per student athlete, so be it, I think it's a great thing to do for the young people that populate our programs, they all work hard, and they all deserve the consideration."

284.    On June 2, 2011, the Associated Press reported the following statement from University of Texas' Athletic Director DeLoss Dodds in regards to increasing the value of athletic scholarships to the cost of attendance:  "We're for it.  It's a positive step and I think doing something for student-athletes is a positive thing."

285.    On June 27, 2011, the *Dallas Morning News* reported that Bill Byrne, then the Athletic Director of Texas A&M, stated that "I've been in favor of total cost of attendance forever, whether I was working at a have or have not [school].  So many student-athletes come from disadvantaged backgrounds and have to pay their way to school or laundry or the movies.  If you really care about the welfare of student-athletes, dig a little deeper."

5.    **The Atlantic Coast Conference.**

286.    It is clear that absent the current restraint, the ACC's members would make competitive offers in the relevant markets for at least the full Cost of Attendance and that the conference did not see any harm to the ACC's views of amateurism or competitive balance from making such offers in that market.  For example, on July 21, 2013, ESPN.com reported that ACC Commissioner John Swofford stated the following:  "I am for looking very diligently at a way to enhance the scholarship itself, whether it's need based, whether it's based on a simple stipend that once existed or some other way to approach it, whether it's going to the full cost of attendance."

287.    On September 10, 2013, *Bloomberg* quoted Notre Dame Athletic Director Jack Swarbrick as stating, in regards to proposed NCAA reforms, that "[o]n one end, there are schools that are fully integrated into the university, and on the other, it's almost like licensing the university name.  In any business association, once members don't have a common business model, you have enormous tension."

288. On October 16, 2013, Durham, North Carolina's *The Herald-Sun* reported Commissioner Swofford as stating that "I'm for enhancing fundamentally the concept of the athletic grant made that we have now" and that "we can't live with our heads stuck in the sand."

6. **Additional Admissions by Defendant Conferences and Their Members that the Challenged Restraint Injures Competition**

a. **American Athletic Conference.**

289. On February 15, 2014, the Associated Press reported: "The commissioner of the American Athletic Conference said Saturday that his schools are committed to matching the power conferences when it comes to providing stipends to athletes . . . [Commissioner] Mike Aresco, who spoke before Saturday's basketball game between Memphis and UConn, says the American is committed to provide a full cost-of-attendance stipend if that is what is eventually approved. 'Whatever it ends up being, whether it is a fixed amount (or not), we have committed as a conference, pledged as a conference, that we're going to do it,' he said . . . 'We have every intention of being a conference just like those other five,' Aresco said."

290. On May 6, 2014, CBSSports.com reported American Athletic Conference Commissioner Mike Aresco as stating that "[w]hatever cost of attendance looks like, our conference has to embrace it. Our competitiveness going forward is really at stake here. We know it."

291. On June 2, 2014, *The New Orleans Advocate* reported that "[n]ot wanting to get left behind, the American Athletic Conference, including incoming member Tulane, on Friday committed itself to following the lead of the so-called Power Five conferences in their proposed NCAA governance changes, including supplying the full cost of attendance for athletes. 'We are working to position ourselves with the five equity conferences on this,' AAC Commissioner Mike Aresco said at the end of the league's spring meetings in Key Biscayne, Fla."

b. **Conference USA.**

292. On August 20, 2013, *USA Today* reported that "Conference USA commissioner Britton Banowsky endorsed the idea of student-athletes receiving a stipend to cover the 'full cost of attendance' in July, and the league's university presidents and athletics directors followed suit by supporting that notion at a retreat this past week in Irving, Texas. New Louisiana Tech athletics

CLASS ACTION COMPLAINT

director Tommy McClelland reiterated no official vote or legislation passed, but McClelland said C-USA members unanimously agreed to support a stipend should one become available. 'We're supportive of it in the event that (a stipend) would be presented that covered the full cost of attendance,' McClelland said. 'Conference USA members presented a united front in support of it.' . . . [Louisiana] Tech football coach Skip Holtz also voiced his approval of C-USA's endorsement. 'I don't know when it will be implemented, but there's been a lot of talk about it,' Holtz said. 'Student-athletes work hard and do an awful lot.' 'I understand the argument that many (athletes) are on scholarship, but at the same time, many don't' have a whole lot at home in the way of (financial) support."

293.    On January 4, 2013, CBSSports.com reported that "'It looks like a line is being drawn in the sand—if you want to be Division I, this is what you have to do,' said Texas-San Antonio athletics director Lynn Hickey, whose Roadrunners enter FBS next year as a Conference USA members. 'If it's something we need to do to say at the FBS level, we're going to find a way to do it.'"

294.    On June 23, 2014, the *Charleston Daily Mail* reported Conference USA Chairman Britton Banowsky as stating that "I know that our conference specifically believes that student-athlete packages should provide up to the cost of attendance. I think the idea that student athletes have the resources necessary to attend the university, we think that's appropriate."

### c.    Sun Belt Conference.

295.    On January 4, 2013, CBSSports.com reported that "Sun Belt [Conference] schools are all in when it comes to paying stipends, says commissioner Karl Benson, who doesn't expect the issue to muscle out the smaller conferences. 'Schools will find that they can't afford not to,' Benson said."

### d.    Mountain West Conference.

296.    On May 4, 2014, utsandiego.com reported that "[t]he Mountain West [Conference] Commissioner Craig Thompson told ESPN this week that he believes each school should have the right to dole out athlete benefits based on what it can afford."

---

CLASS ACTION COMPLAINT

e.      **Mid-American Conference.**

297.    On May 7, 2014, *USA Today* reported that the following in regards to Northern Illinois University, a member of the Mid-American Conference (the "MAC"):  "[A] school like Northern Illinois . . . will have to find a way to go along with whatever the Power 5 decide" regarding the cost of attendance issue.  "'We've got to increase the widget sales.  We've got to build a better mousetrap,' Northern Illinois athletic director Sean Frazier said.  'If we want to be competitive, we've got to do what we've got to do.  Our league, we've got good programs and I think we're all concerned that we can't miss an opportunity to be a part of the conversation.  Now we know who we are.  We're not going to sit here thinking we're going to put our recruiting budgets against Michigan, Notre Dame and Alabama, but we put a quality brand of football out there, and we have to maintain that."

298.    On June 1, 2014, Blade.com reported that [MAC member] "University of Toledo athletic director Mike O'Brien is . . . in favor, he said, of 'whatever can be done to better the environment for the student-athletes.' . . . Mr. O'Brien is in favor of Mid-American Conference schools paying athletes a cost-of-attendance stipend.  'It's something that each institution is going to have to look at,' he said.  'But given the fact that we recruit against various conferences, obviously we have to look at that and in turn be in favor of it.'"

7.      **Additional Admissions from Other Division I Conferences and Their Members that the Challenged Restraint Injures Competition**

a.      **Atlantic 10**

299.    On June 11, 2014, *USA Today* reported that "[t]he A-10 Council of Presidents met Wednesday morning to discuss issues surrounding NCAA governance and potential student-athlete welfare-reform, among other topics.  The conference supports the idea of a new NCAA governance model and plans to adopt at least some of the measure that will improve athlete well-being, particularly those related to player safety, education and the full cost of attendance.  A-10 Commissioner Bernadette McGlade said that the league's presidents voted unanimously to adopt cost-of-attendance stipends when the measure was initially introduced in 2011."

1

             **b.**     **Big East Conference**

2

      300.    On October 18, 2013, New Jersey's *The Star-Ledger* reported that Big East

3

Commissioner Val Ackerman stated the following regarding the stipend issue: "[T]wo or three

4

thousand dollars, which many say would sort of clean up what the landscape is now in terms of

5

impermissible expenses. If you just gave the players some supplemental money then it would just

6

sort of make it easier and it would reflect some of inequities that student-athletes have if they come

7

from disadvantaged homes. To me it's hard to argue with that. I think that makes sense to me and

8

many in college sports I think believe that is what's going to happen at some point. That's going to

9

make its way through and be approved within the NCAA. So that's one, which I support."

10

             **c.**     **Metro Atlantic Athletic Conference**

11

      301.    On November 4, 2011, timesunion.com reported that "The MAAC announced today

12

that it has adopted the NCAA's new "Cost of Attendance" bylaw that allows schools to add $2,000

13

to athletic scholarships. **The increase will be mandatory in men's and women's basketball** and

14

optional, by each school's discretion, in other sports that give out full scholarships. The NCAA

15

bylaw was passed last week to cover miscellaneous expenses incurred by athletes beyond their

16

scholarship, which covers only tuition, room and board and books." (Emphasis added.)

17

             **d.**     **Horizon League**

18

      302.    On November 7, 2011, ESPN.com reported that "[t]he Horizon League announced

19

Monday that its athletic directors have approved the addition of $2,000 in cost of attendance

20

allowances for basketball scholarships, reacting to the NCAA last month voting in favor of allowing

21

conferences to make that decision. 'Our operating regulations reflect our longtime league-wide

22

philosophy of providing NCAA-determined maximum scholarship amounts in the sports of men's

23

and women's basketball programs,' Horizon League commissioner Jon LeCrone said in a statement.

24

'This vote by our athletic directors supports the continuation of that strategy, which has a record of

25

success.' The Horizon League's most high-profile program is Butler, and athletic director Barry

26

Collier told me over the summer that the school would be able to cover the costs of attendance for its

27

student-athletes. 'Pay-for-play is one thing,' Collier said. 'Providing the cost of attendance defines

28

---

CLASS ACTION COMPLAINT

something different philosophically. It's not enough to stop us from doing it. We would do it if passed. We could handle the additional cost.'"

E.   **Football Bowl Subdivision Football Players Seek the Ability to Compete without Anticompetitive Restraint in the Football Bowl Subdivision Labor Market**

303.   A January 6, 2013, *Associated Press* article reported the following regarding the proposed stipend:

> "It kind of goes both ways," said Alabama defensive back Vinnie Sunseri, whose father, Sal, is a college football coach and former NFL player. "A lot of people would say we don't deserve it because we already get enough as college kids that just happen to play a sport. A lot of people don't realize all the work that goes into all the stuff that we have to do throughout the day.

> "I have no time during the day. I wake up at 6 a.m., lift, go to class, right after class you come back up to the football complex to watch film and get ready for practice. By the time you get out, you've got to go to study hall. By the time you get out of study hall, it's basically bed time. It is really like a full-time job."

> Alabama long-snapper Carson Tinker made the team as a non-scholarship walk-on, but earned a scholarship this season.

> "I'm very thankful for my scholarship," Tinker said. "All of us have bills. All of us have expenses, just like every other student. I don't live with football players. I live with two of my good friends. While I'm at practice every day, they have a job. They're able to pay their bills, buy food, stuff like that."

304.   In an article dated September 24, 2013, the writer Patrick Hruby reported:

> Speaking of bad situations, [former college football player Arian] Foster says in "Schooled" that his athletic scholarship didn't always leave him with enough money to eat and pay rent, and that a coach once bought him and his teammates "like, 50 tacos for like four or five of us. Which is an NCAA violation." Foster also claimed he took under-the-table payments during his senior year. Some accused him of lying. *Don't college athletes get lavish training tables? No way those guys go hungry.* Yet according to a recent study by Drexel University professor Ellen Staurowsky, the average difference between scholarship value and the full cost of attending school for Football Bowl Subdivision players in 2011-2012 was $3,285.

> Former Marshall University quarterback Brian Anderson says he experienced that gap, particularly when he lived off-campus his junior and senior years. His scholarship provided roughly $900 a month during the school year for food and rent, and less during summer months. "So you're spending $400 bucks on rent, and the rest is for food, gas, and things like clothes. For some kids, that isn't enough. I was lucky. I had parents who could provide for me."

And what about training tables?

"As far as that being provided, it was always provided after practice if we got out after the cafeteria was closed," says Anderson. "But there were a lot of times we didn't know if we were going to get paid for a weekend when the lunch room wasn't open or something. If we got that money, we were surprised and excited. If we didn't, it was what it was. What the NCAA said the school could pay us. We weren't going to speak out about it."

305.   On July 26, 2013, *Sports Illustrated's* SI.com reported: "During Friday's Pac-12 media day, Stanford offensive lineman David Yankey fielded a question about stipends. He responded by saying: "I definitely think the extra money would help a lot. A full scholarship doesn't cover everything, as far as traveling home to see your parents, especially when you go across the country to a place like Stanford, personally being from Georgia. That could help a lot of players."

## F.   Other Statements Supporting the Stipend Proposal

306.   On June 28, 2007, basketball legend Oscar Robertson, in an Op-Ed piece in *The New York Times*, wrote that "College Athletes should also receive a modest stipend and more realistic expense money. If athletes have to struggle to get by, of course they will want to turn pro as soon as possible. They're also more likely to accept money from agents who want to sign them, although agents aren't the only people who slip money to college athletes. (Signing with an agent makes players ineligible for the college game, whether or not money has changed hands—but coaches are allowed to collect fees for referring agents to players!)."

307.   On March 29, 2013, *The New York Times* reported that "Gary Williams, who has been a [men's basketball] head coach at multiple colleges, most notably at the University of Maryland, said 'I'd be the first one to say players should get a stipend. At a big-time program, you're generating not just the dollars you bring in but the interest of your alumni that will give money to the school, not just to the athletic department. And the applications increase, which is really important to the school." Mr. Williams also served as head coach at Ohio State University, Boston College, and American University. In 2002, he coached the University of Maryland to the national championship. He retired from coaching after the 2010-11 season, and now serves as college

1    basketball analyst for the Big Ten Network, owned by powerful NCAA member the Big Ten

2    Conference.

3           308.    On April 9, 2014, the *Wall Street Journal* reported that "[University of the] Pacific

4    athletic director Ted Leland, a former Stanford athletic director and longtime NCAA committee

5    member, said Wednesday that the NCAA needs to find a way to share revenue with student-athletes

6    before the governing body of college sports is ordered to do so by the courts."  The article continued

7    that Leland, speaking on a panel of the future of college sports at Stanford University, said:  "I'm

8    afraid if we don't figure out the model, we're going to get told what the model is.  If a federal judge

9    looks at this, I can't imagine we wouldn't come out significantly scarred."

10   **G.     NCAA Members' Statements against the Stipend Proposal Show that Opposition is Not
            Based on Valid Antitrust Defenses, but Rather Serve Primarily as Cost-Cutting Efforts
11          or as a Means of Substituting the Judgment of the Cartel for that of the Market**

12          309.    In vigorously opposing the stipend rule, NCAA member institutions laid bare their

13   anticompetitive motivations.  Below are actual comments made by NCAA member institutions in

14   2011 to the NCAA in conjunction with the successful effort by NCAA member institutions to repeal

15   the stipend rule, demonstrating the lack of pro-competitive motives for maintaining the current level

16   of fixed prices.  These invalid justifications include a desire to lower costs, a desire to restrict the

17   choices of athletes in the labor market, or a simple aversion to seeing its labor force with money to

18   spend:[26]

19                       **American University:**

20                       "[O]ur institution does not have the resources to cover the additional
                         cost, so this proposal would put us at a disadvantage."

21
                         **Boise State University:**
22
                         "It creates a recruiting advantage for those that can afford it and puts
23                       those that can't at a disadvantage."

24                       "That tough decision [where to attend college] becomes more
                         complicated when the student and his/her family have to factor in what
25

26          ───────────────────
                 [26] Andy Staples, *Schools, Not NCAA, Standing in the Way of Positive Scholarship Change*,
27   Sports Illustrated, Dec. 20, 2011, *available at*
     http://sportsillustrated.cnn.com/2011/writers/andy_staples/12/20/ncaa-student-
28   athletes/index.html?eref=sihp&sct=hp_t11_a2.

     CLASS ACTION COMPLAINT

school 'offers the best deal' versus where they may want to attend if all offers were for one year without the enticement of $2,000."

**Boston University:**

It would be "compelled to reallocate financial aid in this direction in order to be competitive in recruitment."

**East Tennessee State University:**

"While the legislation is permissive as written, it is mandatory in its practical application. Some conferences and institutions have already mandated the MEA for all or selected sports; those without a conference or institutional mandate must respond in kind to avoid a substantial recruiting disadvantage."

Schools "with larger budgets . . . able to make up the financial difference between their current athletic equivalency and their current overall equivalency will be able to award more scholarship dollars to a greater number of student-athletes."

**Gardner-Webb University:**

Citing "cost concerns."

**Idaho State University:**

"The consequences of not being able to provide this additional money will put our institutions at a recruiting and competitive disadvantage. Prospective student-athletes and their parents are likely to ask about the $2,000 being included in a financial aid award. When our coaches state that they can not provide the additional funds, it will be less likely that the prospective student-athlete commits to our institution if they are offered the money elsewhere."

**Indiana State University:**

"The budgetary impact upon FCS schools such as our institution . . . seem to have gone completely unaddressed by the powers that be. I am sure this is a great thing for the mid to upper-tier BCS schools, but the impact and possible recruiting disadvantage it imposes on the rest of us is absolutely unacceptable."

**Lafayette College:**

"While this is interpreted as permissive legislation, this will become a mandatory requirement for providing full scholarship [sic] at any level in Division I. Only few [sic] can actually afford the implications of this bylaw to the fullest extent."

**Marshall University:**

"The institution is not in a position to fund the additional costs associated with a miscellaneous expense. Many institutions are likely

to be in the same position which would create a competitive advantage for those institutions who had large budgets."

**Miami University (Ohio):**

Referencing "the question of where to find the additional revenue to pay for this 'allowance . . ..'"

**Rutgers:**

Referencing "the lopsided effect it will have on certain institutions without the financial resources to provide this MEA which then cascades into a competitive effect in recruiting and retention."

**Santa Clara University:**

"The intent of the proposal is admirable, but the strain of appropriating additional funds for full scholarship student-athletes makes the struggle to fund scholarships across all sports that much more difficult."

**St. Francis College (New York):**

"When combined with the proposal to allow multi-year grants-in-aid, this will bring forth the sort of negotiations (potentially involving third parties) as prospective student-athletes shop themselves around for the best deal (in terms of length and compensation)."

**Tennessee Technological University ("Tennessee Tech"):**

The new rule "will lead to unlevel playing fields as some institutions will bow to pressure; or in some cases have assets that will allow student-athletes across the board to receive the other countable aid in order to be more competitive athletically."

I want to share a very supportive and knowledgeable university professor's view of this change in legislation  He writes . . . "[i]t seems most dubious to give some student athletes what amounts to 'tattoo money' at a time when far too many others are unable to put food on the table, and the institutions themselves are almost all facing choices among various undesirable options.'"

**University of Maryland, Baltimore County:**

"Trying to legislate cost saving [sic] in other areas, while adding this potential hugh [sic] expense to institutions."

**University of North Carolina, Asheville:**

"Increased financial burdens during touch economic times—Many schools have not raised faculty salaries in 2 to 4 years . . . Though framed as 'permissive' legislation, the $2,000 extra stipend becomes mandatory as institutions recruit to compete with their peers—The $2,000 stipend is only a beginning and will surely increase over time."

CLASS ACTION COMPLAINT

**University of North Florida:**

"Schools with large financial aid funding and the right amount of creativity will find ways in which they no longer have to worry about scholarship limits."

**University of South Carolina Upstate:**

"Although this legislation has been described as permissive, in order to remain competitive in recruiting this will become mandatory for any institution desiring to compete with its peers."

**University of Tennessee at Martin:**

"It's not realistic to maintain that this legislation is permissive and not acknowledge the costs it will create because of competitive equity."

"There's another aspect of the 'cost of attendance' legislation that baffles me. Let us all remember that there's nothing that says we 'must' give a student-athlete a scholarship **and** allow him or her to keep full Pell Grant . . . . But most of us do, at least in our high profile sports, because our competition does." (Emphasis in original.)

"Another reason for overriding this legislation should be the needed to at least eliminate its application to FCS football. The football championship division exists because there are about 120 Division I institutions that sponsor football programs and choose to spend less on scholarships, coaching staffs, etc. than the Division I Football Bowl Subdivision members. Taking a stand against the Cost of Attendance, at least for FCS football, would be consistent with that philosophy."

"I hope our presidents of institutions with over 25% of their athletic budgets funded by allocated resources will resolve to do all they can to derail this legislation before the next national signing date [for recruits] in February, especially for FCS football."

"Unlike coaches [sic] salaries, the market does not demand cost of attendance stipends. The athletes will play their sports without them."

**University of Texas, Pan American:**

"With so many budget cuts and the decrease in funding across college campuses this additional $2000 will only hurt those institutions who are already struggling to fully fund their programs."

**Winthrop University:**

"The labeling this legislation as 'permissive' is a misnomer, considering all 'permissive' legislation leads to required legislation to compete with peers, particularly in recruiting . . . . This legislation will not stop with $2,000/yr, and will likely increase in the future, which would lead to even more budgetary constraints."

CLASS ACTION COMPLAINT

**Wright State University:**

> The proposed rule "provides an unfair disadvantage to smaller institutions that will struggle to find the funds necessary to provide the additional $2,000 to student-athletes."

310.    The NCAA, in a press release on December 2011 regarding the override vote that suspended the new rule, made clear the decision was made to hold down cartel members' costs, stating that "[o]ther schools who objected to the legislation stated they can't afford the additional expense but feel it will be necessary to find the money to pay for it in order to compete for recruits."

311.    As the above comments demonstrate, the primary motivation of NCAA institutions in repealing the stipend rule was to reduce price competition thereby holding down their labor costs. Moreover, many explicitly saw that the current cap had the effect of denying their athletes choice among a variety of financial aid packages.  That is, as Boise State put it:  "That tough decision [where to attend college] becomes more complicated when the student and his/her family have to factor in what school 'offers the best deal' versus where they may want to attend if all offers were for one year without the enticement of $2,000."  But, of course, that is no different than price-fixers of consumer products arguing that by fixing prices, they make it easier for consumers to choose the car, or laundry soap, or milk products that best fits their families' needs, independent of price.

**H.    Major College Football and Basketball Are Highly Commercialized Businesses, not Charitable Endeavors**

312.    The money generated by the college sports enterprise, presided over and facilitated by the NCAA, is staggering.  Some prominent examples, all relating to television contracts, are detailed herein.

313.    The *Wall Street Journal* reported on January 6, 2012,[27] that at least 14% of the total revenue of all of Louisiana State University ("LSU") comes just from football, and quoted LSU chancellor Mike Martin in the following excerpt:

> [T]he school's 14% mark may actually understate the football team's financial impact. It doesn't capture, for instance, academic donations

---

[27] Rachel Bachman, *When Football Is An Economic Strategy*, WALL ST. J., Jan. 6, 2012, *available at* http://online.wsj.com/news/articles/SB100014240529702035136045771432 50385056524?mg=reno64-wsj&url=http%3A%2F%2Fonline.wsj.com%2Farticle%2 FSB10001424052970203513604577143250385056524.html.

from alumni that were largely inspired by a connection to the football team. 'I've never been at a place where people love it as passionately as the people at LSU,' said Martin, who also has worked at universities in the Big Ten and Pac-12 conferences. 'I do believe that donors and others put their money where their mouth is.'

314.    *Sports Illustrated*, in its November 5, 2012 issue, reported that NCAA President Mark Emmert, when he previously was President of NCAA Division I member Louisiana State University, "said that success in football was 'essential for the success of Louisiana State University.'"  The article continued that Emmert "is part of a system—as shown by the Pac-12's new $4.3 *billion* TV contract for football—that grows richer and less controllable by the day.  'We have met the enemy, said former NCAA president Gene Corrigan last month, 'and he is us.'"  The article continued that "[t]he NCAA and television 'have made college football just one notch below professional football,' said [Commonwealth of Pennsylvania Governor Tom] Corbett.  'It's the moneymaker.  So if anybody has enhanced the importance of football to the potential of being more important than education, the NCAA is equally involved.'"

315.    Flush with the proceeds from its television contracts, in June 2012, the NCAA completed the expansion of its headquarters in Indianapolis, at a cost of $47 million.

316.    With respect to the college football playoff system, soon to be implemented, *The New York Times* reported that "[i]n a 12-year, $7.3 billion deal, ESPN gained the rights to the college football playoff, which begins after the 2014 regular season."

317.    In March 2013, ESPN.com published the below information regarding the major NCAA conference's television deals.[28]  It explains that "First-tier rights are for football and/or basketball games broadcast nationally.  Second-tier rights are for football and/or basketball games not selected by the first-tier rights holder.  Third-tier rights are any games not selected by the first- or second-tier rights holders and rights for all sports other than football and basketball and can include digital rights.  These rights are often sold on a per-school basis (not negotiated by the conference as a whole) and often go to regional networks (Comcast Sports Southeast, Raycom, or SportsNet New

---

[28] Kristi Dosh, *A Comparison: Conference Television Deals*, ESPN, Mar. 19, 2013, http://espn.go.com/blog/playbook/dollars/post/_/id/3163/a-comparison-conference-television-deals (last visited Nov. 17, 2014).

York, for example).  They can also be reserved for networks like the Big Ten Network and the Longhorn Network."  The information is as follows:

| NCAA CONFERENCE NAME | TELEVISION CONTRACT INFORMATION | DOLLAR AMOUNT |
|---|---|---|
| **BIG 12** | First and second-tier rights, ESPN/FOX, 13 years through 2024-25:<br>_____<br><br>Per-year average:<br><br>Per-school, per-year average: | **$2.6 Billion**<br>_____<br><br>**$200 Million**<br><br>**$20 Million** |
| **PAC-12** | First and second-tier rights, ESPN/FOX, 12 years through 2023-24:<br>_____<br><br>Per-year average:<br><br>Per-school, per-year average: | **$3 Billion**<br>_____<br><br>**$250 Million**<br><br>**$20.8 Million** |
| **SOUTHEASTERN CONFERENCE** | First-tier rights, CBS, 15 years through 2023-24 (negotiations ongoing):<br><br>Second-tier rights, ESPN, 15 years through 2023-24 (negotiations ongoing):<br>_____<br><br>Per-year average (negotiations ongoing):<br><br>Per-school, per-year average: (negotiations ongoing): | **$825 Million**<br><br>**$2.25 Million**<br><br>_____<br><br>**$205 Million**<br><br>**$14.6 Million** |

| NCAA CONFERENCE NAME | TELEVISION CONTRACT INFORMATION | DOLLAR AMOUNT |
|---|---|---|
| **BIG TEN** | First-tier rights, ESPN, 10 years through 2016-17: | **$1 Billion** |
| | Second-tier rights, Big Ten Network, 25 years through 2031-32: | **$2.8 Billion** |
| | Select basketball rights: (minimum of 24 games, men's tournament semifinal and championship games), CBS, six years through 2016-17: | **$72 Million** |
| | Football championship game, FOX, six years through 2016: | **$145 Million** |
| | Per-year average: | **$248.2 Million** |
| | Per-school, per-year average: | **$20.7 Million** |
| **ATLANTIC COAST CONFERENCE** | First, second and third-tier rights, ESPN, 15 years through 2026-27: | **$3.6 Billion** |
| | Per-year average: | **$240 Million** |
| | Per-school, per-year average: | **$17.1 Million** |
| **FORMER BIG EAST** | First-tier rights: ESPN, seven years for basketball (2013-20); six years for football (2014-20): | **$126 Million** |
| | Second-tier rights: Basketball, BS, six years through 2012-13 (negotiations ongoing) | **$54 Million** |

318.     Among the many beneficiaries of the largest of the television networks are coaches. For example, on November 6, 2013, *USA Today* reported on the results of its exhaustive study of the compensation packages for 126 major-college football head coaches. It reported that "[t]he average compensation package for major-college coaches is $1.81 million, a rise of about $170,000, or 10%, since last season—and more than 90% since 2006 . . . . At this rate, coaches' compensation would

more than double in less than a decade."  Accompanying the article is a database with details on each head coach (all figures here are guaranteed compensation, prior to potential bonus compensation, which is also detailed).  For example, Alabama's Nick Saban will earn $5,545,852; Texas' Mack Brown will earn $5,453,750, and Arkansas' Bret Bielman will earn $5,158,863.  Another five coaches will earn more than $4 million.  Another nine coaches will earn more than $3 million.  Another 33 will earn more than $2 million.

319.    Indeed, as astounding as these figures are, the off-season following the 2013-14 football season resulted in yet more escalation, with Alabama's Nick Saban reportedly receiving a raise to $7 million.  That $1.5 million raise by itself would amount to approximately $17,000 per scholarship football player on Mr. Saban's roster.

320.    The compensation for assistant football coaches is similarly notable, particularly because under NCAA rules each team may have nine assistant coaches.[29]  *USA Today* reported that "[t]he average major-college football assistant coach now earns roughly $200,000, a USA TODAY Sports analysis finds.  That means NCAA Bowl Subdivision assistant coaches joined their bosses in seeing their compensation for the 2012 season increase by more than 10% over last season. Head coaches' pay went up a little faster than assistants' in the past year.  But since USA TODAY Sports began surveying assistant coaches' compensation in 2009, assistants are making about 29% more and head coaches about 21% more."  The article continued that "Southern California defensive coordinator Monte Kiffin leads the new assistant coach survey at more than $1.5 million, but that is what he received during the 2010 calendar year, which is the most recent period for which private school data are available."

321.    The article continued that "Kiffin has said he will depart USC after this season.  That likely will make Clemson offensive coordinator Chad Morris the nation's highest paid assistant.  He

---

[29] *See* NCAA Bylaw 11.7.2 ("Bowl Subdivision Football. [FBS] There shall be a limit of one head coach, nine assistant coaches and four graduate assistant coaches who may be employed by an institution in bowl subdivision football.").  Bylaw 11.7.2.1.1 ("Exceptions to Number Limits") goes on to further allow for a category of "weight (strength and conditioning) coach" that does not count against the limits above, and then further states that "[n]ot more than five weight or strength coaches are permitted to work with a football program in any capacity . . . ."

CLASS ACTION COMPLAINT

is second to Kiffin and tops among public-school assistants at $1.3 million."  The article continued that "Morris is making more than half of the Football Bowl Subdivision head coaches this season. He also is making more than 41 entire assistant-coaching staffs."  The article continued that "The next four highest-paid assistants are defensive coordinators from Southeastern Conference schools: Alabama's Kirby Smart ($950,000), LSU's John Chavis ($911,250), Auburn's Brian VanGorder ($875,000) and Georgia's Todd Grantham ($825,000)."  The article continued that "Clemson's assistants—at a combined total of more than $4.2 million, including outside income—are the highest-paid group among the 102 public schools for which USA TODAY Sports could obtain 2012 pay information for at least eight of the nine assistants generally allowed by NCAA rules."

322.   LSU's assistants also are collecting more than $4 million.  Seven other schools have assistants totaling more than $3 million in compensation:  Texas, Alabama, Auburn, Ohio State, Oregon, Florida State and Oklahoma State.  Last year, six schools had $3 million assistant-coaching staffs.  In 2009, there was one:  Tennessee's, at $3.3 million."  The article continued that "The average pay for assistants at Football Bowl Subdivision schools (not including four schools that moved up to that level just this season) this season is nearly $201,000.  Eighteen assistants make at least $600,000 this season, almost quadruple the number in 2009.  There were 14 last season and nine in 2010.  Among conferences, the Southeastern Conference has the highest average compensation per assistant this season at more than $315,000.  The Big 12 is next at just under $290,000."

323.   NCAA executives themselves share in the enormous wealth created by the efforts of college athletes.  For example, the NCAA's 2011 IRS tax return, the most recent publicly available one, states that President Mark Emmert received annual compensation of $1,674,095, another executive $977,531, two more above $500,000, three more above $400,000, eight more above $300,000, and four more well above $200,000.  On March 27, 2014, the *Indianapolis Star* reported that 86 NCAA employees earn more than $100,000 per year.

324.   The Conference Commissioners also do very well.  For example, on May 19, 2013, Steve Berkowitz of *USA Today* reported that "Pacific-12 Conference commissioner Larry Scott was

CLASS ACTION COMPLAINT

credited with nearly $3.1 million in compensation during the 2011 calendar year, according to the

conference's latest federal tax return—and he isn't the only highly paid member on his staff.  Scott

received $1.575 million in base compensation—$575,000 more than in 2010—and about $1.5

million in bonus and other pay . . . .  Deputy commissioner Kevin Weiberg was credited with

$563,607 in total compensation, including more than $356,000 in base pay and the rest in bonus or

other pay.  Weiberg's total compensation surpassed the commissioners of the Big East Conference

and Conference USA.  John Marinatto, the Big East's commissioner in 2011 (he resigned in May

2012) was paid $560,777 in 2011, including $505,000 in base compensation . . . . That was only

slightly more than the total Conference USA reported for Commissioner Britton Banowsky.

Banowsky was credited with $559,243 in compensation, which included $427,153 in base pay.

Scott's compensation is about $300,000 more than that reported for Big Ten commissioner Jim

Delany and almost double the nearly $1.6 million total for Southeastern Conference commissioner

Mike Slive."

325.    University Athletics Directors also do very well.  On March 6, 2013, *USA Today*

reported that "[a]thletics directors at schools in the NCAA's Football Bowl Subdivision (excluding

four that moved up to the Football Bowl Subdivision in 2012) make an average salary of roughly

$515,000, up more than 14% since USA TODAY Sports last looked at AD compensation in October

2011 . . . .  The number making $1 million or more is up to nine from six, including Jurich.  The

number making $800,000 or more is up to 15 from nine . . . Jurich [of the University of Louisville] is

the highest-paid athletics director at a public school.  His complex deal, valued at a little more than

$1.4 million, is nearly $180,000 more than the next highest.  'Let's hope that continues, huh?' he

says."

326.    As with the coaches of college football, major college basketball coaches receive

outlandish salaries as a result of the large revenues brought in by the programs.  At the top of the list

are coaches in the Power Conferences, and at other successful Division I programs who benefit from

lucrative broadcasting contracts, thus enabling schools to employ head coaches that will keep their

teams competitive and provide a path to the NBA for prospective student-athletes.  According to

USA Today, a Division I coach whose team played in the 2012 NCAA tournament made an average salary of $1.4 million with additional bonuses ranging from $20,000 to $100,000 for qualifying for the tournament's Sweet Sixteen.[30]

327.   Coaches who are able to recruit the best high school athletes, and those who regularly compete for national titles receive the highest pay.  For example, University of Kentucky head coach John Calipari, winner of a national title and considered the best recruiter in college basketball, recently signed a new seven-year deal worth $52.5 million guaranteed.  Under the deal, he will receive a package of $6.5 million in the 2014-15 season, rising steadily to $8 million for each of the final three seasons of the contract.[31]  University of Florida head coach Billy Donovan signed a three-year extension contract in April of 2014, increasing his salary to $3.7 million over the next five years until the 2018-19 season.[32]  In December 2013, Duke head coach Mike Krzyzewski became the highest paid college coach of any sport receiving $7.2 million.[33]  These coaches receive millions of dollars in pay because they are able to lure the nation's best high school athletes with the promise of championship competition and a real chance to play in the NBA.

328.   The disparity between Division I salaries for head coaches and those for Division II head coaches is stark.  In fact, Division II men's basketball head coaches are paid an average of just $50,822.98.[34]  NAIA coaches make significantly less.

329.   Even the best Division II head coaching salaries are dwarfed by those in Division I. For example, Kim Anderson, head coach of the 2014 Division II champion Central Missouri, made

---

[30] Nancy Hart, *The Average Salary of a College Basketball Coach*, HOUSTON CHRON., *available at* http://work.chron.com/average-salary-college-basketball-coach-2102.html (last visited Nov. 14, 2014).

[31] *John Calipari Inks 7-year, $52.5M Deal*, ESPN, June 5, 2014, http://espn.go.com/mens-college-basketball/story/_/id/11038494/kentucky-wildcats-sign-john-calipari-seven-year-deal.

[32] *Billy Donovan Gets Raise to $3.7M*, ESPN, Mar. 25, 2014, http://espn.go.com/mens-college-basketball/tournament/2014/story/_/id/10670695/florida-gators-coach-billy-donovan-gets-three-year-extension-raise.

[33] Cork Gaines, *Here Are the Salaries for the Highest-Paid College Basketball Coaches*, BUS. INSIDER, Dec. 7, 2013,, http://www.businessinsider.com/here-are-the-salaries-for-the-highest-paid-college-basketball-coaches-2013-12?op=1.

[34] http://grfx.cstv.com/photos/schools/nacda/sports/div2ada/auto_pdf/DIISurveyResults05.pdf

CLASS ACTION COMPLAINT

$165,000 per year as the head coach of Central Missouri after a 12-year track record of success.[35] When he recently was hired as the head coach for the University of Missouri, his new contract provided for $1.1 million a year in guaranteed money.[36]

330.     Anderson's Division II salary on a national championship team lined up with relatively unproven coach Andy Enfield, who coached Florida Gulf Coast University, a Division I school in the Sun Belt conference with only two years of experience.  At Florida Gulf Coast, Enfield received a salary of $157,500.[37]  However, after a remarkable run in the 2013 NCAA tournament, Enfield accepted a six-year contract with the University of Southern California, increasing his $157,000 Florida Gulf Coast salary tenfold to $1.55 million per season with the USC Trojans.[38]

331.     Assistant coaches likewise earn large salaries at Division I schools.  For example, Kentucky Assistant coaches Orlando Antigua, Kenny Payne, and John Robic have base salaries ranging from $250,000 to $350,000 before incentives.  Their contracts have a combined guaranteed value of $2.15 million.[39]  In 2012, three Michigan assistant coaches signed deals guaranteeing them between $150,000-160,000 in base salary, plus incentive bonuses.[40]

332.     These numbers are unsurprising when considering the tremendous revenue brought in by college basketball.  In addition to the regular season and conference tournament championships, the NCAA's March Madness brings in a staggering amount of money.  NCAA recently announced a new 14-year television, internet and wireless rights agreement with CBS Sports and Turner

[35] *Kim Anderson's Contract Released*, ESPN, June 13, 2014, http://espn.go.com/mens-college-basketball/story/_/id/11079492/details-kim-anderson-contract-missouri-tigers-released.

[36] *Id.*

[37] *USC Hires FGCU's Andy Enfield*, ESPN, Apr. 2, 2013, http://espn.go.com/los-angeles/mens-college-basketball/story/_/id/9123661/usc-trojans-hire-fgcu-andy-enfield-men-hoops-coach.

[38] Jeff Faraudo, *Coach Andy Enfield Takes on New Challenge at USC*, SAN JOSE MERCURY NEWS, Oct. 15, 2013, *available at* http://www.mercurynews.com/sports/ci_24318258/coach-andy-enfield-takes-new-challenge-at-usc.

[39] *John Calipari's Salary Boosted to $5.2 Million Annually Plus Incentives*, NCAAB, May 4, 2012, http://www.sportingnews.com/ncaa-basketball/story/2012-05-04/john-calipari-salary-raise-kentucky-basketball.

[40] Nick Baumgardner, *Michigan Basketball Assistants Sign New Contracts, Will Receive Bonuses for Remaining in Ann Arbor*, ANN ARBOR NEWS, June 26, 2012, http://www.annarbor.com/sports/um-basketball/michigan-basketball-staff-received-70k-in-bonuses-last-season-assistants-to-earn-stay-bonuses/.

CLASS ACTION COMPLAINT

Broadcasting System, Inc., to present the Division I Men's Basketball Championship (aka March Madness) beginning in 2011 through 2024 for more than $10.8 billion.[41]

333.      An article regarding the NCAA's Pac-12 Conference, in *USA Today*, dated August 10, 2012, detailed the Pac-12's launch of its own television network, and stated that "[s]ome projections have the Pac-12 Networks, along with a 12-year, $3 billion deal with Fox and ESPN, providing roughly $30 million a school annually . . . ."  The article quotes the Pac-12's Commissioner, Larry Scott, as stating "My mandate was, how do you take this storied conference with all this success but is undervalued, under-leveraged from an exposure standpoint, as well as a revenue standpoint, and help kind of turn it around, build an enterprise that stays true to the values of the conference?  How do we blow this thing out?"

334.      The *USA Today* article further quoted Pac-12 Enterprises President Gary Stevenson as stating "We don't think just about a television network or a digital network, but rather, we're creating a content company."

335.      The *USA Today* article further discussed the Big Ten Conference's Big Ten Network, and quoted Jeremy Gray, Indiana University's Assistant Athletics Director for Broadcast Services, as stating that "[w]hen the [Big Ten] network launched [in 2007], people wondered if it was going to be a colossal failure.  Now, it's basically printing money for the schools.  It's been far more profitable than anyone anticipated . . . .  It's simply put us at another level financially."

336.      The scheduling of games is done without regard to student-athlete welfare.  As the *Arizona Daily Star* reported in February 2013, "Pac-12 commissioner Larry Scott was in Tucson last week to attend his first game at McKale Center, a dreaded 9 p.m. start to accommodate ESPN2 . . . .Scott delivered on his promise to broadcast every Pac-12 conference game . . . . The give-and-take of televising so many games is that it requires late tips, Wednesday games and Sunday games. Sometimes, as with Saturday night's ASU-Washington game, a 9 p.m. start in Tempe, it's a bit extreme . . . .  'I don't like the new scheduling,' UA senior forward Solomon Hill told me in Salt

---

[41] Press Release, NCAA, CBS Sports, Turner Broadcasting, NCAA Reach 14-Year Agreement, NCAA (Apr. 22, 2010), *at* http://www.ncaa.com/news/basketball-men/2010-04-21/cbs-sports-turner-broadcasting-ncaa-reach-14-year-agreement.

CLASS ACTION COMPLAINT

1    Lake City. 'We're gone way too long. I've got class. I'm still a student-athlete, you know. But I

2    guess they'll do just about anything for TV."

3        337.    Regarding conference realignment, and schools switching conferences, Duke

4    basketball coach Mike Krzyzewski was quoted in the December 17, 2012, issue of *Sports Illustrated*

5    as stating that "[w]e're undercutting the basic foundation of intercollegiate sports—tradition.

6    Tradition is what separates us from professional sports. With all this realignment, people are making

7    decisions like business executives instead of like the heads of academic institutions."

8        338.    Mr. Krzyzewski was further quoted in the January 14-20, 2013, issue of

9    *SportsBusiness Journal* as stating that, with regard to college sports and conference realignment,

10   "It's about money. People say it's about football, and for 100 or so schools, football drives that. At

11   our school, basketball drives money, and a lot of schools are like that. But football can drive a lot of

12   money. So that's why we're doing all this? There's no grand plan."

13       339.    The highly lucrative nature of college football is highlighted below. The data

14   researchers at Aragorn Technologies compiled the numbers (see chart below) reported by

15   universities to the U.S. Department of Education as mandated by the Equity in Athletics Disclosure

16   Act. Here are the 10 schools that brought in the most college football money from academic years

17   2000-01 through 2011-12:



340. Notice the revenue increase in football for these schools: from less than $300 million to more than $759 million a decade later. That is over 150 percent growth, or about 9 percent annualized.[42]

341. One university exemplifying the exposure football receives is the University of Texas:



342. The Longhorns expanded their football revenue from $25.6 million in 2000-01 to $103.8 million in 2011-12. That is a *quadruple* increase in one decade.

## I. Former NCAA Executive Director, Walter Byers, Makes Clear in his Book that the Purpose of NCAA Rules is to Fix Prices

343. Walter Byers served as the Executive Director of the NCAA for nearly four decades, from 1951 to 1987. In 1995, he wrote a remarkable book, titled "*Unsportsmanlike Conduct—Exploiting College Athletes.*" Mr. Byers therein detailed the history behind the restraint in suit. This history belies Defendants' expected and alleged "procompetitive" justifications for their collusive suppression of the value of athletics grants-in-aid. Mr. Byers documented that the cap (an artificially low one at that) on value provided to college athletes in return for their services was not born from the embryo of preserving amateurism. Nor from any plan to stimulate product output, product

---

[42] Eric Chemi, *The Amazing Growth in College Football Revenues*, BLOOMBERG BUS. WEEK, Sept. 26, 2013, http://www.businessweek.com/articles/2013-09-26/the-amazing-growth-in-college-football-revenues.

quality, or consumer demand.  Quite to the contrary—as explained below, it was a cost saving measure, full-stop.  And even the device created to provide limited payment to collegiate athletes (athletics grants in aid) was not conceived with a fidelity to any educational mission.  Rather, it was devised as a mechanism to avoid legal liability under labor and workers' compensation laws.  These true justifications have now morphed over time as evolving rationales to hold on to an anachronistic system that relies on suppressing competition for student labor under the guise of parochial concern and increasing the attractiveness of the game.

344.   Some of the relevant passages from Mr. Byers' book are set forth below as follows:

- "[i]n the late 1940s, I was one of a small group that patched together the diverse interests of college athletics into a body politic, the modern National Collegiate Athletic Association.  I then became the NCAA's first full-time executive director and, until my retirement in 1987, its only one.  I was charged with the dual mission of keeping intercollegiate sports clean while generating millions of dollars each year as income for the colleges." WALTER BYERS, UNSPORTSMANLIKE CONDUCT—EXPLOITING COLLEGE ATHLETES 5 (1995).

- "[D]own the years I had negotiated nearly 50 sports television contracts that piled multimillion-dollar deals one on top of another— money that funneled directly to the colleges . . . .  As the rewards multiplied, unanswered contradictions quickly followed." *Id.* at 9.

- "Today, the NCAA Presidents Commission is preoccupied with tightening a few loose bolts in a worn machine, firmly committed to the neoplantation belief that the enormous proceeds from college games belong to the overseers (the administrators) and supervisors (coaches).  The plantation workers performing in the arena may receive only those benefits authorized by the overseers.  This system is so biased against human nature and simple fairness in light of today's high-dollar, commercialized marketplace that the ever increasing number of primary and secondary NCAA infractions cases of the 1990s emerge in the current environment as mostly an indictment of the system itself." *Id.* at 2-3.

- "In an unpublicized written memo to the top NCAA management group [in 1985], I said full-need student-athletes should be given additional financial assistance over the permitted grant-in-aid.  The memo said:  'I earnestly hope that the membership does not take a righteous stand in favor of old-time amateur principles for the athlete, but modern-day commercial involvement for coaches and institutions, and somehow expect a relatively small NCAA enforcement crew to keep the situation clean.' . . . .  All I accomplished with those efforts was a hardening of the NCAA position on 'amateurism.'  Players must be shielded from exploitation and the taint of commercial gold, the NCAA officially reiterated in the early 1990s, and it then confirmed that the gold belonged to the coaches and the colleges." *Id.* at 13.

▪ "As the enormous financial rewards for winning expanded during the 1960s and multiplied in the 1970s and 1980s, NCAA enforcement never kept pace and the effectiveness of conference commissioners as regulators and enforcers became virtually non-existent.  Periodic countertrends through the years have caused endless debates, noteworthy for maximum verbiage and minimum results." *Id.* at 40.

▪ "[In the early 1950s, opponents of grants-in-aid not tied to financial need] labeled the emerging grant-in-aid system 'pay for play."  These arguments became muted, however, as more and more colleges went to grant-in-aid funding to meet the competition.  It was then that they came face to face with a serious, external threat that prompted most of the colleges to unite and insist with one voice that, grant-in-aid or not, college sports still were only for 'amateurs.'  That threat was the dreaded notion that NCAA athletes could be identified as *employees* by state industrial commission and the courts." *Id.* at 69.

▪ "[In response to the workers' compensation concern], We crafted the term *student-athlete*, and soon it was embedded in all NCAA rules and interpretations as a mandated substitute for such words as players and athletes.  We told college publicists to speak of 'college teams,' not football or basketball 'clubs,' a word common to the pros." *Id.*

▪ "[i]n 1956, the colleges, acting through the NCAA in the name of 'amateurism,' installed their own pay system called the athletics grant-in-aid or athletics 'scholarship.'" *Id.* at 65.

▪ "[In 1957, the NCAA defined allowable grant-in-aid expenses] "as tuition, fees, room and board, books, and $15 per month for nine months for laundry money.  This compensation package represented an arbitrary but uniquely lucrative allowance at the time, all dedicated to amateurism.  The rationale was that if a player received only expenses, even though it was more than other students received, he was not being paid to perform." *Id.* at 72.

▪ "The accounting variables in college athletics make it difficult if not impossible to know whether a big-time sport pays for itself, much less whether it generates net receipts to finance the deficit sports . . . Do *any* major sports programs make money for their universities?  Sure, but the trick is to overspend and feed the myth that even the industry's plutocrats teeter on insolvency." *Id.* at 221, 224.

▪ "The original grant-in-aid concept of the mid-1950s had allowed for $15 per month for laundry money.  The rule was expanded in time to include course-related supplies.  These extra benefits were eliminated by subsequent NCAA economy actions, and this irritated the bigger schools almost to the same degree as the ban on travel uniforms.  Repeated efforts were mounted to reestablish a monthly cash stipend, many arguing that it should be $50.  These initiatives were averted . . . ." *Id.* at 236.

▪ "College athletics reform movements spanning almost 90 years have been remarkably consistent.  They never reformed much of anything. For nearly 40 of those years, I was part of those visionary efforts that

CLASS ACTION COMPLAINT

came to naught.  We seemed to be constantly chasing the horse after it had escaped from the barn." *Id.* at 337

- "Spectators following the college 'reform' game need a scorecard to keep track of the many measures that have carried the promise of change.  My tally sheet shows only a few major engagements, and even in these the changes were only temporary." *Id.*

- "[t]he Olympics, bellwether of amateurism for half a century, now permits athletes to escrow big dollars and still compete for the gold.  NBA greats form the nucleus of the U.S. Olympic basketball team.  The colleges, meanwhile, have expanded their control of athletes in the name of amateurism—a modern-day misnomer for economic tyranny.  These regulations, like procrustean laws, require all athletes to conform." *Id.* at 347.

- "Pleading hard times and a desperate need for money is standard disinformation pumped out by the biggest colleges." *Id.* at 357.

- "I believe the record now clearly shows the major hope for reform lies *outside* the collegiate structure.  What the colleges will not do voluntarily should be done for them." *Id.* at 369.

- "Collegiate amateurism is not a moral issue; it is an economic camouflage for monopoly practice." *Id.* at 376.

- "[P]rotecting young people from commercial evils is a transparent excuse for monopoly operations that benefit others.  The colleges do take part in trusts (i.e., groups in which control of the members is vested in a single entity), combinations (as association of firms for a commercial purpose), and monopoly practices (exclusive control of a commodity or service)." *Id.* at 388.

- "Prosecutors and the courts, with the support of the public, should use antitrust laws to break up the collegiate cartel . . . ." *Id.*

- "[The NCAA's 512 pages of] rules, based on a turn-of-the-century theory of amateurism, enforce a modern economic order.  Today's educational reformers seem increasingly content to engage in a pedantic tautology.  Players may not receive money, except what we give them, because they must remain amateurs to be eligible under our rules.  They are amateurs if our rules say they are.  Thus, they may only receive what our rules permit." *Id.* at 390.

- "[T]he college player cannot sell his own feet (the coach does that) [via shoe endorsement deals] nor can he sell his own name (the college will do that).  This is the plantation mentality resurrected and blessed by today's campus executives." *Id.* at 391-92.

- "A meeting among business competitors to harmonize their bids on a contract is usually called a conspiracy.  More than 900 members agreeing by contract through the NCAA to issue common contracts to young people recruited to play on various sports teams seems to fit that niche." *Id.* at 391.

- "Since the same college people who harvest the returns set the rules, issue the interpretations, rule on athletes' eligibility, and decide how the annual profits should be divided, I believe state and federal challenges to these artificial restraints will be necessary." *Id.* at 392.

## J.     Reality of College Athlete Life

345.    There is a vast amount of information available that documents the realities of a college athlete's life in the Division I revenue producing sports, *i.e.*, men's basketball and football. Those athletes typically do not enjoy an academic experience anything like that of "regular" students.  Such athletes frequently are required by the university to devote more than 40 hours a week to their sports, can have enormous travel demands placed upon them, are often spoon-fed a curriculum of athlete-friendly classes that are nothing like those experienced by the general student population, and their graduation rates frequently are abysmal.

346.    Two Michigan State University law professors, Robert A. McCormick and Amy Christian McCormick, recently conducted a study regarding Division I athletes in the revenue generating sports, and concluded that those athletes' "daily burdens and obligations not only meet the legal standard of employee, but far exceed the burdens and obligations of most university employees."

347.    After they spend their college years juggling athletic and academic requirements, many student-athletes wind up substantially in debt because their scholarships did not fully cover the basic necessities of life.  A recent study illustrated that so-called "full scholarships" can leave student-athletes with as much as $30,000 in normal student expenses uncovered over the course of their collegiate athletic careers.

348.    College athletes who participate in Division I Football Bowl Subdivision football often spend 30-60 hours per week in practice, team meetings, travel and official games during the season, and many hours per week in athletics-related activities even during the off season.  During the most recent NCAA annual meeting in San Diego, NCAA President Mark Emmert stated "in Division 1 where, you know, student-athletes in some sports are putting in 30-to-40 hours a week,

well that's a full time, uh, commitment . . . ."[43]  Although NCAA rules theoretically restrict the time

college athletes may spend on their sport to 20 hours per week, the NCAA rules contain a large

loophole for so-called "voluntary" workouts that do not count toward the limit and which college

athletes understand to be mandatory in the eyes of their coaches.

349.    According to the *Daily Northwestern* on February 19, 2014, at the recent National

Labor Relations Board hearing in Chicago, Northwestern's associate athletic director of compliance

Brian Baptiste indicated that NCAA rules limiting mandatory participation to 20 hours contain

loopholes so no matter how long an away game takes, including travel to and from the game, NCAA

rules mandate that it counts as only 3 hours towards the official limit of 20.

> In its cross-examination of Baptiste, CAPA focused on the definition
> of "countable athletics-related activities," which dictates which hours
> count toward the NCAA weekly maximum of 20. A day after former
> NU quarterback Kain Colter testified players spend as many as 40-50
> hours a week on football during the season, Baptiste explained that all
> game-day activities count as only three hours, regardless of how much
> time was actually preparing for and playing the game.[44]

The *Chicago Sun-Times* from the same day explained:

> Meanwhile, a university athletics official testified that football players
> cannot practice for a game for more than 20 hours a week during the
> season under NCAA rules, but he acknowledged that players exceed
> those hours by simply traveling to games.
>
> "No one is forcing him to get on the bus" or even to play if the player
> doesn't want to, said Brian Baptiste, the university's associate athletic
> director for compliance.  "We're not mandating someone to be a
> student athlete. You have the ability to withdraw from the program."[45]
>
> The 20-hour limit, called Countable Athletically Related Activity, or
> CARA, omits hours in travel, warm-ups, extra practices and other
> activities that the rules deem voluntary, Baptiste said.

---

[43] See it on video here, where he almost says "job" before changing it to "commitment" NCAA, *2014 NCAA State of the Association*, YouTube (Jan. 16, 2014), http://www.youtube.com/watch?v=02aKLJzsV2k&feature=player_detailpage#t=2254.

[44] Alex Putterman, *Sports Economist, Northwestern Compliance Official Testify on Second Day of NLRB Hearing*, DAILY NORTHWESTERN, Feb. 19, 2014, *available at* http://dailynorthwestern.com/2014/02/19/sports/sports-economist-northwestern-compliance-official-testify-on-second-day-of-nlrb-hearing/.

[45] Sandra Guy, *NU Football Union Would Struggle Because of NCAA Rules: Economist*, CHICAGO SUN-TIMES, Feb. 19, 2014, *available at* http://www.suntimes.com/news/metro/25696146-418/nu-football-union-would-struggle-because-of-ncaa-rules-economist.html.

CLASS ACTION COMPLAINT

1    350.    Because of the tremendous time commitment required to participate in major college

2    sports, as well as NCAA and institutional rules in force during portions of the Class Period that

3    precluded college athletes from working part-time jobs during the school year, college athletes

4    generally are unable to earn additional money from part-time jobs during the school year.

5    351.    The overwhelming majority of players do not turn professional, and those that do turn

6    professional typically do not remain professionals for very long.  Those that do become professionals

7    often emerge from universities totally unprepared to manage their finances, and thus frequently fall

8    prey to financial predators, as a recent expose in *Sports Illustrated* magazine documented.

9    352.    There is no question that the grant-in-aid cap is in effect an agreement to fix wages.

10    353.    Any empirical observation of college athletes' daily activities shows that college

11    athletes are closely akin in practice to traditional workers.[46]  For example, "a self-study performed by

12    the NCAA in 2011" found that "Division I [college] football players [devoted] an average of 43.3

13    hours per week to their sport"—more time than they spent on academic activities, and more than a

14    typical U.S. worker spends on his profession.  In addition, college athletes seem to meet the Internal

15    Revenue Service's multifactor test for employment because NCAA coaching staffs exercise year-

16    round behavioral controls over student-athletes and impose strict limits on their outside financial

17    activities.  Furthermore, in the context of workers' compensation law, at least one court has issued an

18    award to a college athlete—thus treating him as a *de facto* employee.

19    354.    All of these factors combine to significantly rebut the longstanding legal fiction

20    advanced by the NCAA that college athletes are foremost students and not workers.  Indeed, there is

21    even some evidence that this legal fiction was created by the NCAA for the specific purpose of

22

23

24

25

26    _____

[46] *See generally* Robert A. McCormick & Amy Christian McCormick, *The Myth of the Student-Athlete:  The College Athlete as Employee*, 81 WASH. L. REV. 71, 129 (2006) (highlighting the argument made by some that college athletes cannot be victims of wage fixing because they are not employees).

27

28

trying to avoid legal scrutiny. [47]   Thus, it would be the most bizarre of loopholes to allow the NCAA to evade antitrust scrutiny simply by applying a dubious label to their business practices. [48]

## K.  Defendants' Likely Affirmative Defenses Do Not Apply

355.   The NCAA in other antitrust litigation has repeatedly articulated various affirmative defenses that Defendants are likely to reflexively again assert in the present case.  These alleged defenses, if asserted in the present litigation, lack adequate factual and legal support, and do not excuse Defendants' violation of the Sherman Act and other laws.

### 1.   Academic Consensus That Amateurism Is A Façade.

356.   There exists a broad consensus among economists and professors of sports management that "amateurism," as the NCAA defines it, is really just a façade to cover up what amounts to the monopolization of the industry via a cartel, and collective price-fixing. This literature includes the popular press, published academic articles, and textbooks:

(a)    Robert J. Barro, *The Best Little Monopoly in America*, BUS. WEEK, Dec. 9, 2002.

> "Finally, we come to the NCAA, which has successfully suppressed financial competition in college sports.  The NCAA is impressive partly because its limitations on scholarships and other payments to athletes boost the profitability of college sports programs.  But even more impressive is the NCAA's ability to maintain the moral high ground. . . So given this great balancing act, the NCAA is the clear choice for best monopoly in America."

(b)    [Nobel Prize Winner] Gary Becker, "The NCAA as a Powerful Cartel," The Becker-Posner Blog, Apr. 3, 2011, http://www.becker-posner-blog.com/2011/04/the-ncaa-as-a-powerful-cartel-becker.html.

> "It is impossible for an outsider to look at these rules without concluding that their main aim is to make the NCAA an effective cartel that severely constrains competition among schools for players."

(c)    Gary Becker, *The NCAA:  A Cartel in Sheepskin Clothing*, BUS. WEEK, Sept. 14, 1987, *available at* http://www.geocities.ws/jfletchman/beckerncaacartel.html.

---

[47] *See id.* at 74 (arguing that the NCAA self-coined the term "student-athlete" to perpetuate a myth of amateurism and "obtain the astonishing pecuniary gain and related benefits of the athletes' talents, time, and energy").

[48] *See generally Am. Needle, Inc. v. NFL*, 560 U.S. 183, 197 (2010) ("An ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label.").

"Economists disagree about many things, but they strongly agree that cartels raise prices, lower outputs, and are bad for society. The effect on prices and output of explicit cartels like OPEC are direct and obvious. The harmful effects of cartels that hide behind the smokescreen of good intentions are more difficult to detect, especially when nonprofit institutions are involved. The NCAA is a prime example of such a cartel. It is time that all the NCAA's restrictions on competition for athletes and sports revenues be declared an unlawful conspiracy in violation of the antitrust laws."

(d)     Brad R. Humphreys & Jane E. Ruseski, *Monitoring Cartel Behavior and Stability: Evidence from NCAA Football*, 75(3) S. ECON. J. 1 (2001).

"Most economists view the National Collegiate Athletic Association (NCAA) as a cartel operating as a monopsonist in the market for athletic recruits." *Id.* at 1.

(e)     Lawrence M. Kahn, *Markets: Cartel Behavior and Amateurism in College Sports*, 21 J. ECON. PERSP. 209 (2007).

"Most economists who have studied the NCAA view it as a cartel that attempts to produce rents, both by limiting payments for inputs such as player compensation and by limiting output (for example, Alchian and Allen, 1972; Becker, 1987; Barro, 2002)." *Id.* at 210.

"Computations such as these offer evidence that the NCAA does indeed use its cartel power to pay top athletes less than their market value (Fleisher, Goff, and Tollison, 1992; Zimbalist, 1999)." *Id.* at 212.

(f)     James V. Koch, *A Troubled Cartel: The NCAA*, 38 L. & CONTEMP. PROBLEMS, 135 (Winter/Spring 1973).

"Despite the claims of the National Collegiate Athletic Association (NCAA) that it is a champion of amateur athletics and physical fitness in colleges and universities, the NCAA is in fact a business cartel composed of university-firms which have varying desires to restrict competition and maximize profits in the area of intercollegiate athletics." *Id.* at 135.

(g)     James V. Koch, *Intercollegiate Athletics: An Economic Explanation*, 34(2) SOC. SCI. Q. 360-74 (June 1973).

"The Foundation Argument: The NCAA as a Cartel:

. . . The NCAA is a cartel because it: (a) sets the maximum price that can be paid for intercollegiate athletes; (b) regulates the quantity of athletes that can be purchased in a given time period; (c) regulates the duration and intensity of usage of those athletes; (d) on occasion fixes the price at which sports outputs can be sold; (e) purports to control the property rights to activities such as the televising of intercollegiate football; (f) periodically informs cartel members about transactions,

costs, market conditions, and sales techniques (Raiborn, 1982); (g) occasionally pools and distributes portions of the cartel's profits; and (h) polices the behavior of its members and levies penalties against those members of the cartel who are deemed to be in violation of cartel rules and regulations." *Id.* at 361.

(h)     ROBERT PINDYCK & [Former DOJ Chief Economist] DANIEL RUBINFELD, MICROECONOMICS, ch. 12, § 12.6, at 480-81:

"The Cartelization of Intercollegiate Athletics . . .

This profitability [in Intercollegiate Athletics] is the result of monopoly power, obtained via cartelization. The cartel organization is the National Collegiate Athletic Association. The NCAA restricts competition in a number of important activities. To reduce bargaining power by student athletes, the NCAA creates and enforces rules regarding eligibility and terms of compensation."

(i)     Lazaroff, Daniel E., *The NCAA in Its Second Century: Defender of Amateurism or Antitrust Recidivist?*, 86(2) OR. L. REV. 329 (2007).

"Commentators have explained that while the 'original mission' of the NCAA 'focused on providing public goods' by reducing violence and standardizing play, the NCAA 'quickly turned its attention from standardizing rules to instituting the outlines of a cartel.'" *Id.* at 331.

(j)     Richard Posner, "Monopsony in College Athletics," The Becker-Posner Blog, Apr. 3, 2011, http://www.becker-posner-blog.com/2011/04/monopsony-in-college-athleticsposner.html.

"The National Collegiate Athletic Association behaves monopsonistically in forbidding its member colleges and universities to pay its athletes. Although cartels, including monopsonistic ones, are generally deemed to be illegal per se under American antitrust law, the NCAA's monopsonistic behavior has thus far not been successfully challenged."

(k)     [Former Chief FTC Economist] Robert D. Tollison, *Understanding the Antitrust Economics of Sports Leagues*, ANTITRUST 21 (Spring 2000).

"Commonly, the NCAA is viewed as a benign administrator of the rules of college athletics. This perspective recognizes many of the problems and perverse outcomes that result from NCAA rules and actions; yet these outcomes are usually attributed to the short-sightedness, ignorance, or greed of certain elements within the organization. In contrast, economists generally view the NCAA as a cartel.  They hold this view because the NCAA has historically devised rules to restrict output (the number of games televised) and to restrict competition for inputs (student-athletes). Economists have focused primarily on the input market, where monopsonistic aspects of NCAA

CLASS ACTION COMPLAINT

behavior are evident. NCAA rules concerning recruiting and financial aid are seen as transferring rewards from players to schools and coaches, and the rules are seen as an expression of an agreement among buyers to restrict competition for inputs. These points are well established in the literature, and indeed, it could be observed that the NCAA has obtained much more durable returns on its cartel behavior than other, more notable cartels such as OPEC." *Id.* at 22.

2.  **"Amateur College Athletics," "Amateur College Basketball," "Amateur College Football," "Division I Men's Basketball," and "Division I Football Bowl Subdivision Football" All Will Continue to Exist**

357.    The NCAA has asserted in another antitrust litigation action an alleged affirmative defense that "the NCAA's financial aid, eligibility, and amateurism bylaws and rules promote the creation and enhancement of amateur college athletics as 'products' or activities that are distinct from professional and other amateur athletics. The NCAA's financial aid rules accordingly allow the creation and maintenance of a 'product'—amateur college athletics—that would otherwise not exist, and are accordingly procompetitive."

358.    Plaintiffs here do not seek *any* relief that significantly impacts an alleged product of "amateur college athletics." For example, even within the NCAA's structure, hundreds of college football teams exist which compete in collegiate football *outside* of the Division I Football Bowl Subdivision. Specifically, as of the end of the 2012 season, 124 schools compete in collegiate football within the NCAA's Division I Football Championship Subdivision, 162 schools compete in collegiate football in the NCAA's Division II, and 241 schools compete in collegiate football in the NCAA's Division III.[49] "Amateur college football," even as restrictively defined by the NCAA, will continue to exist, regardless of the outcome of the present litigation.

359.    Aside from those schools under the NCAA's purview, there also exist other non-major football associations producing non-major but nonetheless amateur college football. None would be threatened by this ruling. These include the NAIA, the NJCAA, the USCAA, the ACCA, the NWAACC, and the CCCAA.

---

[49] Source : NCAA Football Statistics (Records through 2012 Season). Division I Football Championship Subdivision: 124 (http://fs.ncaa.org/Docs/stats/football_records/2013/FCS.pdf). Division II Football: 162 (http://fs.ncaa.org/Docs/stats/football_records/2013/D2.pdf). Division III Football: 241 (http://fs.ncaa.org/Docs/stats/football_records/2013/D3.pdf).

360.    Moreover, Division I Football Bowl Subdivision collegiate football will continue to exist.  Numerous leading, mainstream publications have published detailed analyses calling for significant change in the artificial financial aid restraints presently imposed on collegiate athletes.  None of them have suggested that such changes would eliminate Division I Football Bowl Subdivision collegiate football.  As one such example, *BusinessWeek* published an article on January 2, 2014 explaining that:

> Hundreds of thousands of U.S. businesses figure out how much to pay workers without going broke; more to the point, college presidents seem perfectly capable of running institutions with 9- or even 10-figure budgets. They can handle market competition when it comes to recruiting engineering professors, but they're somehow incapable of making rational decisions when the recruits in question are athletes? If the NCAA is right and its members really are broke, the market rate for athletes isn't likely to rise very much. But then that makes you wonder why they are fighting so hard to prevent that outcome in the first place.[50]

As a second of numerous examples, on September 16, 2013, *Time* magazine featured a cover story titled "It's Time to Pay College Athletes."  It included the following:

> According to a 2012 study from Oxford Economics, a global research firm, a season's worth of Texas A&M home football games generate $86 million in business for Brazos County, where A&M is located.
>
> . . .
>
> **How We Got Here**
>
> *The athlete is the most available publicity material the college has.  A great scientific discovery will make good press material for a few days, but nothing to compare to that of the performance of a first-class athlete.*
>
> No statement better explains why American colleges are so invested in modern-day sports--and why college athletes have a right to a paycheck.  It was written in 1929, part of a Carnegie Foundation study on American college athletics.  A college, said the authors, "wants students, it wants popularity, and above all it wants money and always more money."
>
> . . .

---

[50] Jonathan Mahler, *College Athletes Should Be Paid Exactly This Much*, BLOOMBERG BUSINESSWEEK, Jan. 2, 2014, http://www.businessweek.com/articles/2014-01-02/how-much-should-college-athletes-get-paid.

CLASS ACTION COMPLAINT

Today college football is a booming profit center for many institutions at the top of Division 1, the highest level of NCAA sports, and is a growing portion of the regional economy in college towns like Boise, Idaho; State College, Pa.; College Station; and South Bend, Ind. According to the most recent federal data, the University of Texas football team netted a profit of $77.9 million in 2011--12, on $103.8 million in revenue.  Michigan made $61.6 million from football, on $85.2 million in revenue.  Any business would kill for those profit margins.

. . .

**A Modest Proposal**

The time is right to give schools the option to share their rising sports income with college athletes.  Not every school would--or could--participate.  Only the 60 or so schools in the power conferences, which have the football and basketball revenues to support such payments, would likely even consider such an option.  With conferences and schools set to see record television payouts for the next decade and beyond, the idea of paying players is no longer just fodder for academic debate.  It's an ethical imperative.

Schools could either pay players whatever schools want in a free market, or salaries could be subject to regulation.  In reality, universities probably aren't going to go from $0 in compensation, where they are now, to allowing an unlimited amount.  Salary caps exist in the NBA and NFL; they're fair game for college sports too.

. . .

College sports are already impure; paying players can't make things much worse.  At the highest levels, the games are mass entertainment.

. . .

Most important, player payments would force schools to operate in an environment in which they're honest with themselves.  Sports are a big business, and we value the exposure and revenue that it brings to our schools.  But let's stop saying one thing--"we care for our student-athletes"--while doing another: preventing them from benefiting monetarily.  "Living a lie," says Richard Southall, director of the College Sport Research Institute at the University of South Carolina, "is hard to do."

Within higher ed, there's clearly momentum to give athletes at least a little more than what they're getting now.  "I think there is change likely on the horizon," says Nebraska chancellor Harvey Perlman, who is chairman of the Bowl Championship Series oversight committee. The NCAA membership has stalled a plan giving schools the option to offer a $2,000 stipend to cover expenses beyond tuition, room and board, books and fees.  Many schools at the lower levels of Division 1 said they couldn't afford it.

---

CLASS ACTION COMPLAINT

But at this point, the power football conferences seem determined to offer at least some kind of extra. "I think we will find a way to provide all scholarship student-athletes with the full cost-of-attendance scholarship," says Perlman. As for anything above that, don't expect radical change, but universities' leaders are at least discussing it. "I don't think there's any doubt about that," says Martin, the Colorado State chancellor who was recently chancellor at LSU.

. . .

The U.S. has enjoyed a long, deep love affair with college sports. It's about time we finally paid for it.

361.    A prime, analogous example of a change in athlete compensation practices not negatively impacting sports fans' enjoyment of a product is in regards to the Olympics. On July 25, 2012, *The Atlantic* published a detailed article titled "The Olympics Show Why College Sports Should Give Up on Amateurism." Therein, the author Patrick Hruby wrote:

Things were falling apart. The system would not hold. For decades, it had clung to the amateur ideal, enforced by a watchful governing body: Athletes could not receive material gain, directly or indirectly, for playing sports.

Only the cash came anyway, in drips and drabs and great big gushers, mostly under the table, the public's insatiable demand for spectacle rushing to meet a limited supply of talented performers. Some decried the resulting corruption and hypocrisy; others lambasted the unfairness of it all. Prominent voices demanded wholesale change. Still, amateurism's defenders held fast, with one telling *Sports Illustrated* that "if we water down the rules now, the [sport] will be destroyed within eight years."[51]

The above does not describe the National Collegiate Athletic Association and contemporary big-time college sports.

The year was 1960. The subject was the Olympics. Once upon a time, the Games were an amateur affair, as committed to no-pay-for-play—no salaries, no endorsements—as today's NCAA. Of course, that was before former International Olympic Committee head Juan Antonio Samaranch pushed for the inclusion of professional athletes. And before basketball's 1992 Dream Team. And before a bevy of pros in everything from track and field to table tennis—in short, the world's best—flooded the Games.

---

[51] Patrick Hruby, *The Olympics Show Why College Sports Should Give Up on Amateurism*, THE ATLANTIC, July 25, 2012, *available at* http://www.theatlantic.com/entertainment/archive/2012/07/the-olympics-show-why-college-sports-should-give-up-on-amateurism/260275/.

CLASS ACTION COMPLAINT

Yet on the way to a grubby Gomorra of unfettered sports commerce, a funny thing happened:  The watered-down Olympics didn't exactly sink to the bottom of the Marianas Trench.

"Dead in eight years?" said Olympic historian Bill Mallon, who has written dozens of books about the Games, in a recent interview.  "If anything, the Olympics are more popular and powerful than ever.  It has been decades since they opened up the Games to the professionals, and they're still going strong."

362.   On May 12, 2014, the *Wall Street Journal* reported that the television network NBC reached a media-rights extension with the International Olympic Committee, agreeing to pay $7.65 billion to televise the winter and summer Olympics between 2022 and 2032, and averaging $1.275 billion for each of the six Olympics during that time.  The article continued that "[d]uring the Olympics, the audience for the Olympics is usually larger than those for the other three major networks combined . . ."

363.   Similarly, just as artificial restraints on the compensation of Olympic athletes did not eliminate the Olympics, changes to the artificial restraints on financial aid for Division I Football Bowl Subdivision football players will not eliminate Division I Football Bowl Subdivision football, Division I Men's Basketball, nor "amateur college football," nor "amateur college basketball," nor "amateur athletics."

### 3.   Competitive Balance Will Not Be Impacted.

364.   The NCAA has elsewhere asserted, as an alleged affirmative defense, that "[i]n addition to enabling the creation of amateur college sports, the NCAA rules promote the creation and maintenance of several unique features of NCAA college athletics, including:  They promote competitive balance between and among NCAA member institutions in the various sports in which they compete . . .."  In actuality, competitive balance does not even presently exist across all NCAA member institutions.  This Complaint cites numerous admissions by Defendants and others to that effect.  As Defendant Pac-12 Commissioner Larry Scott stated in 2011, "I don't think there is an even playing field."  He continued that "[t]here's not an even playing field in TV exposure.  There's not an even playing field in coaches and coaches' salaries.  There's not an even playing field in stadiums."

365.     On May 4, 2014, utsandiego.com reported the comments of Rocky Long, the head football coach for San Diego State University, a member of the Mountain West Conference, regarding a new NCAA rule that eliminated restrictions on the amount of food that teams could provide to players.  The article stated that Coach Long "rebuts the suggestion this puts the [San Diego State] Aztecs at a recruiting disadvantage vis-à-vis the Pac-12's USC, UCLA and Oregon, all of which have the resources to maximize privileges under the new rule.  'They already have huge advantages anyway,' he says.  'They get $20 million a year in TV revenue, we get $1.3 million.  That's a heck of an advantage too.  Those guys aren't getting any more advantages than they already have.  I don't think it changes anything.'"

366.     There exists a broad consensus among economists and professors of sports management that while competitive balance may provide important pro-competitive benefits, the NCAA rules in suit with respect to the fixing of prices offered to athletes across Division I do not contribute to competitive balance and may, in fact, harm it.  This literature includes published academic articles and textbooks, such as:

a.     Jim Peach, *College Athletics, Universities, and the NCAA*, 44 Soc. Sci. J. (2007):

He found that 50% of the Final Four teams from 1950-2006 were from 13 schools.  50% of the top 8 finishes in the AP final poll in college football (from 1950-2005) were from 12 schools.  He concludes that there is not much competitive balance in the NCAA.  Specifically, Peach writes:

> By any reasonable standard, the NCAA has failed in its efforts to improve competitive balance in football.

Peach concludes (with emphasis added) that:

> Third, there is little evidence that the NCAA rules and regulations have promoted competitive balance in college athletics and no a priori reason to think that eliminating the rules would change the competitive balance situation.  Would such price competition alter the distribution of playing talent among academic institutions?  No one knows for certain, but it is worth noting that the power schools in football were the power schools before the imposition of NCAA regulations. . . . **There is also the possibility that eliminating the NCAA eligibility and financial restrictions might increase competitive balance, particularly in football.** In an unrestricted system, wages for first-team student athletes at nonpower schools might be higher than wages for second or third team talent at the power schools. So, it is possible that the distribution of student athlete talent could change.

Peach then adds:

> Fourth, colleges and universities could save a great deal of money. The money cost of participating in the NCAA and in complying with its many regulations is a large but unknown figure. University delegations to NCAA meetings consist of at least an Athletic Director, a university president (since 1997), a faculty representative, and others. In addition, there is the on-going process and associated costs of enforcement and compliance on campus. Even on a relatively small campus, this can involve full-time staff members and faculty oversight committees.
>
> Fifth, university administrators would be forced to make hard decisions instead of relying on the protective shield of NCAA regulations. What hard decisions? Universities would be forced to establish their own academic eligibility requirements for student athletes. Sixth, if the NCAA were to disappear there would be no apparent adverse consequences for women's sports. After all, it was Title IX and not the NCAA that provided the incentive for academic institutions to devote more resources to women's sports.
>
> Seventh, TV revenues might increase. TV revenue, especially for football, is a complex issue. The NCAA has never fully come to grips with this issue involving laws such as the Sports Broadcasting Act of 1961, conferences, bowl-games, conferences, and the distribution of revenues among universities. That is why we have the BCS games.
>
> Eighth, there is no reason to expect that attendance at major sporting events would decline. Fans do not attend games or watch them on TV to see the NCAA in action. It might be fun, however, to broadcast the annual convention of the NCAA so that their decisions were truly public.
>
> Is the NCAA necessary? When an institution fails to perform basic functions, it may be time to alter that institution. Who could change or abolish the NCAA? The universities could do so. The universities are the NCAA. Many others have suggested various reforms for the NCAA (Fort, 2003; Zimbalist, 1999). What is being suggested here goes beyond reform of the NCAA. The NCAA serves no useful purpose and should be abolished.

b.   RODNEY D. FORT, SPORTS ECONOMICS (2d ed. 2005).

> "Just as with pro leagues, a cursory analysis reveals that none of the restrictions on players actually have anything to do with competitive imbalance.  Instead, they transfer value produced by players away from the players and toward the athletic department." *Id.* at 492.

. . .

> "Interestingly, many believe that these recruiting restrictions create a level playing field that enables poorer athletic departments to compete with richer ones for talent.  Nothing could be farther from the truth. Instead, these restrictions entrench power at departments at the top end of the winning percent distribution." *Id.* at 495.

CLASS ACTION COMPLAINT

c.     Woodrow E. Eckard, *The NCAA Cartel and Competitive Balance in College Football*, 13 REV. INDUS. ORG. 347 (1998).

"The NCAA regulates college football player recruiting, eligibility, and compensation. The economic theory of cartels suggests that one consequence may be reduced competitive balance. The enforced restrictions inhibit weak teams from improving, and protect strong teams from competition. A "stratification" is implied which should be evident over time as less "churning" in national rankings and conference standings, and fewer schools achieving national prominence. I test this general hypothesis by comparing various competitive balance measures for about 25 years before and after NCAA enforcement began in 1952. The hypothesis is supported by all measures at both the national and conference levels." *Id.* at 347.

d.     Craig A. Depken & Dennis P. Wilson, *Institutional Charge in the NCAA and Competitive Balance in Intercollegiate Football, in* JOHN FIZEL & RODNEY FORT, ECONOMICS OF COLLEGE SPORTS (2004).

"We find that over time, Division 1-A football has become less balanced. . ." Using the measure most preferred by the authors, "almost all of the institutional changes modeled here have had a negative impact on competitive balance, supporting the special interest-pressure group hypothesis." *Id.* at 209.

. . .

"NCAA decisions have little impact on the competitiveness of NCAA football."

e.     Craig A. Depken & Dennis P. Wilson, *The Impact of Cartel Enforcement in Division I-A Football, in* JOHN FIZEL & RODNEY FORT, ECONOMICS OF COLLEGE SPORTS (2004).

"Our pooled results do support the claim that NCAA enforcement may have the unintended consequence of reducing competitive balance . . . ."

f.     James Quirk, *College Football Conferences and Competitive Balance*, 25 MANAGERIAL & DECISION ECON. 63 (2004).

"[I]n almost all of the conferences, even including the Ivy League, there have been one or more teams that have had records of winning championships significantly different from the equal playing strengths ideal." *Id.* at 72.

4.    **Emmert Statements regarding inter-conference competition (other than with respect to the alleged collusion) and the lack of competitive balance within Division I**

367.    NCAA President Mark Emmert has made the following statements regarding inter-conference competition and the lack of competitive balance within Division I:

a.    "Emmert said he doesn't blame the conferences for taking all that's offered.  But he's the president of all NCAA schools, not just those at the top of the football pyramid.  'There are a variety of dynamics out there that will continue to drive the gap between the highest resource schools and the lowest for the foreseeable future,' Emmert said.  'I don't see that trend abating at all.'[52]

b.    "If students have the opportunity to go to that dominant athletic program, they're going to go."[53]

c.    "I don't think any of the Butler kids were recruited by, you know, by Kansas."[54]

d.    "So if you've got a gap between $40,000 and $150,000, (then) $2,000 isn't going to make much of a difference."[55]

e.    "As for the continued separation of the haves and the have nots, that's economics, Emmert said.  'We've always had that.  The financial differences have always been there.  Some universities have huge competitive advantages [because] of history and culture and decisions that the university made over decades that are in some ways insurmountable and you wouldn't want to take them away. . . . I'm sure Alabama under Bear Bryant had these stunning competitive advantages . . . .  Now to say that the University of Louisiana-Lafayette and Alabama have huge competitive disadvantages it didn't look much

---

[52] Blair Kerkhoff, *A Look at Athletic Department Budget Growth at Kansas and Kansas State*, WICHITA EAGLE, July 7, 2013, *available at* http://www.kansas.com/2012/07/07/2401039/a-look-at-athletic-department.html.

[53] *See* Wickersham, *supra* note18.

[54] *Id.*

[55] *See* Dodd, *supra* note 21.

CLASS ACTION COMPLAINT

1    different 40 years ago.  It reinforces some of those inherent advantages some of

2    those universities have had for a century.'"[56]

3         5.    **Education Will Remain A Condition Of Athlete Eligibility.**

4        368.    The NCAA, in other litigation, has asserted as an alleged affirmative defense that its

5    financial aid rules "help to insure that student-athletes are integrated into the student body as a whole

6    and that education remains an important component of the student-athlete experience."  This alleged

7    affirmative defense, if asserted in the present litigation, is a non-starter.  To be clear, in no sense does

8    any of the relief sought by Plaintiffs herein challenge any rules or regulations that require Class

9    members to be students in good standing at their respective academic institutions.

10          **VI.    INTERSTATE TRADE AND COMMERCE**

11        369.    The business activities of Defendants that are the subject of this action were and are

12    within the flow of, and substantially affected and affect, interstate trade and commerce.

13        370.    During the Class Period, Defendants transacted business in multiple states in a

14    continuous and uninterrupted flow of interstate commerce throughout the United States.

15        371.    While there are no limits to what coaches and administrators can make, the NCAA's

16    definition of amateurism caps "full" athletic scholarships below Cost of Attendance, or the price tag

17    that each school reports to the U.S. Department of Education.  The athletic scholarship is the

18    compensation that athletes receive for their contributions to the college, and every full athletic

19    scholarship in the nation leaves them with out-of-pocket education related expenses.  Using the Cost

20    of Attendance figures that colleges report to the Department of Education each year, a recent study

21    found that the average scholarship shortfall for a full scholarship athlete at a Football Bowl

22    Subdivision school was $3,222 in 2010-11.  Jim Delany of Defendant Big Ten Conference puts this

23    estimate as high as $5,000 for Big Ten Schools.

24        372.    These same colleges are free to *give* full *academic* scholarships that fully cover the

25    Cost of Attendance while their "full" *athletic* scholarships must fall short of the Cost of Attendance

26    due to the NCAA's definition of amateurism.  As one such example, the University of North

27    

---

28    [56] *Id*.

CLASS ACTION COMPLAINT

Carolina (at Chapel Hill) gives out the Morehead-Cain scholarship, which the school describes on its website as "[t]he oldest, most prestigious merit scholarship program in the United States."  This scholarship provides more than a "Full Ride" GIA, including:

- full tuition
- student fees
- housing
- meals
- books and a laptop
- supplies and miscellaneous

- A four-year Summer Enrichment Program made up of diverse, customized experiences that begin the summer before freshman year and include:

  - Outdoor Leadership
  - Public Service
  - Inquiry and Exploration
  - Private Enterprise

- Discovery Funds to be used for education opportunities

373.    In contrast, college athletes have been promised by their colleges and coaches that their educational pursuits will be fully supported with a "full" scholarship, but despite record revenues, they have never fully funded this promise.  This leaves most players and their families unprepared for the financial demands that they must address.

374.    The inequities in this system can be gauged from several vantage points.  When head coaches' salaries are compared with the scholarship shortfall of entire football teams based on 85 scholarships (using in-state tuition calculations only), the gap is striking.  While team shortfalls in 2010-11 ranged from $80,920 to over $520,795, some coaches' bonuses alone were greater than those shortfalls.  Then-University of Florida head football coach Urban Myer could have financed the total scholarship shortfall for his entire team, $271,150, with only *half* of his $575,000 maximum bonus that year, leaving his $4 million salary completely intact.  Similarly, University of Oklahoma head coach Bob Stoops' contract provided for a maximum bonus of $819,500 while his football team's total scholarship shortfall was $338,980.  Among the colleges with the top 10 football revenues, the sum of team scholarship shortfalls was approximately $2.5 million while the maximum bonuses these head football coaches could earn was $5.4 million.  As mentioned before, taking just

CLASS ACTION COMPLAINT

the increase in pay that Alabama coach Nick Saban received after the 2013-14 football season would be enough to pay each scholarship athlete on Saban's team $17,000 per year.  Although some argue that the financial state of college athletics does not have the resources to remedy the scholarship shortfall problem, dollars allocated to the incentives built into coaches' contracts to win conference games, achieve a certain winning percentage, be selected for a non-Bowl Championship Series or Bowl Championship Series bowl, be named coach of the year by a conference or national association, or to simply stay at an institution, incentives that hinge on the performance of athletes who generate the money to pay those incentives would certainly be a budget area to be examined. Even if the claim of poverty is correct, that is no justification for collusion.

## VII.    CLASS ACTION ALLEGATIONS

375.    Plaintiffs bring this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated. Specifically, Plaintiffs pursue this action on behalf of the following proposed classes:

**Division I Football FBS Class**

All persons who received athletic grants-in-aid ("GIAs") for participation in college football from a college or university that is a member of the NCAA's Division I Football Bowl Subdivision ("FBS") conferences any time between March 5, 2010 and the date of judgment in this matter.

**Men's Division I Basketball Class**

All persons who received athletic grants-in-aid ("GIAs") for participation in men's college basketball from a college or university that is a member of the NCAA's Division I conferences any time between March 5, 2010 and the date of judgment in this matter.

376.    Excluded from all Classes set forth above are all men's FBS football players, and all men's Division I basketball players that played for any school in the Ivy League or any of the Service Academies.  The Ivy League consists of Brown University, Columbia University, Cornell University, Dartmouth University, Harvard University, Princeton University, the University of Pennsylvania, and Yale University.  Ivy League schools do not offer athletics Grants-in-Aid.  The Service Academies refer to the United States Military Academy ("Army"), the United States Naval

1    Academy ("Navy") and the United States Air Force Academy ("Air Force"). The Services

2    Academies do not offer athletics Grants-in-Aid.

3        377.    The Classes are so numerous that joinder of all members is impracticable. While the

4    exact number of the Class Members is unknown to Plaintiffs at this time and can only be discerned

5    through discovery, Plaintiffs are informed and believe that there are several thousand Class Members

6    in each Class.

7        378.    Plaintiffs' claims are typical of the claims of the other members of the Classes.

8    Plaintiffs and other Class Members sustained damages arising out of Defendants' common course of

9    conduct in violation of law as complained herein. The injuries and damages of each member of the

10   Classes were directly caused by Defendants' wrongful conduct in violation of laws as alleged herein.

11       379.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes

12   and have retained counsel competent and experienced in class action litigation, including antitrust

13   class action litigation.

14       380.    Common questions of law and fact exist as to all members of the Classes which

15   predominate over any questions affecting solely individual members of the Classes. Although in

16   many cases, the Defendants admit that they have in fact engaged in the conduct listed below,

17   nevertheless among the questions of law and fact common to the Classes are:

18           a.    Whether Defendants engaged in a contract, combination, or conspiracy to

19   unreasonably restrain trade by limiting the monetary amount of grants-in-aid given to the Classes;

20           b.    Whether such conduct caused members of the Classes to receive less in grants-

21   in-aid than they would have in a truly competitive market; and

22           c.    Whether the Classes was injured by Defendants' conduct, and, if so, the

23   appropriate class-wide measure of damages for the Classes.

24       381.    Plaintiffs' claims are typical of the Classes because the cap on grants-in-aid has

25   injured both Plaintiffs and the members of the Classes.

26       382.    Plaintiffs are adequate representatives of the Classes and will protect the claims and

27   interests of the Classes. Plaintiffs do not have interests that conflict with those of the Classes.

28

CLASS ACTION COMPLAINT

1    Plaintiffs will vigorously prosecute the claims alleged herein and have retained competent counsel

2    with extensive antitrust and class action litigation experience.

3         383.    A class action is superior to other available methods for the fair and efficient

4    adjudication of this controversy because joinder of all Class Members is impracticable.  The

5    prosecution of separate actions by individual members of the Classes would impose heavy burdens

6    upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of

7    the questions of law and fact common to the Classes.  A class action, on the other hand, would

8    achieve substantial economies of time, effort and expense, and would assure uniformity of decision

9    as to persons similarly situated without sacrificing procedural fairness or bringing about other

10   undesirable results.

11        384.    The interest of members of the Classes in individually controlling the prosecution of

12   separate actions is theoretical rather than practical.  The Classes have high degrees of cohesion, and

13   prosecution of the action through representatives would be unobjectionable.  The amounts at stake

14   for Class Members, while substantial in the aggregate, are not great enough individually to enable

15   them to maintain separate suits against Defendants.  Plaintiffs do not anticipate any difficulty in the

16   management of this action as a class action.

## VIII.   ANTITRUST ALLEGATIONS

18        385.    Defendants' contract, combination, and conspiracy described herein consisted of a

19   continuing horizontal and vertical agreement, understanding, and concert of action among the

20   Defendants and their co-conspirators, the substantial terms of which were to artificially fix, depress,

21   maintain, and/or stabilize prices received by Plaintiffs and Class Members for their collegiate

22   football and basketball athletic services in the United States, its territories and possessions.

23        386.    In formulating and effectuating the contract, combination, or conspiracy, Defendants

24   and their co-conspirators did those things that they unlawfully combined and conspired to do,

25   including, among other things:

26             a.    agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to

27   Plaintiffs and Class Members for their collegiate football and basketball athletic services; and

28

---

CLASS ACTION COMPLAINT

b.     implementing and monitoring the conspiracy among cartel members.

387.    The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain and/or stabilize prices paid to Plaintiffs and Class Members for their collegiate football and basketball athletic services.

388.    Defendants' actions constitute an unreasonable restraint of trade.

**FIRST CLAIM FOR RELIEF**

***PER SE* VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(Against All Defendants)**

389.    Plaintiffs reallege and incorporate by reference each allegation set forth in all of the preceding paragraphs in this Complaint.

390.    Throughout the Class Period, and continuing through the resolution of this case, the NCAA and its member institutions participating in the relevant markets, including the Conference Defendants, have engaged and continue to engage in a contract, combination and conspiracy, through the cap on grants-in-aid, to fix the amount of financial aid and awards available to Class Members and otherwise unreasonably restrain competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

391.    This combination and conspiracy, organized through the NCAA, which possesses a dominant position in the relevant market, has produced and, unless restrained, will continue to produce, the following anticompetitive effects, among others:

a.    competition in the amount, terms and conditions of financial aid and awards to Class Members at NCAA member institutions that compete in the relevant markets has been and will continue to be unreasonably restricted and artificially eliminated; and

b.    Class Members have been and will continue to be deprived of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions that compete in the relevant markets.

392.     As a direct and proximate result of Defendants' actions, Plaintiffs and the members of the Classes have been, are being, and will continue to be, injured and financially damaged in amounts which are yet to be determined.

393.     The NCAA and its members' abridgement of Class Members' economic rights are a naked, *per se* restraint of trade.

394.     The amount of damages suffered by Plaintiffs and the members of the Classes have not yet been ascertained.  Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

### SECOND CLAIM FOR RELIEF

**VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
UNREASONABLE RESTRAINT OF TRADE
*"QUICK LOOK"* RULE OF REASON ANALYSIS
(Against All Defendants)**

395.     Plaintiffs reallege and incorporate by reference each allegation set forth in all of the preceding paragraphs in this Complaint.

396.     As an alternative to Plaintiffs' First Claim for Relief, if the Court determines that Defendants' conduct does not constitute, in whole or in part, a *per se* antitrust violation, Plaintiffs alternatively plead that Defendants' conduct, as analyzed in whole or in part via the "quick look" "rule of reason" antitrust analysis, violates the Sherman Act.  The anticompetitive nature of Defendants' agreement is so blatant that a detailed review of the surrounding marketplace is unnecessary.  Under this analysis, as the Supreme Court has stated, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."  Those words equally apply to the present case.

397.     Throughout the Class Period, and continuing through the resolution of this case, the NCAA and its member institutions participating in the relevant markets, including the Conference Defendants, have engaged and continue to engage in a contract, combination and conspiracy, through the cap on grants-in-aid, to fix the amount of financial aid and awards available to Plaintiffs and

1    Class Members and otherwise unreasonably restrain competition in violation of Section 1 of the

2    Sherman Act, 15 U.S.C. § 1.

3         398.    This combination and conspiracy, organized through the NCAA, which possesses a

4    dominant position in the relevant markets, has produced and, unless restrained, will continue to

5    produce, the following anticompetitive effects among others:

6              a.    competition in the amount, terms and conditions of financial aid and awards to

7    Class Members at NCAA member institutions that compete in the relevant markets have been and

8    will continue to be unreasonably restricted and artificially eliminated; and

9              b.    Plaintiffs and Class Members have been and will continue to be deprived of

10   the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA

11   member institutions that compete in the relevant markets.

12        399.    As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members

13   have been, are being, and will continue to be, injured and financially damaged in amounts which are

14   yet to be determined.

15        400.    The NCAA and its members' abridgement of Plaintiffs' and Class Members'

16   economic rights are a restraint of trade, and are not connected to any legitimate non-commercial

17   goals.  The purpose of the NCAA's and its members' actions is solely to enhance revenue for

18   themselves by cutting costs, specifically, to eliminate the need to compete, and to pay any

19   compensation to Plaintiffs and Class Members above the artificially depressed, capped grant-in-aid

20   limit.

21        401.    The anticompetitive effects of Defendants' scheme substantially outweigh any alleged

22   pro-competitive effects or justifications that may be offered by Defendants, including that their

23   collusive conduct is shielded by their self-crafted concept of "amateurism."

24        402.    Reasonable and less restrictive alternatives are available to Defendants' current

25   anticompetitive practices.

26        403.    The amount of damages suffered by Plaintiffs and Class Members have not yet been

27   ascertained.  Pursuant to Section 4 of the Clayton Act, Plaintiffs and the Classes are entitled to

28

CLASS ACTION COMPLAINT

recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

### THIRD CLAIM FOR RELIEF

**VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
UNREASONABLE RESTRAINT OF TRADE
FULL RULE OF REASON ANALYSIS
(Against All Defendants)**

404. Plaintiffs reallege and incorporate by reference each allegation set forth in all of the preceding paragraphs in this Complaint.

405. As an alternative to Plaintiffs' First and Second Claims for Relief, if the Court determines that Defendants' conduct does not constitute, in whole or in part, a *per se* antitrust violation, and that Defendants' conduct should not be analyzed, in whole or in part, via the "quick look" "rule of reason" analysis, Plaintiffs alternatively plead that Defendants' conduct, as analyzed in whole or in part via the full "rule of reason" antitrust analysis, violates the Sherman Act.

406. Throughout the Class Period, and continuing through the resolution of this case, the NCAA and its member institutions participating in the relevant markets, including the Conference Defendants, have engaged and continue to engage in a contract, combination and conspiracy, through the cap on grants-in-aid, to fix the amount of financial aid and awards available to Plaintiffs and Class Members and otherwise unreasonably restrain competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

407. This combination and conspiracy, organized through the NCAA, which possesses a dominant position in the relevant market, has produced and, unless restrained, will continue to produce, the following anticompetitive effects among others:

a. competition in the amount, terms and conditions of financial aid and awards to Plaintiffs and Class Members at NCAA member institutions that compete in the relevant markets has been and will continue to be unreasonably restricted and artificially eliminated; and

b. Plaintiffs and Class Members have been and will continue to be deprived of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions that compete in the relevant markets.

CLASS ACTION COMPLAINT

408.     As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members have been, are being, and will continue to be, injured and financially damaged in amounts which are yet to be determined.

409.     The NCAA and its members' abridgement of Plaintiffs and Class Members' economic rights are a restraint of trade, and are not connected to any legitimate non-commercial goals.  The purpose of the NCAA's and its members' actions is solely to enhance revenue for themselves by cutting costs, specifically, to eliminate the need to compete, and to pay any compensation to Plaintiffs and Class Members above the artificially depressed, capped grant-in-aid limit.

410.     The anticompetitive effects of Defendants' scheme substantially outweigh any alleged pro-competitive effects or justifications that may be offered by Defendants, including that their collusive conduct is shielded by their self-crafted concept of "amateurism."

411.     Reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

412.     The amount of damages suffered by Plaintiffs and Class Members has not yet been ascertained.  Pursuant to Section 4 of the Clayton Act, Plaintiffs and Class Members are entitled to recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

### FOURTH CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT—15 U.S.C. § 1 UNREASONABLE RESTRAINT OF TRADE —GROUP BOYCOTT/REFUSAL TO DEAL (Against All Defendants)

413.     Plaintiffs reallege and incorporate by reference each allegation set forth in all of the preceding paragraphs in this Complaint.

414.     Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, entered into a continuing contract, combination, and conspiracy in restraint of trade to effectuate a group boycott of Class Members.  Defendants' group boycott/refusal to deal encompasses Defendants' concerted

1    refusal to pay Class Members the full cost of their attendance, in the United States and its territories

2    and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

3        415.    Plaintiffs and the members of the Class received less than they otherwise would have

4    received for their labor in a competitive marketplace, were thus damaged, and seek to recover for

5    those damages.

6        416.    On information and belief, the NCAA always conditions eligibility to play NCAA

7    Division I college or university men's basketball or NCAA Football Bowl Subdivision (formerly

8    known as Division I-A until 2006) men's football on the Class Member's agreement to abide by the

9    rules and regulations of the NCAA including those prohibiting the offer or acceptance of payment

10   from any institution of amounts in excess of their grants-in-aid.  Member institutions comply with

11   such rules under threat of sanction from the NCAA, up to and including expulsion from the NCAA.

12       417.    Defendants and their co-conspirators' abridgment of compensation rights for current

13   and former student-athletes are not connected to any legitimate non-commercial goal.  Defendants'

14   actions are solely to enhance revenue for themselves and their for-profit business partners by cutting

15   costs, to eliminate the need to compete, and to pay compensation to Plaintiffs and Class Members

16   above the artificially depressed, capped grant-in-aid limit.  Defendants' actions have no relationship

17   to any alleged goal of "amateurism," or pro-educational purposes.  Thus, the NCAA's actions

18   directly regulate a commercial market and therefore are illegal.

19       418.    As a direct and proximate result of Defendants' group boycott, Plaintiffs and the

20   members of the Class have been injured and financially damaged in amounts which are presently

21   undetermined.  Plaintiffs' and Class Members' injuries consist of denial of compensation in excess

22   of amounts permitted by NCAA rules.  Plaintiffs' and Class Members' injuries are of the type the

23   antitrust laws were designed to prevent and flow from that which makes Defendants' conduct

24   unlawful.

25       419.    The anticompetitive effects of Defendants' group boycott substantially outweigh any

26   alleged pro-competitive effects that may be offered by Defendants, including that their collusive

27   conduct is shielded by its concept of "amateurism" or pro-educational purpose.

28

CLASS ACTION COMPLAINT

1    420.    Reasonable and less restrictive alternatives are available to Defendants' current

2  anticompetitive practices.

3    421.    The amount of damages suffered by Plaintiffs and Class Members has not yet been

4  ascertained.  Pursuant to Section 4 of the Clayton Act, Plaintiffs and Class Members are entitled to

5  recover from the NCAA treble the amount of actual damages as well as an award of reasonable

6  attorneys' fees and costs of suit.

7                              **PRAYER FOR RELIEF**

8    **WHEREFORE**, Plaintiffs and the members of the Classes pray for judgment against

9  Defendant NCAA and the Conference Defendants as follows:

10        A.    For actual damages according to the proof at trial;

11        B.    For treble damages pursuant to 15 U.S.C. § 15;

12        C.    For Plaintiffs' attorneys' fees, costs and expenses; and

13        D.    For such other relief that the Court may deem just and equitable.

14                            **DEMAND FOR JURY TRIAL**

15    Plaintiffs, on behalf of themselves and all others similarly situated, hereby request a jury trial

16  on any and all claims so triable.

17  Dated:  November 19, 2014                    Respectfully submitted,

18
                                               **BURSOR & FISHER, P.A.**
19
                                               By: */s/ L. Timothy Fisher*
20                                                   L. Timothy Fisher

21                                               L. Timothy Fisher (State Bar No. 191626)
                                               1990 North California Boulevard, Suite 940
22                                               Walnut Creek, CA 94596
                                               Telephone: (925) 300-4455
23                                               E-Mail: ltfisher@bursor.com

24
                                               **CAFFERTY CLOBES MERIWETHER**
25                                               **& SPRENGEL LLP**
                                               Bryan L. Clobes (to be admitted *pro hac vice*)
26                                               1101 Market St., Suite 2650
                                               Philadelphia, PA 19107
27                                               Telephone: (215) 864-2800
                                               E-Mail: bclobes@caffertyclobes.com
28

CLASS ACTION COMPLAINT